FILED
17-0065
12/20/2017 6:03 PM
tex-21421836
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

No. 17-0065

---

In the Supreme Court of Texas

---

Compass Bank, Petitioner

v.

Francisco Calleja-Ahedo, Respondent

---

On Petition for Review from the First Court of Appeals
in Houston, Texas
Case No. 01-15-00210-CV

---

**Petitioner's Brief on the Merits**

---

HIRSCH & WESTHEIMER, P.C.
Michael D. Conner
mconner@hirschwest.com
State Bar No. 04688650
William P. Huttenbach
State Bar No. 24002330
phuttenbach@hirschwest.com
1415 Louisiana, 36th Floor
Houston, Texas 77002
Telephone: (713) 223-5181
Facsimile:  (713) 223-9319

**Attorneys for Petitioner,
Compass Bank**

930505.20140273/2851932.1

## Identity of the Parties and Attorneys

| **Petitioner:** | **Counsel:** |
|---|---|
| Compass Bank | William P. Huttenbach, trial and appellate counsel<br>State Bar No. 24002330<br>phuttenbach@hirschwest.com<br>Michael D. Conner,<br>counsel in the Court of Appeals<br>State Bar No. 04688650<br>mconner@hirschwest.com<br>HIRSCH & WESTHEIMER, PC<br>1415 Louisiana, 36th Floor<br>Houston, Texas 77002<br>Telephone: (713) 223-5181<br>Facsimile: (713) 223-9319 |

| **Respondent:** | **Counsel:** |
|---|---|
| Francisco Calleja-Ahedo | Michael C. O'Connor, trial and appellate counsel<br>State Bar No. 15187000<br>moconnor@oconnorcraig.com<br>Lesley C. O'Connor, trial and appellate counsel<br>State Bar No. 24086952<br>loconnor@oconnorcraig.com<br>O'CONNOR & CRAIG<br>2825 Wilcrest Drive, Suite 261<br>Houston, Texas 77042<br>Telephone: (713) 266-3311<br>Facsimile: (713) 953-7513 |

# Table of Contents

Identity of the Parties and Attorneys .............................................................i

Index of Authorities..................................................................................vi

Statement of the Case................................................................................1

Statement of Jurisdiction............................................................................3

Issues Presented........................................................................................6

    Issue 1:    The Court of Appeals improperly construed and
                  applied Texas Business and Commerce Code section
                  3.406 without discussing and, thereby, rendering
                  judgment in conflict with cited authorities from other
                  jurisdictions in contravention of Texas Government Code
                  section 311.028 and Business and Commerce Code
                  section 1.103(c)....................................................................6

    Issue 2:    The Court of Appeals' decision conflicts with this
                  Court's decision in Martin where this Court
                  concluded that the customer bears the risk of
                  non-receipt of bank statements...................................................6

    Issue 3:    Other courts have interpreted the term
                  "made available" as it applies to Texas Business and
                  Commerce Code section 4.406, and the
                  Court of Appeals' construction of section 4.406
                  differs from other courts when it determined that
                  Compass had not made the bank statements "available"
                  per section 4.406, which is likely a matter of
                  first impression under Texas law. ................................................6

    Issue 4:    There are strong policy reasons for the
                  Texas Supreme Court to decide this case
                  and affirm the trial court's judgment. ........................................6

Issue 5:     The Court of Appeals exceeded its authority by
             finding or impliedly finding facts necessary to its
             disposition which facts are not supported by or are
             contrary to evidence in the summary judgment record.
             *See Texas Nat. Bank v. Karnes*,
             717 S.W.2d 901, 903 (Tex. 1986).................................................6

Issue 6:     The Court of Appeals improperly analyzed
             summary judgment evidence and/or applied a
             different standard to Compass' evidence as movant
             than that applied to Calleja's evidence as cross-movant...........6

Issue 7:     To support its disposition, the Court of Appeals
             construed plain language in the trial court's
             order granting summary judgment in a manner that
             effectively eliminated summary judgment evidence
             that otherwise supports the trial court's judgment...................7

Issue 8:     Even if this Court determines that the
             2008 Deposit Agreement should apply, Section 4.406
             still bars Calleja's claims because Calleja did not
             timely report the alleged unauthorized disbursements.............7

Statement of Facts.........................................................................................7

  The Account and transactions. ......................................................................7

  The contract between Compass and Calleja....................................................11

Summary of Argument...................................................................................14

  The Court of Appeals impermissibly found facts in
  support of its decision. (Issues 5 and 4) .......................................................15

The Court of Appeals applied one standard for
Compass' custodian's affidavit and a different
standard for Calleja's. (Issues 6 and 4) ............................................................16

Business and Commerce Code section 3.406. (Issue 1) ...............................16

Business and Commerce Code section 4.406. (Issues 2 and 3) ..................16

The 1988 signature card is a part of the parties'
contract, which the Court of Appeals erroneously
failed to give effect. (Issue 8) ..............................................................................17

The Court of Appeals took expressly inclusive language
in the trial court's order and, without justification,
called it exclusive. (Issue 7) ................................................................................18

Argument & Authorities ............................................................................................18

A.      The Court of Appeals exceeded its authority
        by finding facts necessary to support its
        conclusions. (Issues 5 and 4) ....................................................18

B.      The Court of Appeals failed to properly analyze
        competing summary judgment affidavits. (Issues 6 and 4)....22

C.      Calleja's claims are precluded by Texas Business and
        Commerce Code section 3.406. (Issue 1) .................................29

D.      Calleja's claims are precluded under Business
        and Commerce Code section 4.406. (Issues 2, 3, and 8)........42

E.      Other courts have interpreted the term
        "made available" as it applies to Texas Business and
        Commerce Code section 4.406, and the Court of Appeals'
        construction of section 4.406 differs from other

courts when it determined that Compass had
not made the bank statements "available"
per section 4.406, which is likely a matter of
first impression under Texas law. (Issue 3) ...............................59

F.      There are strong policy reasons for the
Court to decide this case and affirm the
trial court's judgment.  (Issue 4) ..................................................63

G.      Without the 2012 agreement and without
the 2008 agreement, there is only one writing
material to the parties' agreement in the record,
the 1988 signature card. (all issues) ............................................65

H.      The Court of Appeals improperly construed
plain language in the trial court's order. (Issue 7) ....................66

Conclusion ..............................................................................................................69

Prayer .....................................................................................................................70

Certificate of Compliance ...................................................................................71

Certificate of Service ............................................................................................71

Appendix to Petitioner's Brief on the Merits ..........................................................72

# Index of Authorities

## Texas Cases

*1/2 Price Checks Cashed v. United Auto. Ins. Co.*,
  344 S.W.3d 378 (Tex. 2011) ......................................................................... 37, 38

*American Airlines Employees Federal Credit Union v. Martin*,
  29 S.W.3d 86 (Tex. 2000) ..............................................................................*passim*

*Apache Indus. Painting v. Gulf Copper & Mfg. Corp.*,
  No. 01-08-00812-CV, 2010 WL 1611450
  (Tex. App.—Houston [1st Dist.] Apr. 22, 2010, no pet.) ...................................49

*Avery v. LPP Mortgage, Ltd.*,
  No. 01-14-01007-CV, 2015 WL 6550774
  (Tex. App.—Houston [1st Dist.] Oct. 29, 2015, no pet.) ...................................24

*Barfield v. Howard M. Smith Co. of Amarillo*,
  426 S.W.2d 834 (Tex. 1968) ...........................................................................*passim*

*Calleja-Ahedo v. Compass Bank*,
  508 S.W.3d 791 (Tex. App.—Houston [1st Dist.] 2016, pet. filed) ............*passim*

*Castilla v. Citibank (S. Dakota), N.A.*,
  No. 05-11-00013-CV, 2012 WL 762822
  (Tex. App.—Dallas Mar. 9, 2012, no pet.) ........................................................24

*Childers v. Advanced Found. Repairs, L.P.*,
  No. 13-04-00193-CV,
  2007 WL 2019755 (Tex. App.—Corpus Christi July 12, 2007, no pet.) ...........23

*City of Keller v. Wilson*,
  168 S.W.3d 802 (Tex. 2005) ....................................................................... 26, 66

*CBM Engineers, Inc. v. Tellepsen Builders, L.P.*,
   403 S.W.3d 339
   (Tex. App.—Houston [1st Dist.] 2013, pet. denied) ..................................... 27, 29

*Coastal Plains Development Corp. v. Tech-Can Corp.*,
   531 S.W.2d 143
   (Tex. Civ. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.)................................48

*Compass Bank v. Nacim*,
   459 S.W.3d 95 (Tex. App.—El Paso 2015, no pet.) ......................................*passim*

*Contractors Source, Inc. v. Amegy Bank Nat'l Ass'n*,
   462 S.W.3d 128 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ......................23

*Cross Creek Investments, Inc. v. First State Bank*,
   No. 03-00-00439-CV, 2001 WL 459177
   (Tex. App.—Austin May 3, 2001, no pet.) ...................................................... 43, 55

*E.I. Du Pont De Nemours & Co. v. Shell Oil Co.*,
   259 S.W.3d 800 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)...............26

*El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*,
   389 S.W.3d 802 (Tex. 2012) ................................................................................67

*FM Props. Operating Co. v. City of Austin*,
   22 S.W.3d 868 (Tex. 2000) ..................................................................................49

*Gellatly v. Unifund CCR Partners*,
   No. 01-07-00552-CV, 2008 WL 2611894
   (Tex. App.—Houston [1st Dist.] July 3, 2008, no pet.) .....................................24

*Golden Eagle Archery, Inc. v. Jackson*,
   116 S.W.3d 757, 761 (Tex. 2003) .................................................................. 20, 50

*Hathaway v. Gen. Mills, Inc.*,
   711 S.W.2d 227 (Tex. 1986) ................................................................. 48, 49

*HECI Exploration Co. v. Neel*,
   982 S.W.2d 881 (Tex. 1998) ......................................................................31

*Heritage Resources, Inc. v. NationsBank*,
   939 S.W.2d 118 (Tex. 1996) ......................................................................51

*In Matter of Estate of Downing*,
   461 S.W.3d 231 (Tex. App.—El Paso 2015, no pet.) ..............................66

*In re Estate of Berry*,
   280 S.W.3d 478 (Tex. App.—Dallas 2009, no pet.)................................46

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
   341 S.W.3d 323 (Tex. 2011) .....................................................................54

*Jefferson State Bank v. Lenk*,
   323 S.W.3d 146 (Tex. 2010) ...........................................................4, 46, 59

*Johnson v. Bethesda Lutheran Homes & Services*,
   935 S.W.2d 235 (Tex. App.—Houston [1st Dist.] 1996, writ denied)...............23

*Kachina Pipeline Co., Inc. v. Lillis*,
   471 S.W.3d 445 (Tex. 2015) ................................................................ 53, 54

*Kennamer v. Estate of Noblitt*,
   332 S.W.3d 559 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)........ 26, 66

*Levine v. Steve Scharn Custom Homes, Inc.*,
   448 S.W.3d 637 (Tex. App.—Houston [1st Dist.] 2014, pet. denied)........ 20, 50

*Lewis v. Aurora Loan Services*,
   No. 01-15-00362-CV, 2016 WL 887176
   (Tex. App.—Houston [1st Dist.] Mar. 8, 2016, no pet.).................21, 28, 49, 65

*Miller v. Raytheon Aircraft Co.*,
   229 S.W.3d 358 (Tex. App.—Houston [1st Dist.] 2007, no pet.) .....................25

*Morrison v. Chan*,
   699 S.W.2d 205 (Tex. 1985) ...............................................................................56

*Nixon v. Mr. Prop. Mgmt. Co.*,
   690 S.W.2d 546 (Tex. 1985) ...............................................21, 28, 49, 65

*Okonkwo v. Washington Mutual Bank, FA*,
   No. 14-05-00925-CV, 2007 WL 763821
   (Tex. App.—Houston [14th Dist.] Mar. 15, 2007, no pet.)....... 43, 55, 56, 59-60

*Rizkallah v. Conner*,
   952 S.W.2d 580 (Tex. App.—Houston [1st Dist.] 1997, no writ).........23, 25, 26

*Ryland Group, Inc. v. Hood*,
   924 S.W.2d 120 (Tex. 1996) ...............................................................................23

*Schiro v. Texas Community Bank*,
   68 S.W.3d 55 (Tex. App.—Dallas 2001, no pet.) ............................. 43, 55, 56, 60

*Schlumberger Tech. Corp. v. Swanson*,
   959 S.W.2d 171 (Tex. 1997) ...............................................................................31

*Shields Ltd. P'ship v. Bradberry*,
   526 S.W.3d 471 (Tex. 2017) ........................................................................ 49, 50

*Sw. Bank v. Info. Support Concepts, Inc.*,
   149 S.W.3d 104 (Tex. 2004) ........................................................................*passim*

930505.20140273/2851932.1

ix

*Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*,
  253 S.W.3d 184 (Tex. 2007) ...............................................................49

*Texas Nat. Bank v. Karnes*,
  717 S.W.2d 901 (Tex. 1986) ....................................................6, 20, 50

*Trico Techs. Corp. v. Montiel*,
  949 S.W.2d 308 (Tex. 1997) ...............................................27, 28, 29

*Tyler v. Henderson*,
  162 S.W.2d 170 (Tex. Civ. App.—Fort Worth 1942, writ ref'd w.o.m.)...........67

*Union Bankers Ins. Co. v. Shelton*,
  889 S.W.2d 278 (Tex. 1994) .................................................................56

*Via Net v. TIG Ins. Co.*,
  211 S.W.3d 310 (Tex. 2006) .................................................31, 37, 41

*Wagner & Brown, Ltd. v. Horwood*,
  58 S.W.3d 732 (Tex. 2001) ............................................................31, 41

*Waite v. BancTexas-Houston, N.A.*,
  792 S.W.2d 538 (Tex. App.—Houston [1st Dist.] 1990, no writ).....................25

## Non-Texas Cases

*Bank of Nichols Hills v. Bank of Oklahoma*,
196 P.3d 984 (Okla. Civ. App. 2008) .................................................. 40, 67

*Borowski v. Firstar Bank Milwaukee, N.A.*,
  579 N.W.2d 247 (Wis. Ct. App. 1998) .......................................... 58, 62

*Dominion Const., Inc. v. First Nat'l Bank of Maryland*,
  315 A.2d 69 (Md. 1974) ....................................................................67

*First Citizens Bank of Clayton County v. All-Lift of Georgia, Inc.,*
   555 S.E.2d 1 (Ga. Ct. App. 2001)................................................................46

*Gast v. Am. Cas. Co. of Reading, Pa.,*
   240 A.2d 682 (N.J. Super. Ct. App. Div. 1968) ......................................68

*General Petroleum Products, Inc. v. Merchants Trust Co.,*
   160 A. 296 (Conn. 1932)...............................................................................63

*John Hancock Fin. Servs., Inc. v. Old Kent Bank,*
   346 F.3d 727 (6th Cir. 2003) ......................................................................34

*Kaplan v. JPMorgan Chase Bank, N.A.,*
   No. 14-C-5720, 2015 WL 2358240 (N.D. Ill. May 12, 2015).............56

*LaSalle Bank Nat'l Ass'n v. Sleutel,*
   289 F. 3d 837 (5th Cir. 2002) ............................................................. 56, 60

*McMickle v. Girard Bank,*
   515 A.2d 16 (Pa. Super. Ct 1986) .............................................................62

*Myrick v. Nat'l Sav. & Trust Co.,*
   268 A.2d 526 (D.C. 1970).................................................................*passim*

*Putnam Rolling Ladder Co., Inc. v. Manufacturers Hanover Tr. Co.,*
   546 N.E.2d 904 (NY 1989) ........................................................35, 37, 42

*Stowell v. Cloquet Co-op Credit Union,*
   557 N.W.2d 567 (Minn. 1997) ...................................................................61

*Tatis v. U.S. Bancorp,*
   473 F.3d 672 (6th Cir. 2007) ......................................................................57

*Terry v. Puget Sound Nat. Bank,*
   492 P.2d 534 (Wash. 1972)..............................................31, 32, 37, 40

*Thompson Maple Products, Inc. v. Citizens Nat'l Bank of Corry*,
    234 A.2d 32 (Pa. Super Ct. 1967) ...................................................................39

*Westport Bank & Tr. Co. v. Lodge,*
    325 A.2d 222 (Conn. 1973) ......................................................................63

*Wetherill v. Putnam Investments*,
    122 F.3d 554 (8th Cir. 1997) .....................................................................62

*Woods v. MONY Legacy Life Ins. Co.*,
    641 N.E.2d 1070 (N.Y. 1994) ...................................................................62

**Statutes**

Tex. Bus. & Com. Code § 1.103 ........................................................ 4, 4, 6, 36, 38

Tex. Bus. & Com. Code § 1.201(b)(36) ...........................................................46

Tex. Bus. & Com. Code § 3.406 ...........................................................*passim*

Tex. Bus. & Com. Code § 4.406 ...........................................................*passim*

Tex. Civ. Prac. & Rem. Code § 33.001 ...........................................................34

Tex. Estates Code § 351.102 ...........................................................46

Tex. Fin. Code § 34.301(a) ...........................................................30, 53, 65

Tex. Fin. Code § 34.302 ...........................................................30

Tex. Gov't Code § 22.001(a) ...........................................................3

Tex. Gov't Code § 311.028 ...........................................................3, 6, 37. 38

## Rules

Tex. R. App. P. 9.4(e) ........................................................................................71

Tex. R. App. P. 9.4(i) .........................................................................................71

Tex. R. Civ. P. 166a(c) ......................................................................................27

Tex. R. Civ. P. 166a(f) ................................................................................. 23, 24

## Other Authorities

Black's Law Dictionary 284 (7th ed. 2001) ...................................................26

# Statement of the Case

| | |
|---|---|
| *Nature of the Case* | Bank customer, Calleja, sued Compass for paying unauthorized items. Compass asserted various defenses, including defenses under the deposit agreement, and under sections 3.406 and 4.406 of the Business and Commerce Code. Calleja argues he had no duty to notify Compass that he was no longer receiving his account statements. The parties also disagree as to whether bank statements were otherwise "made available" and whether Calleja timely reported the alleged unauthorized disbursements after not reporting same for 18 months. |
| *Trial Court* | 55th District Court, Harris County, the Honorable Jeff Shadwick presiding |
| *Trial Court Disposition* | On cross motions for summary judgment the trial court granted Compass's motion and denied Calleja's. |
| *Court of Appeals* | First Court of Appeals, Houston; Justice Evelyn V. Keyes authored the opinion for the panel also including Chief Justice Sherry Radack and Justice Laura Higley |
| *Court of Appeals Opinion* | *Calleja-Ahedo v. Compass Bank*, 508 S.W.3d 791 (Tex. App.—Houston [1st Dist.] 2016, pet. filed). |

*Court of Appeals Disposition*

The Court of Appeals reversed and rendered judgment in favor of Calleja. Both parties moved for rehearing. The court of appeals denied both motions, but withdrew its original opinion (*see* No. 01-15-00210-CV, 2016 WL 2342758 (Tex. App.—Houston [1st Dist.] May 3, 2016)), and issued its superseding opinion.

2

## Statement of Jurisdiction

This case present questions of law which are important to the jurisprudence of the state. Tex. Gov't Code § 22.001(a).

This case involves the issue of whether a bank customer's failure to protect himself after previously experiencing bank fraud, identity theft, and failure to monitor his account for an extended period constitutes a "failure to exercise ordinary care," which "substantially contribute[d]" to the making of a forgery under section 3.406 of the Texas Business and Commerce Code. *See* Tex. Bus. & Com. Code § 3.406(a). Construction and application of section 3.406 appears to be a matter of first impression for the Court.

It is important to Texas jurisprudence that construction and application of uniform statutes, *e.g.*, sections 3.406 and 4.406 of the Texas Business and Commerce Code, be construed to effect the general purpose of such uniform acts to make uniform the law of this state with the law of those other states that have adopted them. Tex. Gov't Code § 311.028; Tex. Bus. & Com. Code § 1.103(c).

This case presents a question of law of importance to Texas jurisprudence within the "statutory scheme reflect[ing] an underlying policy decision that furthers the Uniform Commercial Code's ("UCC") objective of promoting

certainty and predictability in commercial transactions' [citations omitted] … by allocating responsibility among the parties according to who is best able to prevent a loss." *American Airlines Employees Federal Credit Union v. Martin*, 29 S.W.3d 86, 92 (Tex. 2000). This case presents the question whether "the risk of non-receipt of account statements"—applied by the Court in *Martin*—also applies beyond the 4.406 context. *See Martin*, 29 S.W.3d at 90; Tex. Bus. & Com. Code § 1.103.

This case presents a question of law of importance to Texas jurisprudence regarding the meaning of the phrases "makes available" and "made available" in section 4.406 of the Texas Business and Commerce Code. *See* Tex. Bus. & Com. Code § 4.406(a), (c), (f). The Court has addressed the issue, in part, in such cases as *Martin*, 29 S.W.3d at 92 (where there was no dispute that statements were mailed to customer's correct address), and *Jefferson State Bank v. Lenk*, 323 S.W.3d 146, 149-50 n.6, n.7 (Tex. 2010) (addressing making statements available when the customer is deceased). This case presents the opportunity to address the meaning and application of "makes available" and "made available" in the context of the broader statutory scheme, including section 1.103(a) of the Texas Business and Commerce Code. *See* Tex. Bus. & Com. Code § 1.103(a)(1), (2).

This case also includes the fundamentally important legal issue of the limitations on a reviewing court's authority to make original findings of fact in support of its disposition.

These questions of law will likely recur. The Court's resolutions of the questions presented in this case, including construction and application of statutory and decisional language, are important to the jurisprudence of the state.

# Issues Presented

Issue 1: The Court of Appeals improperly construed and applied Texas Business and Commerce Code section 3.406 without discussing and, thereby, rendering judgment in conflict with cited authorities from other jurisdictions in contravention of Texas Government Code section 311.028 and Business and Commerce Code section 1.103(c).

Issue 2: The Court of Appeals' decision conflicts with this Court's decision in *Martin* where this Court concluded that the customer bears the risk of non-receipt of bank statements.

Issue 3: Other courts have interpreted the term "made available" as it applies to Texas Business and Commerce Code section 4.406, and the Court of Appeals' construction of section 4.406 differs from other courts when it determined that Compass had not made the bank statements "available" per section 4.406, which is likely a matter of first impression under Texas law.

Issue 4: There are strong policy reasons for the Texas Supreme Court to decide this case and affirm the trial court's judgment.

Issue 5: The Court of Appeals exceeded its authority by finding or impliedly finding facts necessary to its disposition, which facts are not supported by or are contrary to evidence in the summary judgment record. *See Texas Nat. Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex. 1986).

Issue 6: The Court of Appeals improperly analyzed summary judgment evidence and applied a different standard to Compass' evidence as movant that applied to Calleja's evidence as cross-movant.

Issue 7: To support its disposition, the Court of Appeals construed plain language in the trial court's order granting summary judgment in a manner that effectively eliminated summary judgment evidence that otherwise supports the trial court's judgment.

Issue 8: Even if this Court determines that the 2008 Deposit Agreement should apply, section 4.406 still bars Calleja's claims because Calleja did not timely report the alleged unauthorized disbursements.

## Statement of Facts

The Court of Appeals correctly stated the nature of the case. The following is offered for clarification and to further illuminate the context in which the case arises and the importance of the legal issues it implicates.

**The Account and transactions.**

This dispute involves allegedly unauthorized transactions from a regular deposit account at Compass Bank ("Compass"). Respondent, Francisco Calleja-Ahedo ("Calleja"), had previously had his banking information compromised, and Calleja had previously suffered a loss due to bank fraud. Subsequently, in this matter, more than 18 months after the first allegedly unauthorized transaction, a $33.23 charge for blank checks (CR246), Calleja claimed various transactions and withdrawals from his account (#****3759; the "Account") were also unauthorized.

Calleja, a citizen and resident of Mexico, opened the Account in Texas. CR50, 230 (1988 signature card). Calleja, his wife, and his father all were signatories on the Account until it was closed in 2014. CR46, 50. The wife and the father are not parties to this suit and neither gave testimony or other evidence. *See, e.g.,* CR420, *et seq.* The Account signature card includes on the address line "Hold All Correspondence":



CR50; CR230. Paragraph 22 of the signature card, above, requires the customer to "notify Bank in writing of any change in the information given to" Compass. CR50; CR230. (A more legible copy of the signature card is attached as Tab 1 for the Court's convenience.)

From 1988 until the Account was closed in 2014, Calleja's statements were available upon request at any Compass branch. CR397. Since before 2012, Account statements were available on-line had Calleja so chosen. CR397.

For at least four out of the 24-plus years of the relationship, Compass also provided monthly Account statements by mail. According to Calleja, because he lives in a suburb of Mexico City, "prior to July 2012, [Calleja] directed the bank statements for the Account be mailed by the Bank to the address of [his] brother" in The Woodlands, Texas, where Calleja would "retrieve" the statements "from time-to-time." CR46. The appellate record contains no evidence that Calleja's "direct[ion]" to Compass (*see id.*) was in writing. *See* CR50; CR230. Compass accommodated the request. Nevertheless, the record contains no evidence of *any writing* informing Compass "of any change in the information given to the Bank" in 1988. CR50; CR230; *see also* CR65; CR212.

The statement for May 2012 activity is the last statement mailed to the brother's Woodlands address. Similarly accommodating the request of someone possessing sufficient information to identify the Account and to identify himself as Calleja (and having his banking information), Compass mailed the Account statement for the period from May 31 through June 28, 2012, to an address in Cupertino, California. CR246. Subsequent statements were mailed to Sacramento (CR249-57) and, later, to Georgia. CR 258, *et seq.* Although Calleja claims he did not personally request these changes (*see, e.g.*, CR46), he presented

no affidavit or other evidence from the other two Account owners.[1] There also is no evidence that Calleja, another owner, or Calleja's brother contacted Compass to notify it that Account statements were no longer being received in The Woodlands.[2] Calleja admits that he did nothing to monitor the bank account for over 18 months, even though he had previously been the victim of bank fraud.

On June 26, 2012, the Account was debited $33.23 for new checks; this charge appeared on the June statement. CR246. On July 30, 2012, a $38,700.00 check was paid from the Account. CR249. The debit appears on the July statement. *Id.* From June 2012 until January 2014, Compass received no notice from Calleja (or his wife, his father, or brother) of any complaint regarding the Account.

After ignoring his bank account for 18 months, Calleja alleges he "discovered a problem" in January 2014, when "an acquaintance" to whom he had written a check reported it as returned, marked "account closed." CR47. When Calleja finally contacted Compass in the last week of January 2014, he was

---

[1]  Co-signatories on the Account, Ana Elizabeth Haller de Calleja and Francisco Calleja Cajigas, each also had the right to change the mailing address. CR65; CR212; *see also* CR412, *et seq.* (Compass's motion to strike); CR685 (Order at ¶ 6, overruling Compass's objection).
[2]  The lack of such evidence is significant under terms of the 2012 (or the 2013) deposit agreement. *See* CR212 (2012 deposit agreement at p. 6: "Notify us promptly if you do not receive your statement by the date you normally would expect to receive it.").

given information including a copy of the $38,700.00 check (*id.*) posted to the Account and listed on the Account statement a year and one-half earlier. CR71. He claimed the check was forged. CR47.

When asked what he did to monitor the Account after January 2012 (6 months *before* the first allegedly unauthorized transaction), Calleja answered under oath, "There was no need to 'keep track' of banking information because no authorized checks (except perhaps two checks described in response to Interrogatory No. 10) would be shown in statements after May 2012." CR321-22. Calleja's brother who he had entrusted to receive his statements either told Calleja that he was no longer receiving statements after May 2012 (and Calleja did not care) or Calleja's brother failed to tell Calleja that he was no longer getting statements (and again Calleja did not care to get his bank statements).

**The contract between Compass and Calleja.**

In the trial court, the parties argued that distinct editions of Compass' deposit agreement should apply during the relevant period.[3] In addition to the 1988 signature card (CR230), Compass offered the 2012 edition of the deposit agreement described by its representative and records custodian as "the written

---

[3]   The respective deposit agreements in the record are poor copies. An accurate, more legible copy of the 2008 edition of the deposit agreement is appended at Tab 2 for the Court's reference. An accurate, more legible copy of the 2012 edition of the deposit agreement is appended as Tab 3.

contract governing the deposit relationship" and as "the agreement in effect between Plaintiff and Compass Bank." CR202-03; CR205, *et seq.*

With his affidavit, Calleja submitted the 1988 signature card (CR50) and a 2008 edition of the Compass deposit agreement which he described as, "A true and correct copy of the Agreement pertaining to the Account, which I received from the Bank." CR438; CR443, *et seq.*; *see also* CR51, *et seq.* Calleja did not say how or when he "received" the 2008 deposit agreement and did not specify how or when it "pertain[ed]" to the Account. CR438-41. The "true and correct copy" Calleja placed in the record bears Compass' "bates" numbering. CR443, *et seq.*; CR51, *et seq.*[4] Thus, the exact copy of the document Calleja "received" from Compass was provided by Compass' attorney after Calleja filed this lawsuit, well after the facts in dispute occurred.

The 2008 and 2012 deposit agreements are similar in several respects. Regarding periodic statements, for example, both editions provide:

> If we have a deliverable address on file for you, we will mail or deliver to you periodic statements for your account at approximately monthly intervals ….
>
> …

---

[4]    Calleja also submitted a copy of the 2013 edition of the deposit agreement as an attachment to his counsel's affidavit. CR 136, *et seq.* In addition to other revisions distinguishing it from the 2008 edition, the 2013 deposit agreement (like the 2012 edition; CR209) permits the "prevailing party" to recover attorney's fees. CR139.

[These materials] may be mailed to … the address shown in our records.

…

Our records regarding [the Account] will be deemed correct unless you timely establish with us that we made an error.

…

We may make statements, cancelled checks (if applicable to your account), notices or other communications available to you by holding all or any of these for you or delivering all or any of these items to you in accordance with your request or instructions.

CR65 (2008); CR212 (2012).

The 2012 agreement adds to prior editions and specifies that Calleja should "[n]otify us promptly if you do not receive your statement by the date you normally would expect to receive it." CR212.[5]

Both the 2008 and the 2012 deposit agreements include Calleja's (and the other account owners') promise to "carefully examine each account statement …." CR65; CR212. They include Calleja's "agree[ment] to act in a prompt and reasonable manner in reviewing your statement or notice and reporting any exceptions to us." CR65; CR212.

Compass debited the Account in June for new checks (CR246); it paid a check on July 30, 2012. CR249. Calleja did not report any problem or exception

---

[5]  While Compass believes that such a statement would be a "common sense" understanding, it nevertheless added such a phrase to its then current version of the deposit agreement.

for over 18 months.[6] Likewise, Calleja did not tell Compass for 18 months that statements were no longer being delivered to his brother's address in The Woodlands. Calleja made no effort to obtain copies of statements from any Compass branch, via the internet, or otherwise, at any time between June 2012 and January 2014. *See* CR397.

**Summary of Argument**

As a predicate matter, the existence of the 1988 signature card together with the absence of pleading or proof that the contractual "Hold All Correspondence" language was ever modified in writing should inform the Court's disposition. It informs Calleja's lack of care under 3.406; it informs Calleja's failure to report under section 4.406. The undisputed language of the signature card supports the concept and permits making account information available other than by mailing. The absence of evidence that the contract was modified informs the Court of Appeals' errant process of review and illuminates that court's disparate treatment of competing summary judgment affidavits.

---

[6]    Compass takes no position on any claims Calleja may have against his own brother.  In other words, Calleja apparently entrusted his brother to receive his bank statements and possibly do other banking activities. If Calleja's brother was supposed to be monitoring the account and notifying Calleja if the statements were received or not received, such issues would be between Calleja and his brother.

Compass will begin its discussion with the Court of Appeals' departure from normal review of cross motions for summary judgment.

**The Court of Appeals impermissibly found facts in support of its decision.**

When the Court of Appeals wrote, "Both parties agree that the 2008 Agreement was, at least at one point, effective as to Calleja," the court exceeded its authority. The Court of Appeals either found or impliedly found facts to support its judgment. There is no evidence that the 2008 deposit agreement was "effective" at any time material to this case. There is no evidence that the parties ever agreed as the Court of Appeals said. Compass advocated the 2012 deposit agreement was "in effect and," Calleja said the 2008 deposit agreement "pertained" to his account. In any event, assuming—as the Court of Appeals did—that the 2008 deposit agreement was effective "at least at one point," the Court of Appeals' judgment depends on the erroneous further assumption that the "at one point" was a material point in time. There simply is no evidence of the agreement inferred by the Court of Appeals on which its judgment is necessarily predicated. That judgment should be reversed.

**The Court of Appeals applied one standard for Compass' custodian's affidavit and a different standard for Calleja's.**

The Court of Appeals incorrectly analyzed the competing summary judgment affidavits. First, it determined Compass' records custodian's affidavit testimony was conclusory. It is not. But, in any event, Calleja's affidavit is no less conclusory on the salient point of which (if either) of the two editions of the Compass deposit agreement was in effect at material times. That is, to the extent the Court of Appeals' analysis of Ms. Mueller's affidavit is sustainable, the court was obliged to analyze Calleja's affidavit on equivalent bases. It did not.

**Business and Commerce Code section 3.406.**

The Court of Appeals gave only cursory consideration to section 3.406. That court omitted any reference to cited authorities from other jurisdictions holding to the effect that a customer's inattention to her or his account statements constitutes negligence sufficient under section 3.406(a) to preclude recovery. The Court of Appeals' failure to consider these decisions contravenes the statutory requirement that uniform acts be interpreted in a uniform manner.

**Business and Commerce Code section 4.406.**

The Court of Appeals' decision conflicts with this Court's decision in *Martin* by too narrowly applying this Court's conclusion that customers bear the

risk of non-receipt of bank statements. By failing to properly allocate this risk, the Court of Appeals failed to apply the underlying policy that furthers the UCC's objective of promoting certainty and predictability in commercial transactions.

**The 1988 signature card is a part of the parties' contract, which the Court of Appeals erroneously failed to give effect.**

There is only one writing both parties agree was part of the contract, the 1988 signature card, offered as summary judgment evidence by both parties. The Court of Appeals wholly failed to give effect to the unambiguous contractual language in the signature card: "Hold All Correspondence." Regardless whether the 2012 version of the deposit agreement, the 2008 version, some other version, or no version of deposit agreement at all was "in effect" or "pertained," the signature card is part of the contract. The Court of Appeals erred by failing to treat it as such.

The Court of Appeals further erred by determining, again without evidentiary support, that the signature card was modified. Neither the 2008 nor the 2012 deposit agreement includes language modifying the "Hold All Correspondence" term. To the contrary, both editions of the deposit agreement contemplate the possibility that a customer might ask Compass to hold

statements as Calleja did. The Court of Appeals re-wrote the parties contract, and in doing so, it erred. Its judgment cannot stand.

**The Court of Appeals took expressly inclusive language in the trial court's order and, without justification, called it exclusive.**

The Court of Appeals read an expressly inclusive sentence to be exclusive in order to support its conclusion that Calleja did not substantially contribute to the forgery of the $38,000.00 check. This strained reading of the trial court's language effectively negated record evidence supporting the judgment and in conflict with the disposition by the Court of Appeals.

## Argument & Authorities

Because the Court may determine this case should be remanded to the trial court for determination of an essential fact—what edition, if any, of Compass' deposit agreement was in effect at material times, Compass first addresses the Court of Appeals' impermissible fact finding and its disparate treatment of the parties' respective summary judgment evidence.

A.    **The Court of Appeals exceeded its authority by finding facts necessary to support its conclusions.**

There is no evidence that the 2008 deposit agreement was "in effect" at any material time.

As the Court of Appeals correctly stated, where parties both move for summary judgment, and the trial court grants one motion and denies the other, the court reviews both parties' summary judgment evidence and determines all questions presented. *Calleja-Ahedo v. Compass Bank*, 508 S.W.3d 791, 797 (Tex. App.—Houston [1st Dist.] 2016, pet. filed) (citations omitted). Having further stated that it "must determine which version of the deposit agreement governed the parties' relationship," an inherently factual inquiry, without reference to summary judgment evidence, the Court of Appeals said, "Both parties agree that the 2008 Agreement was, at least at one point, effective as to Calleja." *Id.* at 797. The flaw in using this statement as the predicate for reversing and rendering judgment is the utter lack of summary judgment evidence that the 2008 deposit agreement was "effective" at any time material to this case. Even assuming—as the court appeals did—that "at least at one point," the 2008 deposit agreement was "effective as to Calleja," the Court of Appeals' rendition of judgment for Calleja necessarily further assumes there was no 2009, 2010, or 2011 edition of the deposit agreement.

The true state of the record is that Compass, as summary judgment movant, attempted to establish that the 2012 deposit agreement was "the written contract governing the deposit relationship" and was "the agreement in

effect between Plaintiff and Compass Bank." CR202-03; CR205, *et seq.* Calleja, also as summary judgment movant, described the 2008 edition of the deposit agreement as "the Agreement pertaining to the Account, which I received from the Bank." CR438; CR443, *et seq.*; *see also* CR51, *et seq.* Contrary to the Court of Appeals' unsupported "finding," neither party agreed or conceded that if its version of the deposit agreement was not in effect at material times, then the other party's version was. Thus, the Court of Appeal's assumption that it was faced with a binary choice was just that—an assumption. Such an assumption constitutes harmful, reversible error in this case.

A court of appeals has no authority to act as fact finder. *See, e.g.*, *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 653 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). "[A] court of appeals cannot make original findings of fact; it can only 'unfind' facts." *Texas Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex. 1986) (citations omitted). The Court of Appeals ran afoul of this established rule by setting up—without factual foundation—its either/or—if not one then necessarily the other—decision.[7] This is impermissible fact

---

[7] There is no stipulation and no evidence or other indication that the parties agreed that if the 2012 agreement was not the operative agreement, then the 2008 agreement necessarily must be.

finding: that no other deposit agreement existed between the 2008 and 2012 editions. Calleja did not prove that to be the case. As summary judgment movant, Calleja is not entitled to any such inference in his favor. *See Lewis v. Aurora Loan Services*, No. 01-15-00362-CV, 2016 WL 887176, at *2 (Tex. App.—Houston [1st Dist.] Mar. 8, 2016, no pet.) (citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985)). The classic aphorism, the absence of evidence is not evidence of absence, should obtain, especially where the judgment under review is a summary judgment.

Calleja's affidavit does not supply the missing facts. *See* CR46. In order to be entitled to the rendition of judgment he got in the Court of Appeals, Calleja must have conclusively established with admissible evidence that the 2008 deposit agreement was in effect (or still in effect) at material times after January 2012, the point from which Calleja admitted he paid no attention to his account. He did not. Calleja's affidavit does not aver that the 2008 agreement was in effect at *any* material time. *See* CR46. Calleja says only, "A true and correct copy of the Agreement pertaining to the Account, which I received from the Bank, is attached hereto at Attachment 2." *Id.*; CR438; *see also* CR51-70 (the 2008 agreement). Notably, he did not say when or how he received it. CR46; CR438. As above, "Attachment 2" to the affidavit is a bates-labeled document produced

by Compass during discovery. CR51, *et seq.*; CR443, *et seq.* Calleja did not say,

moreover, that the 2012 agreement (or some other interim edition) did not

"pertain" to the account, and he did not deny "receiv[ing]" the 2012 or any

other edition of the deposit agreement. Calleja offered no testimony or other

evidence about which edition, if any, of the deposit agreement was in effect at a

particular time, or ever. Thus, the Court of Appeals' assumption—if not the

one, then necessarily the other—has no factual support, and rendition of

judgment in Calleja's favor was reversible error.

**B.    The Court of Appeals failed to properly analyze competing summary judgment affidavits.**

The Court of Appeals stated: "As a threshold issue, we must determine

which version of the deposit agreement governed the parties' relationship."

*Calleja-Ahedo v. Compass Bank*, 508 S.W.3d 791, 797 (Tex. App.—Houston [1st

Dist.] 2016, pet. filed). Compass' custodian of records, Ms. Mueller, testified by

affidavit that, among other things, "the [2012] account agreement evidences the

agreement in effect between the Plaintiff and Compass Bank." CR203, ¶ 8. The

Court of Appeals determined Mueller's affidavit testimony was conclusory.

*Calleja-Ahedo*, 508 S.W.3d at 799. It is not. But in the event the Court agrees with

the Court of Appeals, Calleja's affidavit is no less conclusory; his affidavit is not

evidence, certainly not conclusive evidence, that the 2008 deposit agreement was (or that the 2012 edition was not) in effect at any material time.

Mueller's statement is supported by additional facts, and it is clear, positive, direct, and readily controvertible. Though he could have, Calleja did not controvert the factual statement that the 2012 deposit agreement was "in effect." *See, e.g.*, *Childers v. Advanced Found. Repairs, L.P.*, No. 13-04-00193-CV, 2007 WL 2019755, at *2 (Tex. App.—Corpus Christi July 12, 2007, no pet.); *Johnson v. Bethesda Lutheran Homes & Services*, 935 S.W.2d 235, 239 (Tex. App.—Houston [1st Dist.] 1996, writ denied) (Hedges, J., concurring) (stating that logical conclusions based on stated underlying facts are proper in both lay and expert testimony). Affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Tex. R. Civ. P. 166a(f); *Contractors Source, Inc. v. Amegy Bank Nat'l Ass'n*, 462 S.W.3d 128, 133 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The Court of Appeals relied on the general rule stated in *Contractors Source*, a case considering expert witness affidavits. *Calleja-Ahedo*, 508 S.W.3d at 799; *see also Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996); *Rizkallah v. Conner*, 952 S.W.2d 580, 587-88 (Tex. App.—Houston [1st Dist.] 1997, no writ) (reviewing for "some

support in the record" for factual statements of interested witness). Mueller, a Compass employee, was not offered as an expert; she testified as custodian of records. CR202-03. The Court of Appeals omitted reference to cases stating that an affiant's testimony establishing her status as a custodian of records and her relationship to the facts of the case satisfies the personal knowledge requirement of Rule 166a(f). *See, e.g., Avery v. LPP Mortgage, Ltd.*, No. 01-14-01007-CV, 2015 WL 6550774, at *2 (Tex. App.—Houston [1st Dist.] Oct. 29, 2015, no pet.); *Castilla v. Citibank (S. Dakota), N.A.*, No. 05-11-00013-CV, 2012 WL 762822, at *6 (Tex. App.—Dallas Mar. 9, 2012, no pet.); *Gellatly v. Unifund CCR Partners*, No. 01-07-00552-CV, 2008 WL 2611894, at *5 (Tex. App.—Houston [1st Dist.] July 3, 2008, no pet.). Mueller's affidavit is based on personal knowledge (CR202, ¶ 1); she is a Compass employee and "[i]n this capacity" has "personal knowledge of accounts held at Compass Bank." CR202, ¶ 2. Mueller testified that she is "a custodian of records" for Compass, that "Tabs 1 and 2" to the affidavit are "true and correct" copies of bank records, and that "[she is] personally familiar with the records." CR203, ¶ 8. These are admissible, uncontroverted facts about which Mueller testified. Mueller stated clearly, positively, and directly, "the account agreement [2012] evidences the agreement in effect between the Plaintiff and Compass Bank." CR203, ¶8. The statement is

her logical conclusion based on stated underlying facts. *See Rizkallah*, 952 S.W.2d at 588; *Bethesda Lutheran Homes & Services*, 935 S.W.2d at 239. Calleja could have, but did not controvert the statement.

Further, identifying herself as an employee and custodian of Compass' records (CR202-03) "shows *how* [Mueller] gained personal knowledge." *See, e.g., Waite v. BancTexas-Houston, N.A.*, 792 S.W.2d 538, 540 (Tex. App.—Houston [1st Dist.] 1990, no writ); *see also Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 365-66 (Tex. App.—Houston [1st Dist.] 2007, no pet.). She identified Calleja's account as a "regular bank account." CR202. She said, "Attached as Tab 1 is a copy of the written contract governing the deposit relationship between [Calleja] and Compass Bank." *Id.* Mueller identified the 2012 agreement as a business record of which she had personal knowledge and as the agreement "in effect between" the parties. CR203.[8]

Mueller's second affidavit provides additional facts supporting her statement that the 2012 agreement "evidences the agreement in effect between [Appellant] and Compass Bank." CR396-98; CR202-03. She states that the 2012 agreement has a revision date of February 2012—prior to the events at issue.

---

[8] The words "believe" and "belief" do not appear in this affidavit. CR202-03; *see Calleja-Ahedo*, 508 S.W.3d at 799.

CR396. That fact "has some support in the record." *See Rizkallah*, 952 S.W.2d at 588; see also CR228 (final page of 2012 agreement). Mueller referenced Calleja's allegation that an imposter changed the account address in the summer of 2012; she referenced the account signature card and its provision regarding amendments to the account agreement. CR396; CR230. Those statements have support in the record. CR46-47, 50 (Calleja's affidavit recounting his version of events with signature card attached); *see Rizkallah*, 952 S.W.2d at 588. Mere use of the words believe or belief in the second affidavit does not render the testimony in the first affidavit conclusory.

"The term 'conclusory' is defined as '[e]xpressing a factual inference without stating the underlying facts on which the inference is based.'" *E.I. Du Pont De Nemours & Co. v. Shell Oil Co.*, 259 S.W.3d 800, 809 (Tex. App.— Houston [1st Dist.] 2007, pet. denied) (citing Black's Law Dictionary 284 (7th ed. 2001)). Reviewing the entire record, there is ample support for Mueller's statement—without resort to inference—that "the account agreement evidences the agreement in effect between the Plaintiff and Compass Bank." CR203; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005); *Kennamer*, 332 S.W.3d at 566.

Further, "summary judgment based on the uncontroverted affidavit of an interested witness is proper if the evidence is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *Trico Techs. Corp. v. Montiel*, 949 S.W.2d 308, 310 (Tex. 1997); Tex. R. Civ. P. 166a(c); *CBM Engineers, Inc. v. Tellepsen Builders, L.P.*, 403 S.W.3d 339, 346 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (noting that readily controvertible means the factual assertions "could be 'effectively countered by opposing evidence." (quoting *Trico Techs. Corp.,* 949 S.W.2d at 310)). Mueller testified that the 2012 agreement was "in effect between" the parties. CR203. On this record, the testimony satisfies all requirements for a summary judgment affidavit. Calleja could have, but did not controvert the testimony.

The totality of Calleja's evidence about the deposit agreement is: "A true and correct copy of the Agreement pertaining to the Account, which I received from the Bank, is attached hereto at Attachment 2." CR46; CR438; *see also* CR51-70 (the 2008 agreement). *Calleja did not say* that the 2012 agreement did not also "pertain" to the account; *he did not say* he did not "receive" the 2012 agreement; and *he did not controvert* Mueller's testimony by saying the 2012 agreement was not in effect or that the 2008 agreement was in effect at any

material time. By his own admission, Calleja was not reviewing communications from Compass in February 2012, when the account agreement was revised. Nevertheless, he could have, but failed to controvert the testimony. *See Trico Techs. Corp.*, 949 S.W.2d at 310.

Like the appellee in *Trico Techs. Corp.*, in discovery Calleja could have inquired about, "the meaning of the 'Al Nova Branches Only." *Compare Trico Techs. Corp.*, 949 S.W.2d at 310, and *Calleja-Ahedo*, 508 S.W.3d at 798. Calleja could have inquired about how Compass gave notice of the amendment. *See Trico Techs. Corp.*. Rather, Calleja relied solely on the statement that a 2008 document "pertain[ed]" to the account, and he "received" a copy from the bank. CR46; CR438. Notably, the "true copy" Calleja relied on bears Compass' "bates" numbers on each page. Calleja "received" the copy he attached in discovery in this case, undermining any inference[9] or implication that Calleja received the 2008 agreement in the normal course of his banking business but did not receive the 2012 agreement the same way. *See* CR51-70. Thus, the Court of Appeals' conclusion that Compass did not establish that the 2012 deposit agreement was "ever effective as to Calleja" is based on its outline of additional,

---

[9] As cross-movant for summary judgment, Calleja is not entitled to any favorable inference. *See Lewis v. Aurora Loan Services*, No. 01-15-00362-CV, 2016 WL 887176, at *2 (Tex. App.—Houston [1st Dist.] Mar. 8, 2016, no pet.) (citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985)).

hypothetical evidence that Calleja did not present to controvert Mueller's factually supported assertion that the 2012 agreement was the agreement in effect between the parties. *See Trico Techs. Corp.*, 949 S.W.2d at 310; *CBM Engineers, Inc.*, 403 S.W.3d at 346. Respectfully, Calleja is not entitled, by judicial fiat, to the benefit of an available litigation strategy that he did not pursue. The Court of Appeals erred by reversing the summary judgment in favor of Compass.

## C.  Calleja's claims are precluded by Texas Business and Commerce Code section 3.406.

A customer's actions can help prevent bank fraud.  Even if a customer has never experienced fraud on a bank account, it is his duty under the law protect his own interests.  In this case, Calleja had already been the victim of bank fraud and either knew or should have known that he needed to take care to protect himself. At a minimum, Calleja should have reviewed his monthly statements and kept his banking information protected, as he agreed to do in the Account agreement. Calleja should have asked his brother each month for a copy of the statement that his brother purportedly received on Calleja's behalf.

If Calleja had monitored the Account after January 2012, he would have noticed that his June statement did not arrive as expected. Both the 2008 and the 2012 editions of the deposit agreement provide: "You agree to act in a

prompt and reasonable manner in reviewing your statement or notice and reporting any exceptions to us." CR65; CR212. This should include noticing a statement does not arrive when expected. The 2012 deposit agreement expressly incorporates this common sense idea: "Notify us promptly if you do not receive your statement by the date you would normally expect to receive it." CR212. Calleja did not notice the May-June statement never arrived. Therefore, he did not notice or report a $33.23 charge for blank checks (CR246) that he later claimed was not authorized. Likewise, Calleja did not notice the absence of monthly statements until January 2014. CR47.[10]

Regardless whether the 2008 edition, the 2012 edition, or some other version of the deposit agreement was in effect, the deposit agreement between Compass and Calleja is "a contract in writing for all purposes." Tex. Fin. Code § 34.301(a). The contract "may be evidenced by one or more agreements, deposit tickets, signature cards,[11] or notices as provided by Section 34.302, or by other documentation as provided by law." *Id.*; *see also* Tex. Fin. Code § 34.302.

---

[10] Calleja's failure to notice that he did not receive statements until late January 2014 is even more egregious since he had already been the victim of prior bank fraud on a different bank account.

[11] *See* CR50.

As the Court has written:

> Contracting parties are generally not fiduciaries. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). Thus, due diligence requires that each protect its own interests. *See Barfield v. Howard M. Smith Co. of Amarillo*, 426 S.W.2d 834, 840 (Tex. 1968) ("As a party to arm's length business transactions, **respondent had a duty to use ordinary care for the protection of its own interests**"). Due **diligence may include asking a contract partner for information needed to verify contractual performance**. *See* [*Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732 (Tex. 2001)] at 736; [*HECI Exploration Co. v. Neel*, 982 S.W.2d 881 (Tex. 1998)] at 886. If a contracting party responds to such a request with false information, accrual may be delayed for fraudulent concealment. *Wagner & Brown*, 58 S.W.3d at 737; *HECI*, 982 S.W.2d at 886. **But failing to even ask for such information is not due diligence.** *See Wagner & Brown*, 58 S.W.3d at 736; *HECI*, 982 S.W.2d at 886.

*Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 314 (Tex. 2006) (emphasis added). By failing even to ask about the May-June Account statement (or any subsequent statement), Calleja demonstrated a lack of diligence which, under similar facts, the Supreme Court of Washington said was "substantial evidence of negligence" under section 3.406. *See Terry v. Puget Sound Nat. Bank*, 492 P.2d 534, 535 (Wash. 1972) (per curiam).[12] In addition to their failure to "inquire of the bank" about the absence of three successive months of statements, the *Terry* plaintiffs left blank checks in an unlocked drawer, easily accessible to the bad actor. *See id.* Similarly, in

---

[12] *Terry* was tried to a jury. The Washington court reviewed and found sufficient evidence to support submission of the bank's 3.406 affirmative defense.

31

addition to failing to inquire of Compass about the absence of at least 18 monthly statements, Calleja, or one of the other account owners, left sufficient personal information unguarded and accessible for an interloper to have Compass redirect Account statements before the first transaction. Calleja failed to discharge his duty to use ordinary care for the protection of his own interests. *Barfield*, 426 S.W.2d at 840; Tex. Bus. & Com. Code § 3.406(a); *Terry*, 492 P.2d at 535. Despite Compass' citation to *Terry*, the Court of Appeals did not discuss the case.

The first transaction Calleja claimed was not authorized was the imposter's order for blank checks. CR246. The charge appeared on the May-June statement. *Id.* The statement had been redirected. Calleja did not ask why it did not arrive as expected. The next statement shows a $38,700.00 check paid on July 30, 2012. CR249. Calleja did not contact Compass to ask about this missing statement either. *See Terry*, 492 P.2d at 535.[13]

---

[13] Under Calleja's analysis, if a bank customer such as Calleja instructs the bank to mail statements to a relative, and then the bank complies as requested, there could be scenarios where a bank customer then never has to monitor the account. For example, if that bank customer then intentionally or inadvertently lets their banking information become compromised to allow an imposter to call the bank and have all the necessary information to change the address to which statements are sent, and such future statements are sent to a different address, under Calleja's analysis, Calleja never has to notice that his account statements are no longer being sent per his direction, and he can simply ignore the account for 18 months.

In *Myrick v. Nat'l Sav. & Trust Co.*, a case from the District of Columbia court of appeals, the customer received only one bank statement and a few cancelled checks over about nine months. *See Myrick v. Nat'l Sav. & Trust Co.*, 268 A.2d 526, 527 (D.C. 1970). The *Myrick* court affirmed judgment n.o.v. for the bank where "[t]he record is devoid of any evidence justifying [customer's] failure to inquire of the bank as to her lack of receipt of monthly statements and cancelled checks" and "[held] that Miss Myrick was negligent as a matter of law in not making this inquiry of the bank …." *Id.* at 527-28. Quoting its version of 3.406, the court held Myrick's "'negligence substantially contribute(d) [*sic*] … to the making of an unauthorized signature,'" precluding her claim. *Id.* Despite Compass' citation to *Myrick*, the Court of Appeals did not discuss the case.

From at least as early as January 2012, six months before someone used his personal and account information to redirect the bank statements, Calleja ignored his account. He said, "There was no need to 'keep track' of banking information because no authorized checks (except perhaps two checks described in response to Interrogatory No. 10) would be shown in statements after May 2012." CR321-22. It is not "authorized" activity that demands vigilance. *See Barfield*, 426 S.W.2d at 840 (stating that a party to an arm's length business transaction has a duty to use ordinary care for the protection of his

own interests and is charged with knowledge of all facts that would have been discovered by a reasonably prudent, similarly situated person). Rather, it is the risk of unauthorized activity which the customer is in the best position to guard against and demands Calleja's diligence. *See Martin*, 29 S.W.3d at 92, 94 (noting the UCC's purpose of allocating responsibility to the person best able to prevent loss and placing the risk of non-receipt of bank statements on the customer in the 4.406 context); *Sw. Bank v. Info. Support Concepts, Inc.*, 149 S.W.3d 104 (Tex. 2004) (resolving perceived tension between Texas Civil Practice and Remedies Code Chapter 33[14] proportionate responsibility and UCC section 3–406's comparative fault and liability scheme allocating the loss between two negligent—but innocent—parties.); *John Hancock Fin. Servs., Inc. v. Old Kent Bank*, 346 F.3d 727, 732 (6th Cir. 2003). Calleja willingly accepted the risk that unauthorized transactions could go undetected by asking Compass to mail statements to his brother's home in The Woodlands then, "from time-to-time," retrieving them, unopened. CR46; CR152. Calleja claimed he "never signed up for online access and relied completely" on reviewing statements mailed to The Woodlands. CR321; *but see* CR50. Where Calleja's complete reliance (CR321) on retrieval of unopened statements "from time-to-time" meant Calleja did not

---

14    Tex. Civ. Prac. & Rem. Code § 33.001, *et seq.*

review statements for at least 18 to 24 months (*see id.*), there was, as the trial court determined, a failure to exercise diligence as a matter of law. CR735; *see also, Barfield*, 426 S.W.2d at 840.

Unlike the trial court, the Court of Appeals focused on Calleja's inattention to his affairs during the 18 months after the first transaction. As to the six months preceding the first transaction, the Court of Appeals noted, "there is scant summary judgment evidence concerning the circumstances under which the unknown third party obtained Calleja's banking information and used that information to change the account address, obtain a debit card, order blank checks, and forge Calleja's signature on several checks." *Calleja-Ahedo*, 508 S.W.3d at 806. But scant evidence about how it occurred does not change the undisputed fact that someone obtained and used Calleja's information.

There is no dispute that Calleja's personal information was allegedly purloined and used to effectuate the fraud.[15] Precisely because there is "scant evidence" of how that occurred, section 3.406 is implicated. Without evidence to the contrary, one assumes Calleja and Compass are both "innocent," if potentially negligent, parties. With "scant evidence" (there is none) how Calleja's

---

[15] Calleja provided no evidence to the trial court that other signers had not changed the address. In other words, even if Calleja swore that he did not change the address, if another signer on the account had properly changed the address, the bank was doing as an account owner had directed.

personal information was compromised, section 3.406 serves the "important objective" of the UCC "of promoting certainty and predictability in commercial transactions … [b]y prospectively establishing rules of liability that are generally based not on actual fault but on allocating responsibility to the party best able to prevent the loss by the exercise of care …." *Putnam Rolling Ladder Co., Inc. v. Manufacturers Hanover Tr. Co.*, 546 N.E.2d 904, 908 (NY 1989); *Sw. Bank v. Info. Support Concepts, Inc.*, 149 S.W.3d 104, 109-10 (Tex. 2004). As the trial court recognized, Calleja was that party.

Calleja was in the best position to safeguard his personal and account information used by an interloper to telephone the bank and redirect monthly statements.[16] Regardless of the circumstances by which it was compromised, Calleja (or one of the other account owners or the brother) failed to protect his own interests by failing to safeguard the information. *Barfield*, 426 S.W.2d at 840. Further, it was Calleja's choice to "rel[y] completely" on his sporadic (at best) approach to reviewing statements. CR321. Liberal construction and application

---

[16] If this Court follows Calleja's logic, one who has experienced bank fraud can notice that he did not receive a bank statement for a month, and under Calleja's analysis, the law purportedly allows him to do nothing. Under Calleja's analysis, even a person who has experienced bank fraud on another account does not have to review bank statements for as long as it takes to drain the entire account and then still can make a claim against his bank to recover the entire amount of the loss. Calleja's argument cannot be reconciled with this Court's prior determination that a customer is generally in the best position to prevent the loss.

of section 3.406 in service of the purposes and policies of the UCC dictates that Calleja, not Compass, was the party best able to prevent the loss. Tex. Bus. & Com. Code § 1.103(a); *Info. Support Concepts, Inc.*, 149 S.W.3d at 110; *Martin*, 29 S.W.3d at 93.

Having done nothing to keep track of his account since at least January ("there was no need" (CR321-22)), when the May-June 2012 statement did not arrive at The Woodlands address, like the *Terry* and *Myrick* plaintiffs, Calleja's failure to make any inquiry compounded his negligence.[17] Consistent with *Terry* and *Myrick*, applying the Government Code, and under the same rule employed by this Court in *TIG Ins. Co.*, the Court of Appeals should have affirmed the trial court's judgment. Tex. Gov't Code § 311.028; *see TIG Ins. Co.*, 211 S.W.3d at 314; *1/2 Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 391 (Tex. 2011) ("The UCC should be construed to promote uniformity with other jurisdictions."). In service of the important objectives of the UCC, the Court of Appeals should have affirmed. *See Putnam*, 546 N.E.2d at 908; *Info. Support Concepts, Inc.*, 149 S.W.3d 104.

---

[17] Had Calleja promptly informed Compass that his May 31, 2012 – June 28, 2012, statement was not received and requested a copy, he would have seen a debit for checks he claims he did not order. Had Calleja exercised a modicum of diligence, the July 31, 2012, transaction could have been prevented or, if not prevented, made known to Compass while viable opportunities for recovering the funds still existed.

Rather than properly applying section 3.406, the Court of Appeals based its decision on the perceived absence of an explicit "operative statutory or contractual[18] provision that required Calleja to notice that he was not receiving statements … and to report those missing statements to the Bank within thirty days." *Calleja-Ahedo*, 508 S.W.3d at 805. The court's reliance on the conjunctive, "to notice" *and* "to report … within thirty days," conflates sections 3.406 and 4.406.[19] Section 3.406, a comparative negligence statute, recognizes a duty of ordinary care and precludes Calleja if his failure to discharge his duty "substantially contributes … to the making of a forged signature." Tex. Bus. & Com. Code § 3.406. Thus, contrary to the statement by the Court of Appeals, section 3.406 is the "operative statutory … provision." *Calleja-Ahedo*, 508 S.W.3d at 805. It is the operative statutory provision of a uniform law which the Court of Appeals glossed over with no reference to cited decisions of other jurisdictions. *See* Tex. Gov't Code § 311.028; Tex. Bus. & Com. Code § 1.103(a)(3); *1/2 Price Checks Cashed*, 344 S.W.3d at 391.

---

[18]   The 2012 deposit agreement includes the term, "[n]otify us promptly if you do not receive your statement by the date you normally would expect to receive it." CR212. Both the 2008 and the 2012 deposit agreements require the customer to "report exceptions to us within thirty (30) days after we send or make the statement or notice available …." CR65; CR212.

[19]   Indeed, there are two different sections in the UCC for a reason, and in this case, Calleja is trying to avoid both UCC sections and claim he never needed to review a bank statement if an imposter gets his banking information and changes his address.

The Court of Appeals also failed to properly analyze the causation element of 3.406. *See Calleja-Ahedo*, 508 S.W.3d at 805. The court first erroneously tied Calleja's duty of ordinary care to the "trigger" of 4.406. *Id.* It then utilized a questionable textual analysis of the trial court's order to discount the effect of Calleja's "from time to time" method of monitoring the Account on the interloper's ability to drain the Account. *Calleja-Ahedo*, 508 S.W.3d at 806. The Court of Appeals read an expressly inclusive sentence to be exclusive[20] to support its conclusion. This analysis runs counter to the recognized objectives of the UCC, including certainty, predictability, and allocation of responsibility to the party best able to prevent the loss. *See Info. Support Concepts, Inc.*, 149 S.W.3d at 109-10.[21]

Comment 2 to section 3.406 explains "what is intended" by use of "substantially contributes" in subsection (a), referencing *Thompson Maple Products, Inc. v. Citizens Nat'l Bank of Corry*, 234 A.2d 32, 34 (Pa. Super Ct. 1967). *See* Tex.

---

[20] The trial court's order states: "In particular, but not as the sole reason for this ruling, the Court rules that where the check at issue was cashed on July 30, 2012, and the Plaintiff did not notify the bank until January 29, 2014, as a matter of law Plaintiff has failed to exercise diligence in protecting himself from alleged fraud regardless of any shortcomings in sending bank statements." CR539.

[21] Under the Court of Appeal's analysis, a bank customer can intentionally or inadvertently allow a third-party to get his bank information and call the bank and change the address. Then, the bank customer can do nothing indefinitely; and, if the bank account is drained, the bank is apparently absolutely liable.

Bus. & Com. Code § 3.406 cmt. 2. As one Oklahoma court explained (in a case not involving bank statements), "Section 3–406 requires less stringent proof than the 'direct and proximate cause' test for general negligence. Conduct is a contributing cause of an alteration or forgery if it is a substantial factor in bringing it about, or makes it 'easier for the wrongdoer to commit his wrong.'" *Bank of Nichols Hills v. Bank of Oklahoma*, 196 P.3d 984, 986-87 (Okla. Civ. App. 2008) (citations omitted). The summary judgment record supports the trial court's determination that Calleja's chosen method of monitoring the Account by relying "completely" on reviewing statements delivered to The Woodlands, which he did not bother to retrieve for at least two years (CR321-22), together with the undisputed fact that some third party gained access to his personal and banking information made it "easier for the wrongdoer to commit his wrong." *Bank of Nichols Hills*, 196 P.3d at 986-87.

In the *Terry v. Puget Sound* case mentioned above, the Washington court, relying on section 3.406, precluded the customers' recovery for their failure to "inquire of the bank" about the absence of three successive months of statements, coupled with leaving blank checks in an unlocked drawer. *Terry*, 492 P.2d at 535. In the *Myrick* case, the District of Columbia court affirmed judgment n.o.v. for the bank where "[t]he record is devoid of any evidence

justifying [customer's] failure to inquire of the bank as to her lack of receipt of monthly statements and cancelled checks" and "[held] that Miss Myrick was negligent as a matter of law in not making this inquiry of the bank …." *Myrick*, 268 A.2d at 527-28. Quoting its version of 3.406, the court held Myrick's "'negligence substantially contribute(d) [*sic*] … to the making of an unauthorized signature.'" *Id.* Despite Compass' citations, the Court of Appeals did not discuss either case.

Ordinary care includes diligence to protect one's own interests. *See Via Net*, 211 S.W.3d at 314. Like the customers in *Myrick* and *Puget Sound*, Calleja's "failing even to ask" for information about his account was "not due diligence." *Id.* (citing *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 736 (Tex. 2001)). Calleja's cavalier, "[t]here was no need to 'keep track' of banking information because no authorized checks … would be shown" (CR321-22), was "not due diligence." *Via Net*, 211 S.W.3d at 314.

As between Compass and Calleja, Calleja was in the best position to protect his personal and banking information. Calleja had experienced bank fraud in the past and should have had an even greater motivation to monitor his banking activities. He was in the best position to know if he was not receiving bank statements where and when he would normally expect them. Calleja was the party

best able to prevent the loss by the exercise of ordinary care. *Info. Support Concepts, Inc.*, 149 S.W.3d 104; *Putnam Rolling Ladder Co., Inc.*, 546 N.E.2d at 908. [The Court of Appeals erred by reversing the trial court's judgment.]

### D. Calleja's claims are precluded under Business and Commerce Code section 4.406.

While Article 3 of the Texas Business and Commerce Code, "Negotiable Instruments," governs rights and duties of parties to negotiable instruments like the check at issue here, Article 4, "Bank Deposits and Collections," governs the relationship between a bank and its customer. In *Martin*, a live-in girlfriend took funds from Martin's account without his permission and concealed her fraud by intercepting monthly statements. *See Am. Airlines Emps. Fed. Credit Union v. Martin*, 29 S.W.3d 86 (Tex. 2000). Martin argued that since he never received the bank statements, he never had a duty to report unauthorized transactions. This Court rejected this argument and explained that the customer's burden to discover unauthorized transactions "includes the risk of non-receipt of account statements." I*d.* at 94.

Calleja claims that because the monthly bank statements were sent to the new address, Calleja had no duty to review the statements, report any alleged improper disbursements, or alert the bank that he was no longer receiving statements. Calleja acknowledges that he did nothing to monitor the account for

approximately 24 months and did not notice that funds were taken from the account during this time. CR46-49; CR321-22. Between a customer and his bank, the customer is in the best position to know whether he received his monthly bank statement, and the customer should notify the bank accordingly and request a duplicate copy.

This argument ignores the UCC statutory scheme, which "provides for an allocation of responsibility between the customer and a financial institution according to which party is best able to prevent loss." *Okonkwo v. Washington Mutual Bank, FA*, No. 14-05-00925-CV, 2007 WL 763821, at *6 (Tex. App.—Houston [14th Dist.] Mar. 15, 2007, no pet.).[22]

The customer's duty to exercise reasonable care to discover and report unauthorized transactions is triggered when the bank provides "sufficient information," which is "<u>statutorily defined</u> as a bank 'send[ing] **or mak[ing] available** to a customer a statement of account showing payment of items for the account….'" *Okonkwo*, 2007 WL 763821, at * 6 (quoting Tex. Bus. & Com. Code § 4.406(a)) (emphasis added); *see, e.g.*, *Schiro*, 68 S.W.3d at 57. The official UCC comment makes clear that: "[t]he 'safe harbor' provided by subsection (a) serves to

---

[22] *See also Schiro v. Texas Community Bank*, 68 S.W.3d 55, 57 (Tex. App.—Dallas 2001, no pet.); *Cross Creek Investments, Inc. v. First State Bank*, No. 03-00-00439-CV, 2001 WL 459177 (Tex. App.—Austin May 3, 2001, no pet.).

permit a bank, **based on the state of existing technology**, to trigger the customer's duties under subsection (c) …." Tex. Bus. & Comm. Code § 4.406, cmt. 1 (emphasis added).

Compass made "available" to Calleja a statement of account and supplied "sufficient information" identifying the disbursements and checks at issue.[23] *See* CR397. Again, if Calleja did not receive a statement, he should have exercised ordinary care and contacted the bank to request a statement. *See* CR397. Calleja presented no evidence that he did so.

Calleja argues that he had no duty to monitor his monthly banking activity unless and until Compass sent a monthly bank statement. This argument ignores both provisions in the deposit agreement and that section 4.406 is entitled, **Customer's Duty to Discover and Report Unauthorized Signature or Alteration**, and that this Court stated as follows:

> Section 4.406 acknowledges that the customer is best situated to detect unauthorized transactions on his own account by placing the burden on the customer to exercise reasonable care to discover and report such transactions.

---

[23] If a bank customer's account information becomes compromised, the bank is called with that information, and the address is changed so the customer never receives another monthly statement, under Calleja's arguments, the customer never has to notify the bank that he has not received statements, and he can recover damages from the bank for an indefinite period of time once the account has been completely drained.

*Martin*, 29 S.W.2d 86 at 92. Later in its opinion, this Court stated,

> Further, as we have said, the purpose of section 4.406 is to place the burden on those best able to detect unauthorized transactions so that further unauthorized transactions can be prevented, **and this burden includes the risk of non-receipt of account statements.** Necessarily then, the burden must fall on the customer, the one most familiar with the underlying transaction.

*Id.* at 94 (emphasis added). A bank customer is in the best position to know whether he received a monthly statement, and if not, the exercise of ordinary care requires that he alert the bank. Allowing a customer to avoid a duty to report unauthorized transactions in this situation undermines the reasoning of *Martin*.

Even if the statements were no longer sent to his brother's address—a situation that apparently neither Calleja nor his brother were monitoring—Calleja could have obtained additional copies of statements. Moreover, Compass made them available in several different ways. *See* CR397-98. Calleja received statements until the address was changed in 2012. All of the statements Calleja admitted receiving stated, "*If you have any questions about your statement, call Customer Service at 1-800-266-7277.*" CR397. Thus, Calleja had information available to contact the bank to inquire about the status of his account. *See* CR397. Compass did not refuse to make them available. *See* CR397-98. Calleja could also have visited a bank branch to obtain them. *See* CR397. Alternatively, Calleja could have reviewed the statements by obtaining online banking for free. *See* CR397-98. The

Court of Appeals used a strained interpretation of the contract and purported facts to avoid holding Calleja responsible for failing to timely notify the bank.

It is settled under section 4.406 that by mailing properly addressed statements to the customer the bank makes them available. *See, e.g.*, *In re Estate of Berry*, 280 S.W.3d 478, 480–81 (Tex. App.—Dallas 2009, no pet.); Tex. Bus. & Com. Code § 1.201(b)(36); *see also Jefferson State Bank v. Lenk*, 323 S.W.3d 146, 149 (Tex. 2010). The limits of what else may constitute making bank statements available in particular circumstances are not yet defined.

The Court determined in *Lenk* that when the customer is deceased and no representative appointed, a bank holding statements makes them available. *Lenk*, 323 S.W.3d at 149 (noting an estate administrator's authority and duties under the Probate Code—now the Texas Estates Code—including, to "collect and take into possession the personal property … of the estate …."); *see, e.g.*, Tex. Estates Code § 351.102. The Court distinguished its decision in *Lenk* from a Georgia Supreme Court case, *First Citizens Bank of Clayton County v. All-Lift of Georgia, Inc.*, 55 S.E.2d 1 (Ga. Ct. App. 2001), on the basis that the customer there was not deceased. *Lenk*, 323 S.W.3d at 150, n. 7. The Georgia court found "that a bank does not make statements available within the meaning of [4-406] by merely holding statements and doing nothing more." *All-Lift of Georgia, Inc.*, 555 S.E.2d at 3. The

Georgia court further stated that the bank's policy of holding statements pursuant to a written request would "probably qualify as making them available within the meaning of [4.406]." *Id.* But, in that summary judgment case, the bank produced, "at best, only circumstantial evidence" of any such request and, All Lift's president submitted an affidavit providing direct evidence that the customer never authorized the bank to hold statements. *Id.*

The 1988 signature card states in the "mailing address" blank: "Hold All Correspondence Fuente De Baco #13 Tecamachalco, Mexico D.F." CR50, CR230. The same document, a part of both Calleja's and Compass' summary judgment evidence, provides: "Depositor shall immediately notify Bank in writing of any change in the information given to Bank as appears herein." CR50; CR230. Unlike the *All-Lift* case, the record here includes more than mere circumstantial evidence of Calleja's written instruction to hold bank statements. And, in this case, there is a complete absence of evidence that Calleja ever gave Compass written notice changing the "information given to the Bank" in 1988. CR50; CR230.

With no evidence of any written notice, the Court of Appeals credited Calleja's affidavit testimony that he "directed that the bank statements" be mailed to his brother's address (CR46), and that neither he nor another signatory "requested or directed the Bank at any time after 2008 to change the address on

the Account … or to retain the Account statements at the Bank." *Calleja-Ahedo*, 508 S.W.3d at 803. Upon this affidavit testimony, the Court of Appeals concluded that "the parties contractually limited the ways in which the Bank could make account statements available to Calleja, and both parties are bound by this limitation." *Id.* (citing *Compass Bank v. Nacim*, 459 S.W.3d 95, 108 (Tex. App.—El Paso 2015, no pet.)).

Parties, of course, have the power to modify their contracts. *See, e.g.*, *Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 228 (Tex. 1986). However, whether a contract has been modified depends on the parties' intent, a quintessentially factual inquiry. *Id.* at 228-29 (citing *Coastal Plains Development Corp. v. Tech-Can Corp.*, 531 S.W.2d 143 (Tex. Civ. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.)). Here there are no facts to support a modification. By its terms, the signature card requires notice "in writing of any change in the information given to" Compass. CR50; CR230. Calleja presented no evidence or authority that would exclude changing the record "Mailing Address" … "Hold All Correspondence Fuente De Baco #13 Tecamachalco, Mexico D.F." from the requirement for written notice. CR50; CR230. In order to prove the contract was modified as the Court of Appeals concluded, Calleja had the burden of proving (conclusively as summary judgment movant) that he changed his mailing address of record by the agreed

method, written notice. *See Hathaway*, 711 S.W.2d at 229. There is no such evidence—certainly no conclusive evidence. There is a complete absence of evidence that Calleja notified Compass in writing *or* that Compass agreed at any time that mailing statements to Calleja's brother's address would be the exclusive method for making statements available.[24]

Further, as summary judgment movant,[25] Calleja is not entitled to an inference that when he "directed" Compass to send statements to his brother's address that the direction was in writing.[26] *See Lewis v. Aurora Loan Services*, No. 01-15-00362-CV, 2016 WL 887176, at *2 (Tex. App.—Houston [1st Dist.] Mar. 8, 2016, no pet.) (citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985)). Calleja is not entitled to an inference that by accommodating the

---

[24] Both editions of the deposit agreement include a "nonwaiver" provision: "No departure by us from the provisions of this Agreement … shall constitute a waiver by us of any further right to impose … or enforce the provisions of this Agreement …." CR70; CR218. Nonwaiver provisions in contracts are binding and enforceable. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481 (Tex. 2017).

[25] The parties filed cross motions for summary judgment, and the court of appeals reversed the summary judgment entered in favor of *Compass (under which it* would be proper to grant an inference in favor of Calleja) and instead directed judgment be entered on Calleja's affirmative motion for summary judgment (under which all inferences should be resolved in favor of Compass, as the non-movant). *See, e.g.*, *Apache Indus. Painting v. Gulf Copper & Mfg. Corp.*, No. 01-08-00812-CV, 2010 WL 1611450, at *2 (Tex. App.—Houston [1st Dist.] Apr. 22, 2010, no pet.) (citing *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000); *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192, 199 (Tex. 2007)).

[26] Calleja produced no evidence in the trial court that other signatories had also not called Compass or shared the banking information.

request Compass agreed that mailing statements to the brother's address became the exclusive method of making them available or that it waived the right to rely on the signature card as a component of the written contract. *Id.*; *see also Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481 (Tex. 2017) (acknowledging nonwaiver provisions in contracts are binding and enforceable); CR70; CR218.

The Court of Appeals, moreover, has no authority to find or impliedly find such omitted, necessary facts. *See, e.g.*, *Texas Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex. 1986); *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 653 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Without proof of those facts, there is a complete absence of support for the Court of Appeals conclusion, as stated, that "the parties contractually limited the ways in which the Bank could make account statements available to Calleja." *Calleja-Ahedo*, 508 S.W.3d at 803. There is no evidence that the parties formed the contract the Court of Appeals conclusion necessarily implies. Because the signature card formed a part of the agreement at all times, moreover, any contractual limitation on how Compass could make statements available necessarily includes Compass' right to "hold all correspondence," unless and until that "information" was changed by written

notice, regardless whether the 2008 deposit agreement, the 2012 deposit agreement, or neither of them was effective at material times. *See* CR50; CR230.

The passage from the *Nacim* case quoted by the Court of Appeals is part of the El Paso court's contract analysis to determine the effect of what it determined was a contractually modified section 4.406 "trigger" date. *Nacim*, 459 S.W.3d at 107-08. With respect for both courts, the ambiguity analysis in *Nacim* is inapposite, if flawed,[27] and the Court of Appeals reliance on *Nacim* in this case is misplaced.

The deposit agreement language in *Nacim* and in this case is the same:

> You agree that you will carefully examine each account statement or notice *you receive* and report any exceptions to us promptly *after you receive the statement* or notice. You agree to act in a prompt and reasonable manner in reviewing your statement or notice and reporting any exceptions to us. If you do not report an exception to us *within thirty (30) days after we send the statement or notice to you*, you agree that we will not be liable to you for any loss you suffer related to that exception. This means that, if you do not report exceptions to us within thirty (30) days after we send the statement or notice to you, we will not reimburse you for any loss you suffer, including, but not limited to, any amounts lost as a result of: paying any unauthorized, forged, or altered item ....

---

[27] "'A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation.'" *Nacim*, 459 S.W.3d at 107 (quoting *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). Contrary to the El Paso court's interpretation, the deposit agreement does not "require[]" in the first two sentences quoted above that "the customer report questionable transactions once the customer *actually receives* the account statement." *Nacim*, 459 S.W.3d at 108. Rather, those sentences embody the customer's agreements to carefully examine and report exceptions after receiving a statement and to act in a prompt and reasonable manner in reviewing statements and reporting exceptions. *See id.* The two sentences which follow do not create ambiguity; they merely specify when ("after we **send** the statement") the agreed, thirty day reporting period begins and what that means to the bank's liability.

*Calleja-Ahedo*, 508 S.W.3d at 803 (emphasis by Court of Appeals); *Nacim*, 459 S.W.3d at 108; *see also* CR65 (2008 deposit agreement). The El Paso court in *Nacim* reviewed the contract for ambiguity as to when the agreed, thirty day period to report exceptions began to run. *Nacim*, 459 S.W.3d at 107. The parties' agreement that thirty days was the measure of "reasonable promptness" (Tex. Bus. Com. Code § 4.406 (c)) in examining statements was central to the bank's defense in *Nacim* where thirty three days elapsed between "sending" and reporting. *Nacim*, 459 S.W.3d at 104. In this case, Compass' defenses did not require reliance on a contractually agreed notice period—Calleja did not notify Compass of any exception for over eighteen months. And neither party here suggested ambiguity in any part of the deposit agreement.

To the extent the Court of Appeals relied on *Nacim* to hold that Calleja's duty to report "never arose under the 2008 Agreement" (*Calleja-Ahedo*, 508 S.W.3d at 803) based on use of the word "send" (or "receive") in the above quoted excerpt, Compass and Calleja, nonetheless, agreed on the meaning of "made available" in both the 2008 and the 2012 deposit agreements, and they expressly agreed in the signature card that that Compass would hold all correspondence.

Paragraphs (a) and (c) of section 4.406 each use the disjunctive, "sends or makes available"; paragraph (f) uses the past tense, "made available." Tex. Bus. &

Com. Code 4.406(a), (c), (f). These provisions of the UCC "shall be liberally construed and applied to promote its underlying purposes and policies." *Martin*, 29 S.W.3d at 93. Calleja and Compass agreed in 1988 that Compass would "hold all correspondence." CR50; CR230. They agreed in 1988 that the "Depositor [Calleja] shall immediately notify Bank in writing of any change in the information given to Bank as appears herein." CR50; CR230. The signature card is part of the agreement between Compass and Calleja. Tex. Fin. Code §§ 34.301(a). Compass and Calleja reiterated in 2008 (and in 2012) their agreement that Calleja would give written notice of any change of address. CR65; CR212.

Compass and Calleja agreed in 2008 (and in 2012) that Compass "may make statements … available" by "holding" them or delivering them to Calleja "in accordance with your request or instructions." CR65; CR212. Neither the 2008 nor the 2012 editions of the deposit agreement amends the terms of the signature card to the effect that Compass can no longer "hold all correspondence." To the contrary, both writings permit it and expressly provide that by doing so, Compass made such statements available. CR65; CR212. When courts interpret a contract, they are to examine the entire agreement and give effect to each provision so that none is rendered meaningless. *See, e.g.*, *Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015).

To conclude that the language quoted by the Court of Appeals and by the court in *Nacim* obviates the parties' express agreement as to what constitutes making statements available is contrary to this basic tenet of contract construction. The agreement that, "We may make statements … available to you by holding all or any of these items for you, or delivering all or any of these items to you, in accordance with your instructions" (CR65; CR212), would be rendered meaningless in the context of either deposit agreement. *Kachina Pipeline Co.*, 471 S.W.3d at 450. It cannot have been the "true intention of the parties" (*Kachina Pipeline Co.*, 471 S.W.3d at 450 (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)) that an agreement to a specific period in which to report exceptions following receipt of a statement or the sending of a statement means that when a statement is either not received, or is it made available other than by sending, the customer is absolved of all responsibility to monitor his account for all time. Such a result would undermine the UCC's "carefully considered allocation of responsibility" between a bank and its customer. *Info. Support Concepts, Inc.*, 149 S.W.3d at 107.

As the Court stated in *Martin*:

Section 4.406 acknowledges that the customer is best situated to detect unauthorized transactions on his own account by placing the burden on the customer to exercise reasonable care to discover and report such transactions. The customer's duty to exercise this care is

triggered when the bank satisfies its burden to provide sufficient information to the customer.

*Martin*, 29 S.W.3d at 92 (footnote omitted). Section 4.406 permits a bank either to send or to otherwise make available the account information. Tex. Bus. & Com. Code § 4.406(a), (c), (f). As in *Martin*, when Compass satisfied its section 4.406 burden by making sufficient information available as agreed, *i.e.*, "by holding all or any of these items for [Calleja] in accordance with [his] instructions" (CR65; CR212; *see also* CR50; CR230), Calleja's duty to "promptly notify" Compass was triggered. Tex. Bus. & Com. Code § 4.406 (c). As the trial court correctly determined, Calleja failed to discharge that duty. The judgment of the Court of Appeals should be reversed and the judgment of the trial court reinstated.

Other Texas courts have recognized and applied the UCC statutory scheme, which "provides for an allocation of responsibility between the customer and a financial institution according to which party is best able to prevent loss." *Okonkwo v. Washington Mutual Bank, FA*, No. 14-05-00925-CV, 2007 WL 763821, at *6 (Tex. App.—Houston [14th Dist.] Mar. 15, 2007, no pet.) (citing *Martin*, 29 S.W.3d at 92); *see also Schiro v. Texas Community Bank*, 68 S.W.3d 55, 57 (Tex. App.—Dallas 2001, no pet.); *Cross Creek Investments, Inc. v. First State Bank*, No. 03-00-00439-CV, 2001 WL 459177 (Tex. App.—Austin May 3, 2001, no pet.). The courts uniformly recognize the disjunctive nature of 4.406, that the customer's

duty to exercise reasonable care to discover and report unauthorized transactions is triggered when the bank provides "sufficient information," which is "statutorily defined as a bank 'send[ing] **or mak[ing] available** to a customer a statement of account showing payment of items for the account….'" *Okonkwo*, 2007 WL 763821, at * 6 (quoting Tex. Bus. & Com. Code § 4.406(a)) (emphasis added); *see, e.g., Schiro*, 68 S.W.3d at 57.

In Texas, the "cardinal rule of statutory construction is to ascertain the 'legislature's intent,' and to give effect to that intent. The duty of the court is to construe a statute as written and ascertain the legislature's intent from the language of the act." *LaSalle Bank Nat'l Ass'n v. Sleutel*, 289 F. 3d 837, 839 (5th Cir. 2002) (citing *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex. 1994); *Morrison v. Chan*, 699 S.W.2d 205, 208 (Tex. 1985)). Further informing the legislative intent, the official UCC comment makes clear that: "[t]he 'safe harbor' provided by subsection (a) serves to permit a bank, **based on the state of existing technology**, to trigger the customer's duties under subsection (c) …." Tex. Bus. & Com. Code §4.406 cmt. 1 (emphasis added). Existing technology includes on-line access to account statements. *See, e.g.*, *Kaplan v. JPMorgan Chase Bank, N.A.*, No. 14-C-5720, 2015 WL 2358240 (N.D. Ill. May 12, 2015). The plaintiff in *Kaplan* argued that she had not seen account statements, and this was why she waited

more than a year to report alleged unauthorized disbursements. The bank confirmed that the account statements were made available online each month. Kaplan claimed that she had problems using her online banking access, but the court concluded the statements were made available after reasoning that plaintiff also could have obtained her account statements by going to her local branch by requesting them either in person or by phone.

Here, if Calleja—who knew statements were being generated—could have used online banking but chose not to, or he could have called the bank and requested a copy of any monthly statement. *See Tatis v. U.S. Bancorp*, 473 F.3d 672, 675–76 (6th Cir. 2007) (finding that where Tatis, who knew that monthly statements were generated and originally had elected to have his statements held by the bank, that "the statements were 'made available'" under Ohio's version of section 4.406). Like in this case, there was no evidence in *Tatis* that the bank ever refused to provide any copy or refused to provide online access. CR397; *Tatis*, 473 F.3d at 675. Plus, the backs of the statements that were mailed to Calleja's brother's address had both addresses and phone numbers for Calleja to call to get information from Compass. *See* CR397. Nevertheless, Calleja never contacted Compass to get a copy of his statement or to inquire why statements were no being received at the Woodlands address. *See* CR397. Calleja elected not to take

advantage of the existing technology, online banking; he did not visit or contact any Compass branch; Calleja made no effort for eighteen months to review any bank statements.[28] *See* CR397-98. Nor did Calleja ever contact Compass to verify the balance of his account. Calleja wholly failed to monitor the status of his bank account for six months before and eighteen months after the first unauthorized transaction. There is no evidence that he would have reviewed the statements even if the statements had been delivered to his brother's apartment.

Again, if Calleja did not receive a statement, he had a duty of ordinary care and should have contacted Compass to find out why statements were no longer being sent to the Woodlands. Compare *Borowski v. Firstar Bank Milwaukee, N.A.*, 579 N.W.2d 247, 250 (Wis. Ct. App. 1998) (stating where properly addressed statements are intercepted by an interloper, the customer still is not relieved of his or her responsibilities to either examine the statements or find out why they are not coming). Calleja presented no evidence that he made any effort to discharge his responsibility. *See Barfield*, 426 S.W.2d at 840.

---

[28] Calleja, through his brother who was allegedly receiving the monthly statements, knew or should have known if the statements were, in fact, not being received. *See* CR306.

**E.** **Other courts have interpreted the term "made available" as it applies to Texas Business and Commerce Code section 4.406, and the Court of Appeals' construction of section 4.406 differs from other courts when it determined that Compass had not made the bank statements "available" per section 4.406, which is likely a matter of first impression under Texas law.**

The Appellate Court relied in part on *Jefferson State Bank v. Lenk* in trying to analyze the "made available" provision in section 4.406. *See Jefferson State Bank v. Lenk*, 323 S.W.3d 146 (Tex. 2010). In that case, the bank customer had died, and the Court discussed what banks need to do after a customer's death because the customer was no longer able to receive statements or report purported unauthorized transactions. The present case is distinguishable because Calleja has always been alive throughout this dispute. Calleja simply failed to review any of his bank statements for approximately two years. *See* CR46-47.

There does not appear to be any Texas case that has construed what constitutes "mak[ing] available" bank statements when the customer is alive and never tells the bank that he is not receiving statements or when an alleged imposter causes bank statements to be sent to a new address, and the customer fails to inform the bank he is no longer getting statements.

Under section 4.406, "[t]he plain language of the statute [thus] simply require[s] the Bank to 'send **or make available**' account statements." *Okonkwo*

*v. Washington Mutual Bank, FA*, No. 14-05-00925-CV, 2007 WL 763821, at \*6 (Tex. App.—Houston [14th Dist.] March 15, 2007, no pet.) (emphasis added); *see also Schiro v. Texas Community Bank, N.A.*, 68 S.W.3d 55, 57 (Tex. App.—Dallas 2001, no pet.). In Texas, the "cardinal rule of statutory construction is to ascertain the 'legislature's intent,' and to give effect to that intent. The duty of the court is to construe a statute as written and ascertain the legislature's intent from the language of the act." *LaSalle Bank Nat'l Ass'n v. Sleutel*, 289 F. 3d 837, 839 (5th Cir. 2002).[29]

Here, if Calleja had called the bank and requested a duplicate copy of the monthly statement, and the bank had refused to provide a duplicate copy, then this would show that the statements were not made available. The backs of the monthly statements Calleja did receive had several addresses or phone numbers for Calleja to call to get information from Compass. However, Calleja in this matter never contacted Compass to get a duplicate copy. *See* CR305; CR397. Calleja could have used online banking, visited a branch or done other things to review statements.[30] *See* CR397-98. Instead, Calleja wholly failed to monitor the

---

[29]  Surely the legislature did not intend for a bank customer to never have to notify a bank if they stop receiving bank statements.
[30]  Calleja, through his brother who was allegedly receiving the monthly statements, knew or should have known if the statements were not being received. *See* CR306.

status of his bank account. There is no evidence that he would have reviewed the statements even if the statements had been delivered to his brother's apartment.

The Supreme Court of Minnesota analyzed the issue of placing the risk of non-receipt of bank statements on the bank customer as opposed to the bank. *See Stowell v. Cloquet Co-op Credit Union*, 557 N.W.2d 567 (Minn. 1997). In *Stowell*, the customer argued that the customer had not received statements and said the statements were not "made available" under the UCC. The credit union mailed duplicate statements, but Stowell claimed not to receive them, likely because they were intercepted by the purported wrongdoer. At no time did Stowell go to the bank branch and ask that a statement be printed or otherwise provided to him. The court explained, "**[a]llowing accountholders to avoid their duty to inspect their account statements by denying receipt of the account statements would place unreasonable financial burdens on banks and other financial institutions by forcing them to prove receipt either through the use of certified mail or by individually contacting the customers, or to confirm that they had, in fact, received their account statement. Such measures would often be prohibitively expensive**." *Id.* at 572 (emphasis added).

Likewise, the court in *Borowski* confirmed that, even if a customer claimed that the bank was at fault for allegedly not properly sending out the statements, the bank customer is not relieved of his or her responsibilities "to either examine those statements and/or find out why they are not coming." *Borowski v. First Star Bank Milwaukee*, 579 N.W.2d 247, 250 (Wis. Ct. App. 1998). In *Wetherill*, the court explained that for several years, the plaintiff sought never to review the account statements and never contacted the bank to ensure that everything was as it should be. *See Wetherill v. Putnam Investments*, 122 F.3d 554, 556 (8th Cir. 1997). In *Wetherill*, the plaintiff argued that the statements were not "properly addressed" because they were mailed to an address other than the one that plaintiff had agreed to for the receipt. *Id.* at 556. However, the court held that had Wetherill exercised "reasonable diligence", he would have discovered the forgeries years before he did so. *Id.* at 557.

Similarly, other courts have held that bank statements were "made available" although the depositor did not receive the statements. *See Woods v. MONY Legacy Life Ins. Co.,* 641 N.E.2d 1070 (N.Y. 1994); *McMickle v. Girard Bank*, 515 A.2d 16 (Pa. Super. Ct 1986) *Myrick*, 268 A.2d at 527 (holdings that (*Myrick*) was negligent as a matter of law for failing to inquire with the bank as to her lack of receipt of monthly statements and cancelled checks).

In *Westport Bank & Tr. Co. v. Lodge,* 325 A.2d 222 (Conn. 1973) the bank depositor failed to receive her bank statements and did not notify the bank. *See Lodge*, 325 A.2d at 223. Because the fraudster had changed the mailing address on her bank account, *Lodge* failed to receive bank statements for more than two years. *Id. Lodge* at no time attempted to reconcile her bank statements or inquire of the bank during the two years, and the court held that the lack of effort to examine the bank statements on the part of *Lodge* constituted negligence so as to preclude liability of the bank. *See also General Petroleum Products, Inc. v. Merchants Trust Co.*, 160 A. 296, 299 (Conn. 1932).

F. **There are strong policy reasons for the Court to decide this case and affirm the trial court's judgment.**

Because there is a substantial likelihood that similar facts will occur in the future, this Court should continue to interpret and apply the UCC in a way that clarifies that customers are responsible for monitoring their banking activity and are not to be rewarded for their failure to do so. This Court should not excuse Calleja's admitted, intentional failure to monitor his account for two years (particularly after he had already experienced bank fraud). *See* CR46-48. If the court's decision stands, nothing will prevent a bank customer from entrusting oversight of an account to a friend or relative, abdicating all personal responsibility. If the person allegedly monitoring the account has the

customer's account information and personal information, the person can have the bank change the account address without the customer's knowledge. Then, by omission or design, that person could fail to mention to the customer that statements are not being received where the customer expected them for six months, eighteen months, or two years. The customer's willful ignorance would allow a bad actor (or co-conspirator) to drain the account, supposedly without the customer's knowledge.

Accordingly, if the Court of Appeals' ruling in this case stands, the customer has no duty to discover and to report the "loss" he facilitated by failing to protect his banking information and willfully ignoring his account, leaving the bank liable for the loss. There would be no way for the bank to prevent this type of fraud. Permitting a customer to not report that he did not get bank statements for 18 months and bear no responsibility is an unjust result. The customer is in the best position to monitor his own account activity. Sound policy dictates that there must be some degree of responsibility for a customer to notify the bank if monthly statements stop arriving.

**G.** **Without the 2012 agreement and without the 2008 agreement, there is only one writing material to the parties' agreement in the record, the 1988 signature card.**

The only writing both parties agree was part of the contract is the 1988 signature card; both offered the card as evidence. *See* CR46, 50; CR203, 230. Regardless whether the 2012 version or the 2008 version, or some other version of deposit agreement also might have been "in effect," the signature card is part of the contract. Tex. Fin. Code § 34.301(a). The card includes the parties' agreement that Compass was authorized to "Hold All Correspondence":

CR50; CR230. Calleja offered no evidence that he rescinded his agreement authorizing Compass to "hold all correspondence." As a movant, he is not entitled to any inference in his favor. *See Lewis v. Aurora Loan Services*, 01-15-00362-CV, No. 2016 WL 887176, at *2 (Tex. App.—Houston [1st Dist.] Mar. 8, 2016, no pet.) (citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985)). Calleja offered no evidence or authority that Compass' subsequent agreement to provide copies of statements to Calleja's brother necessarily revoked the existing, written agreement authorizing Compass to hold all correspondence. By the clear terms of the only writing in the record which both

parties agree applies, Compass made all statements available at its banking locations as expressly agreed between the parties. Calleja's claims are precluded by the contract and by section 4.406 of the Business and Commerce Code. CR50; Tex. Bus. & Com. Code § 4.406.

### H. The Court of Appeals improperly construed plain language in the trial court's order.

The Court of Appeals' interpretation of the trial court's statement that Calleja "has failed to exercise diligence in protecting himself from the alleged fraud" as referring only to "Calleja's lack of diligence post-forgery" is impermissibly narrow. *See Calleja-Ahedo*, 508 S.W.3d at 806. Rather than "the context of the final judgment itself" (*id.*), the scope of the context should have been the entire record: "Reviewing courts do *not* disregard the evidence supporting the motion." *City of Keller v. Wilson*, 168 S.W.3d at 824 (Tex. 2005); *see also Kennamer v. Estate of Noblitt*, 332 S.W.3d 559, 566 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

The Court of Appeals read an expressly inclusive sentence to be exclusive[31] to support its conclusion. *See In Matter of Estate of Downing*, 461

---

[31] The trial court's order states: "In particular, but not as the sole reason for this ruling, the Court rules that where the check at issue was cashed on July 30, 2012, and the Plaintiff did not notify the bank until January 29, 2014, as a matter of law Plaintiff has failed to exercise diligence in protecting himself from alleged fraud regardless of any shortcomings in sending bank statements." CR539.

S.W.3d 231, 238 (Tex. App.—El Paso 2015, no pet.) (citing *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805–06 (Tex. 2012); see also *Tyler v. Henderson*, 162 S.W.2d 170, 175 (Tex. Civ. App.—Fort Worth 1942, writ ref'd w.o.m.) ("We must give verity to the judgment of the court having such jurisdiction; we will not construe its language so as to destroy its legal effect …."). The trial court's judgment does not exclude or negate reliance on the conclusively established facts that Calleja failed to safeguard his personal and banking information and ignored his account for six months before account funds paid for blank check stock in June (CR246) and before one of those checks was paid in July, 2012 (CR249). *See also* CR321-22. Had Calleja paid attention, personally or through his brother, he would have noticed when—before any forgery occurred—his bank statement did not arrive at the Woodlands address. *See Myrick*, 268 A.2d at 527-28. The Court of Appeals' restrictive reading of the judgment fails to give due effect this material part of the summary judgment record; *i.e.*, Calleja's lack of diligence *pre-forgery*, including his obvious failure to safeguard his personal information, making it "easier for the wrongdoer to commit his wrong." *Bank of Nichols Hills,* 196 P.3d at 986-87; Tex. Bus. & Com. Code § 3.406(a).

As the Maryland court of appeals stated, "[t]he common thread running through [cases discussing section 3-406] is that the substantial contribution test under the UCC includes negligent conduct on the part of the [person precluded] which previously had been viewed as too remote in the chain of causation to preclude recovery." *Dominion Const., Inc. v. First Nat'l Bank of Maryland*, 163, 315 A.2d 69, 73-74 (Md. 1974). The "new" UCC standard replaced proximate cause with the "substantial factor" test. *Id.* The New Jersey court explained: "[t]he language of [section 3.406] … states plainly that it is the contribution to the forgery rather than the negligence that must be substantial." *Gast v. Am. Cas. Co. of Reading, Pa.*, 240 A.2d 682, 685 (N.J. Super. Ct. App. Div. 1968). Thus, Calleja's inattention to his account, the obvious failure to safeguard his personal information and his "failure to inquire of the bank as to [his] lack of receipt of monthly statements," was "negligent as a matter of law." *Myrick*, 268 A.2d at 528. Just like Myrick's, Calleja's conclusively proven "negligence substantially contribute(d) … to the making of an unauthorized signature" precluding his claim. *Id.* (internal quotations omitted). The trial court's judgment should be affirmed.

## Conclusion

This Court should not excuse Calleja's admitted, intentional failure to monitor his account for two years. It should not shift responsibility from Calleja to Compass for Calleja's failure to properly safeguard his personal and banking information. If the Court of Appeals' decision stands, nothing will prevent a bank customer from entrusting the receipt of account statements to a friend or relative, abdicating all personal responsibility. The Court of Appeals decision sanctions Calleja's chosen method of monitoring his account by relying "completely" on reviewing statements delivered to The Woodlands, then not bothering to retrieve a single statement for at least two years. The Court of Appeals' decision improperly shifts the burden of loss to Compass where Calleja was always in the best position to protect against the loss. It was Calleja's willful inattention to his own interests and affairs that made it easier for a bad actor to drain the account. If the Court of Appeals decision stands, Calleja will have been absolved of all duty to discover and to report a "loss" he facilitated by failing to protect his banking information and willfully ignoring his account. There will be no way for a bank to prevent this type of fraud. Common sense, sound policy, and the law dictate that an account owner bear a degree of

responsibility for protecting his own interests. The Court of Appeals' decision absolves Calleja and wrongly places the burden on Compass.

## Prayer

Compass respectfully asks this Court to reverse the decision of the Appellate Court and to affirm the summary judgment in favor of Compass. In the alternative, Compass asks the Court to remand the case to resolve all issue of fact necessary to disposition of this case.

Respectfully submitted,

HIRSCH & WESTHEIMER, P.C.

By: _/s/ Michael D. Conner_
    Michael D. Conner
    mconner@hirschwest.com
    State Bar No. 04688650
    William P. Huttenbach
    State Bar No. 24002330
    phuttenbach@hirschwest.com
    1415 Louisiana, 36th Floor
    Houston, Texas 77002
    Telephone: (713) 223-5181
    Facsimile:  (713) 223-9319

**Attorneys for Petitioner Compass Bank**

**Certificate of Compliance**

I do hereby certify that the relevant contents of this document consist of 14,956 words, in compliance with Tex. R. App. P. 9.4(i) and this document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14 point Garamond font, except for footnotes which are in 13 point typeface.

*/s/ Michael D. Conner*
Michael D. Conner

**Certificate of Service**

I hereby certify that on this 20th day of December, 2017, a true and correct copy of the foregoing document was served via e-service as follows:

Michael C. O'Connor
moconnor@oconnorcraig.com
Lesley C. O'Connor
loconnor@oconnorcraig.com
O'CONNOR & CRAIG
2825 Wilcrest Drive, Suite 261
Houston, Texas 77042
Telephone: (713) 266-3311
Facsimile: (713) 953-7513

*/s/ Michael D. Conner*
Michael D. Conner

No. 17-0065

---

In the Supreme Court of Texas

---

Compass Bank, Petitioner

v.

Francisco Calleja-Ahedo, Respondent

---

On Petition for Review from the First Court of Appeals
in Houston, Texas
Case No. 01-15-00210-CV

---

**Appendix to Petitioner's Brief on the Merits**

---

Signature Card (CR50) ............................................................................Tab 1

Consumer Disclosure (2008 deposit agreement; CR51 *et seq.*) ...................Tab 2

Consumer Deposit Account Agreement
(2012 deposit agreement; CR205 *et seq.*)................................................Tab 3

# Tab 1

(16) It is agreed that the Bank will not be liable for any damage caused by its premature payment, through accident, or inadvertance of a post-dated check, whether such damages arise from dishonor of check subsequently presented or otherwise. It is further agreed that Bank shall have all rights of a purchaser and holder in due course of a post-dated check for which it pays out money or gives other value in good faith before the date of the instrument.

(17) All stop payment orders must be in writing, dated, signed, and must describe the item with particularity. An order to stop is effective for only six months unless renewed in writing. Depositor agrees to indemnify and reimburse Bank for any loss, damages, cost, suits, judgements, and any expenses resulting from nonpayment of any item drawn on this Account for which a stop payment order is requested. Should Bank pay an item subsequent to a request of stop payment either due to inadvertance or oversight, or if by reason of such payment other items drawn by Depositor are returned insufficient, it is expressly agreed that Bank shall in no way be held responsible or liable. Bank will charge a fee for implementing any stop payment order.

(18) All items received for deposit or collection shall be deemed to be received pursuant to the applicable provisions of the Uniform Commercial Code of Texas, Federal Reserve Regulations and operating letters, and Clearing House Rules.

(19) Notice of any change on this Agreement or any additional terms hereto shall be either conspicuously posted in Bank's main lobby and shall become binding on customer after having been so posted for five (5) business days or shall be mailed or delivered to customer and shall become effective five (5) business days after sent by Bank.

(20) The Depositor shall execute this Agreement and any and all documentation required by Bank which shall be delivered to Bank.

(21) Co-Depositor Accounts. The Depositors whose authorized signatures appear below hereby each agree with the other and with Bank that Bank may pay monies at any time on deposit in this Account to or on the order of any said Depositor either before or after the death of the other for any one or more of the others without reference to the ownership of the funds so deposited. Such payments shall be valid and shall discharge Bank from liability. Each of the Depositors appoints the other attorney with power to deposit in said Account moneys of the other and for that purpose to endorse any check, draft, note or other instrument payable to the order of the other or both. In the event of the death of any or all of said Depositors either payment may, at the option of Bank, the conditions upon the production of evidence that all inheritance or estate taxes, if any be due, have been paid and that all other provisions of law in such made and provided have been fulfilled. This Agreement may be terminated upon written representation to the Bank upon actual contradictory receipt of such written notice by the Bank, no business will be conducted in connection with said Account unless all of the Depositors agree in writing. The power of attorney granted herein shall not terminate on disability or incompetence of the Customer granting the same. Power of attorney granted herein is irrevocable as long as this Account is open and this Agreement is in effect.

(22) Depositor shall immediately notify Bank in writing of any change in the information given to Bank as appears herein.

(23) Bank is hereby authorized to recognize the signature/ signatures below in payment of funds or transactions of any other business of Depositor. The undersigned persons, jointly and severally Depositor, each agree to be bound by the terms of the Agreement as now in effect or as hereafter amended as provided by above.

Adding sig. of Ana Elizabeth Haller de Calleja

| 3-11-88 | EMS/RAM-Updating | YLW |
|---|---|---|
| Date Initial Amount | Acct Opened By | Officer |

Hold All Correspondence    Fuente De Baco #13

Mailing Address

Tecamachalco, Mexico  D.F.

City                    State                    Zip

Computer Technology        589-2473

Occupation              Home Phone        Business Phone

Related Accounts          Social Security No
                          * Mex. Passport ▓▓▓

BROWNSVILLE NATIONAL BANK MONEY MARKET AGREEMENT (Continued)

Port #300 0 71          ACCOUNT NO. ▓▓▓

NAME: * Francisco Calleja Ahedo or Francisco  Calleja Cajigas or Ana Elizabeth Haller de Calleja

Fuente De Baco #13  Tecamachalco, Mexico D.F.

SIGNATURES

* Francisco Calleja Ahedo

Francisco Calleja Cajigas

Ana Elizabeth Haller de Cal[

Bank authorized signature                    F440-00099(12/80)  20-050-12-80

Tab 2

# CONSUMER DISCLOSURE

Effective August 22, 2008

Compass Bank, a member of the BBVA Group

# Consumer Disclosure

**Highlights**
1. Changes to Consumer Deposit Account Agreement     2
2. Changes to Checking and Savings Accounts     4

**Other Fees and Service Charges**     9

**Consumer Deposit Account Agreement**     11
1. Definitions     11
2. Account Operations     12
3. Account Statements and Notices     13
4. Account Transactions     14
5. Deposits, Collections and Payment of Items     15
6. Withdrawals     17
7. Sub-accounts     17
8. Arbitration     18
9. Waiver of Jury Trial     19
10. Dormant and Abandoned/Unclaimed Accounts     19
11. Set Off     19
12. Waivers     19
13. Other Services     19
14. Interest; Interest Reporting     20
15. Changes to Account Status     20
16. Applicable Law     20
17. Additional Provisions     20

**Funds Availability Disclosure**     21

**Electronic Fund Transfer Disclosure Statement**     22

**Taxpayer Identification Numbers (Backup Withholding)**     24

**Compass Consumer Privacy Disclosure**     26

**Important Information About Your Checking Account (Check 21)**     29

**Visa® Check Card Agreement and Disclosure Statement**     31

# HIGHLIGHTS

## Changes to Consumer Deposit Account Agreement

This Disclosure Booklet contains the terms and conditions that will govern your consumer deposit accounts at Compass Bank beginning August 22, 2008. A consumer deposit account includes any type of checking, savings, money market or NOW account to which funds may be deposited and that is used primarily for personal, family or household purposes. Please carefully review the **Consumer Deposit Account Agreement** on pages 11-21 of this Consumer Disclosure Booklet and keep it for future reference. Many terms of your Compass account will be different from those at Texas State Bank, including, but not limited to, the following:

- **Posting Order and Order of Payment.** At Compass Bank, checks and other debits to your account may be posted and/or paid in a different order than at Texas State Bank. If two or more items are presented for payment from your account on the same day, we may pay or charge the items to your account in any order. To avoid overdrawing your account, make sure you have a sufficient available balance in your account before you write a check, use your Check Card or authorize an electronic payment.

- **"Available Balance" and "Posted Balance."** At Compass Bank, we distinguish between the "available balance" and the "posted balance" for your account. The term "available balance" refers to the balance of funds in your account that is available for immediate withdrawal. Unlike the posted balance, the available balance reflects any holds placed on your account. The term "posted balance" refers to the balance of funds in your account based solely on items that have been posted as credits or debits to your account. Your available balance may be more or less than the amount of your posted balance, but does not include any credit available under any Compass Bank Overdraft Protection Line of Credit you may have.

- **Holds for Check Card Transactions.** If we issue a Visa® Check Card for your account and you use your Card for certain transactions (including every POS and many Visa transactions), the merchant accepting your Card may request advance authorization of that transaction. If we authorize a transaction, we may place a temporary "hold" on your account for the amount requested by the merchant. This hold is not payment for an authorized transaction, and may be placed on your account before the actual transaction is presented to us for payment. For more information about these holds, when they are released, their effect on your account, and the authorizations requested by merchants, please refer to the Check Card Agreement and Disclosure Statement included with your new Check Card.

- **Unauthorized Transactions and/or Forgeries.** It is essential that any account errors, unauthorized transactions, alterations, unauthorized signatures, forgeries, encoding errors, posting errors, or any other improper transactions on your account (collectively referred to as "exceptions") be reported to us as soon as reasonably possible. You must carefully examine each account statement or notice you receive and report any exceptions to us promptly after you receive the statement or notice. If you do not report an exception to us within **thirty (30) days** after we send the statement or notice to you, we may not be liable to you for any loss you suffer related to that exception. Different rules may apply to items that are electronic fund transfers.

- **Resolving Disputes Related to Your Account.** If a dispute of any kind arises under your account agreement or relates to your account or any transactions involving your account, either you or we can choose to have that dispute resolved by binding arbitration. If (i) neither you nor we seek to compel arbitration of any dispute we have related to this Agreement, your account, or any transactions involving your account, or (ii) some or all of the arbitration provision is unenforceable and we are in a dispute in a court of law, then each of us agrees to waive any right we may have to a jury trial to the extent permitted by law. **The arbitration and jury trial waiver provisions in your account agreement limit your ability to litigate claims in court and your right to a jury trial. You should review these provisions carefully.**

- **Consumer Privacy Disclosure.** The Compass Consumer Privacy Disclosure is included in this Consumer Disclosure Booklet. The Privacy Disclosure contains information on Compass' sharing practices within the Compass family of companies and provides information on how you may choose to limit marketing by our affiliates based on information that Compass shares with them.

For information on Miscellaneous Fees at Compass Bank, please see page 9 of this Booklet.

2

Other differences found in the *Consumer Disclosure Booklet* include:

1. **Consumer Deposit Account Agreement** sections:

   - ACCOUNT OPERATIONS
     - Powers of Attorney
     - Service Charges; Other Charges

   - ACCOUNT STATEMENTS AND NOTICES
     - Errors, Unauthorized Transactions and Forgeries
     - Record Retention

   - ACCOUNT TRANSACTIONS
     - Signatures; Facsimile Signatures
     - Wire Transfers
     - Insufficient Balance and Overdrafts
     - Stop Payment Orders
     - Inter-Account Transfers
     - Illegal Transactions

   - DEPOSITS, COLLECTIONS, AND PAYMENT OF ITEMS
     - Deposits by Minors, Agents or Trustees
     - Collection as Agent
     - Check Endorsement Standards
     - Foreign Currencies
     - ATM Depositories, Night Depositories, Direct Deposit and Deposits by Mail
     - Chargebacks
     - Stale and Postdated Checks; Miscellaneous

   - WITHDRAWALS

   - RESTRICTIONS ON WITHDRAWALS

   - SET OFF

   - INTEREST; INTEREST REPORTING

   - CHANGES TO ACCOUNT STATUS – Conversion to Business Accounts

   - ADDITIONAL PROVISIONS – Closing Your Account

   - APPLICABLE LAW

   - AMENDMENT TO THIS AGREEMENT

2. **Funds Availability Disclosure**

3. **Electronic Fund Transfer Disclosure Statement**

4. **Consumer Privacy Disclosure**

5. **Important Information About Your Checking Account (Check 21)**

3

## Changes to Checking and Savings Accounts

Here are highlights to the changes in the terms and features of your accounts after they transfer to Compass Bank.

| Texas State Bank | Compass Bank | Please Note Changes to These Account Terms and Features |
|---|---|---|
| **Regular Checking, TexStar Checking, and Club Checking** | Regular Checking | $10.00 monthly Service Charge. $750 minimum daily collected balance and $2,500 average daily collected balance required to waive monthly Service Charge. Standard fees will apply for cashier's checks and traveler's checks. Customers enrolled in Add-On Values will be converted to CompassPlus and will be assessed a $5 monthly fee. |
| **Free Checking, Freedom Advantage, Group Checking, Penny Wise, Student Checking (TRN), Riverway Premier Checking, Economy Checking, and Fresh Start** | Build-To-Order Free Checking | No monthly Service Charge or minimum balance requirement. Unlimited transactions. Choose two premium features at no charge (additional features are $2/statement cycle): Free foreign ATMs, rebates of ATM fees other banks charge, up to $25 cash on your account anniversary, interest on your checking account balance, cash back on Visa Check Card purchases, double Visa Extras Rewards points, one overdraft fee waiver per year. Customers enrolled in Add-On Values will be converted to CompassPlus and will be assessed a $5 monthly fee. |
| **Colmes Basic Bonus, Colmes Family Bonus, Colmes Bonus Plus, FISI Madison Basic, San Augustine FISI Individual, San Augustine FISI Joint, San Augustine FISI Family, FISI Madison Family, and Vista Club** | Build-To-Order Free Checking | No monthly Service Charge or minimum balance requirement. Unlimited transactions. Choose two premium features at no charge (additional features are $2/statement cycle): Free foreign ATMs, rebates of ATM fees other banks charge, up to $25 cash on your account anniversary, interest on your checking account balance, cash back on Visa Check Card purchases, double Visa Extras Rewards points, one overdraft fee waiver per year. Accidental Death Insurance, Savers Club Book, Sojourns magazine, Payment Card Protection, Key Ring Protection and Half Price Hotel no longer available. Customers enrolled in Add-On Values will be converted to CompassPlus and will be assessed a $5 monthly fee. |
| **Fifty Plus Free Checking, Gold Checking, Senior Advantage Checking, Senior Partner Checking, Senior Checking, Senior Checking (TRN), Senior Gold, and Senior Gold Plus** | Basic 50 Checking | No monthly Service Charge or minimum balance requirement. Unlimited transactions. Free traveler's checks. Free supply of custom checks. Bonus rates available on CDs. Foreign ATM transaction fees apply. Standard fees will apply for cashier's checks. Customers enrolled in Add-On Values will be converted to CompassPlus and will be assessed a $5 monthly fee. |

4

## Changes to Checking and Savings Accounts *continued*

Here are highlights to the changes in the terms and features of your accounts after they transfer to Compass Bank.

| Texas State Bank | Compass Bank | Please Note Changes to These Account Terms and Features |
|---|---|---|
| **ETA (Electronic Transfer Account), Value Checking, and Value Checking (TRN)** | Basic Checking | All current terms, conditions, and Service Charges will remain in effect. Transaction fees for Value Checking and Value Checking (TRN) will be waived. Customers enrolled in Add-On Values will be converted to CompassPlus and will be assessed a $5 monthly fee. |
| **Freedom Select Checking, Freedom Select Checking (TRN), Star Checking, Choice Checking, Senior Choice Checking, Interest Checking, and Interest Checking (TRN)** | CompassLink Checking | No monthly Service Charge with a combined average daily collected balance of $2,000 in CompassLink Checking and Preferred Money Market Accounts, or when linked to an outstanding installment loan or line of credit balance of $7,500 or more. Otherwise, $15 monthly Service Charge. No fee for using another bank's ATM and eligible for surcharge rebates. Free custom wallet checks, cashier's checks, and traveler's checks. Bonus rates available on CDs. The following Rate Tiers apply: $0-$1,999; $2,000+. Customers enrolled in Add-On Values will be converted to CompassPlus and will be assessed a $5 monthly fee. |
| **Freedom Platinum Checking and Premier Investment** | CompassLink Checking | No monthly Service Charge with a combined average daily collected balance of $2,000 in CompassLink Checking and Preferred Money Market Accounts, or when linked to an outstanding installment loan or line of credit balance of $7,500 or more. Otherwise, $15 monthly Service Charge. No fee for using another bank's ATM and eligible for surcharge rebates. Free custom wallet checks, cashier's checks, and traveler's checks. Bonus rates available on CDs. Customers enrolled in Add-On Values will be converted to CompassPlus and will be assessed a $5 monthly fee. |
| **Texas Freedom Club, Texas Freedom Club (TRN), Relationship Checking, and Senior Medallion Checking** | Directions Checking | No monthly Service Charge with a minimum daily collected balance of $1,000. Otherwise, $6 monthly Service Charge. No fee for using another bank's ATM and eligible for surcharge rebates. Free custom wallet checks, cashier's checks, and traveler's checks. Bonus rates available on CDs. Free new 3x5 Safe Deposit Box in the first year, 25% discount thereafter. Two free Stop Payments per month. The following Rate Tiers apply: $0-$1,999; $2,000+. Customers enrolled in Add-On Values will be converted to CompassPlus and will be assessed a $5 monthly fee. |

## Changes to Checking and Savings Accounts *continued*

Here are highlights to the changes in the terms and features of your accounts after they transfer to Compass Bank.

| Texas State Bank | Compass Bank | Please Note Changes to These Account Terms and Features |
|---|---|---|
| **Group Interest Checking and Group Banking** | Build-To-Order Free Checking with Interest | No monthly Service Charge or minimum balance requirement. Unlimited transactions. Choose one premium feature at no charge (additional features are $2/statement cycle): Free foreign ATMs, rebates of ATM fees other banks charge, up to $25 cash on your account anniversary, cash back on Visa Check Card purchases, double Visa Extras Rewards points, one overdraft fee waiver per year. Interest on your checking account balance is a preselected premium feature. The following Rate Tiers apply: $0-$1,999; $2,000-$9,999; $10,000-$24,999; $25,000-$74,999; $75,000+. Customers enrolled in Add-On Values will be converted to CompassPlus and will be assessed a $5 monthly fee. |
| **Regular Savings and Border Savings** | Basic Savings | $15 quarterly Service Charge. $500 minimum daily collected balance required to waive quarterly Service Charge. Accounts with more than four (4) withdrawals per quarter will receive a $3 Service Charge for each additional withdrawal. The following Rate Tier applies: $0+. |
| **Group Savings** | Basic Savings | No monthly Service Charge or minimum balance requirement. Accounts with more than four (4) withdrawals per quarter will receive a $3 Service Charge for each additional withdrawal. The following Rate Tier applies: $0+. |
| **Student Savings** | Young Savers | No quarterly Service Charge or minimum balance requirement. Accounts with more than four (4) withdrawals per quarter will receive a $3 Service Charge for each additional withdrawal. The following Rate Tier applies: $0+. |
| **Money Market Savings, Freedom Investment, Money Management Savings, and Premier Money Market** | Consumer Preferred Money Market | No monthly Service Charge or minimum balance requirement. Unlimited in-person transactions. A $10 excessive transfer fee is assessed per statement cycle for pre-authorized or telephone transfers over six (6) per statement cycle. A $10 excessive checkwriting fee is assessed per statement cycle for checks over three (3) per statement cycle. The following Rate Tiers apply: $0-$9,999; $10,000-$19,999; $20,000-$49,999; $50,000-$99,999; $100,000-$249,999; $250,000-$999,999; $1,000,000-$2,499,999; $2,500,000-$4,999,999; $5,000,000+. |

# Build-to-Order Free Checking Account Disclosure

**PLEASE RETAIN A COPY OF THIS DISCLOSURE FOR FUTURE REFERENCE.**

## Standard Benefits/Requirements

- Requires $25 minimum deposit to open.
- Checks posted to the account are not returned in the monthly statement, but photocopies are available. Charges for photocopies are $3.00 per posted item.
- An image statement is available for a service charge of $3.00 per month. An image statement includes reduced pictures of cancelled checks in numerical order. The paper copies of cancelled checks will not be returned in the statement for this account.
- Free safekeeping of checks.

## Definitions

- Account Anniversary: The Account Anniversary is the month and day you opened your Build-to-Order Checking account or converted to a Build-to-Order Checking account.
- Feature Year: This is a period of twelve statement cycles between Account Anniversaries, beginning with the statement cycle in which the Account Anniversary falls. Certain Custom Features may be tied to the Feature Year. Please see the description of Custom Features below.
- Custom Features: These are the additional features you can select to customize your Build-to-Order Checking account, and they are listed below.

**Custom Features: *Select two Custom Features at no charge. Go online, visit your branch or call 1-800-COMPASS to select your two features. (See charges for additional features below.)***

- **No fee for using another bank's ATM**
- **Rebate of ATM fees that other banks charge**

  In order to receive rebate, ATM receipts showing ATM fees or account statements showing ISF fees must be mailed within 90 calendar days of the ATM transaction to Compass Bank. Rebate will be directly deposited into the checking account within 10 business days of receipt. Compass does not rebate International Service Fees for Point of Sale transactions (for example, purchases from a foreign merchant using your Check Card).

- **Interest on your checking balances**

  If you select this feature, the following terms apply: The daily balance method is used to calculate the interest on your account. This method applies a daily periodic rate to the daily collected balance in the account each day. Interest on deposits begins to accrue no later than the business day on which we receive credit for the deposit. Accrued interest is credited to the balance in the account on the last day of the statement cycle. Accrued Interest that is credited to the balance in the account begins to earn interest no later than the next business day and compounds with each statement cycle. Statement cycles are generally monthly, unless otherwise disclosed. If you close your account or convert your account to a noninterest-earning account before accrued interest, if any, is credited, you will not receive the accrued interest. A taxpayer identification number will be required to earn interest on these accounts.

- **Cash Bonus on your account anniversary (up to $25)**
  - This bonus must be selected for twelve consecutive statement cycles, and the account must be active each of those twelve consecutive statement cycles to receive the full $25 bonus. A portion of this bonus (approximately $2.08) is accrued for each statement cycle in which the feature is selected and your account is active. An "active" statement cycle for purposes of this bonus is a statement cycle in which there is at least 1 customer-initiated deposit or withdrawal during the statement cycle. If there is no deposit or withdrawal during the first statement cycle, which can be less than 30 days, the bonus will not be accrued for that first statement cycle.
  - Build-to-Order Checking account must be open on the Account Anniversary for this feature to be paid. If the Build-to-Order Checking account is closed before the Account Anniversary, the cash bonus accrued to that point will not be paid.
  - Bonus will be paid on the Account Anniversary. (If the Anniversary Date falls on a holiday, weekend or non-processing day, the bonus will be paid the next processing day.) Bonus is paid only from time of the most recent selection of the bonus feature, meaning the prorated feature will be paid only for the period in which the feature is selected consecutively up to the Account

7

Anniversary. If the cash bonus feature is selected at account opening and subsequently de-selected prior to the Account Anniversary the cash bonus accrued prior to the deselection of the feature will not be paid. Cash bonus will be directly deposited into the Build-to-Order Checking account.

- Limit two bonus features per customer.

## Double Visa Extras points

Visa Extras program enrollment required. Standard Visa Extras points will be earned. On the month following your Visa Extras account update, Compass will match those points earned in the previous month, thereby giving double the rewards. Points are paid only on Qualifying Purchases. A "Qualifying Purchase" is any signature-based purchase, Internet purchase, phone or mail-order purchase, bill payment, contactless purchase (purchases made by holding your Visa card or other device up to a secure reader instead of swiping your card), or small dollar purchase for which you are not required to sign, made with an enrolled Visa card, that is processed or submitted through the Visa U.S.A. Inc. payment system. A Qualifying Purchase does not include a purchase made using a Personal Identification Number (PIN) or purchase you initiate through identification technology that substitutes for a PIN. Additional restrictions apply. For more information on qualifying purchases, see program terms and conditions.

## Cash Back on Visa Check Card transactions

- Available for the primary Check Card for the account only. Earn cash back on Qualifying Check Card Purchases* routed through Visa. (*See "Double Visa Extras Points" for Qualifying Purchase definition.)
- $0.05 will be earned for every signature-based purchase (excluding teller cash disbursements and merchant authorizations that are not completed).
- In addition, $0.05 will be earned for every two PIN-based purchases (excluding cash transactions, ATM transactions, quasi-cash transactions, payments made for prepaid or re-loadable cards such as certain gift cards, Visa Buxx and similar cards, transactions conducted at Global Access Cash Terminals and pre-authorizations for transactions).
- Returns or debits of a Visa Check Card charge will be deducted from the cash calculation.
- Cash back rewards will be credited at the end of the statement cycle for the Build-to-Order Checking account linked to the primary Check Card. The posting date for a qualifying transaction will determine the date of the transaction for purposes of this feature. Credits for the net purchase activity will be made at the end of the cycle period. If the Build-to-Order Checking account is closed, the cash back rewards accrued in the current statement cycle will not be paid.

## One Overdraft Fee (NSF Charge) Forgiveness per year

Applies to one NSF Charge-Paid Item or one NSF Charge-Returned Item (see "Miscellaneous Fees"). The Overdraft Fee (NSF Charge) Forgiveness Feature must be redeemed during your anniversary year in which this feature is selected or it will be forfeited; this feature does not accrue or carry forward into subsequent years. Once you redeem this feature it will remain a selected feature until the Account Anniversary. You may cancel this feature after the Account Anniversary before you redeem it in the next Anniversary Year. If you select other features during the year, and have redeemed the Fee Forgiveness feature, they will be in addition to this feature. This feature may not be used for forgiveness of Extended Overdraft Service Charges.

## Pricing:

- Two features provided free of charge.
- Additional features may be selected for an "Add-On Benefit Charge" of $2.00 each. ("Add-On Benefit Charge" will be the description on your monthly account statement.) For example, if five features are chosen, the account will be charged an "Add-On Benefit Charge" of $6 per month.
- The "Add-On Benefit Charge" will reflect the highest number of features selected during the given statement cycle, regardless of the number of days the features were in effect. The "Add-On Benefit Charge" will be incurred on the day the statement is generated.
- The features selected at 8:00 pm/CST at the end of a banking day will be the features given for that day. (Example: If double points are selected at 10:00 am, card is used during the day, and double points is changed to Interest in the evening of the same day, double points will NOT be awarded; rather the account will have Interest as the feature.)
- Note: Features are calculated based on statement cycle, not month.

## Other Fees and Service Charges for Consumer Accounts

ATM/Check Card Replacement Fee ...... $5.00
(applies to non-personalized Compass ATM/Check Cards)

Bank Bags

Zipper ...... $5.00

Locked ...... $20.00

Bond Coupon Collection Fee ...... $5.00

Check Charges

Personalized check orders are debited from your account when your order is received. Personalized check order charges vary by style, check design chosen by customer, and number of checks ordered.

Collection Item

Incoming:

Customer ...... $20.00

Non-Customer ...... $25.00

Outgoing:

Customer ...... $20.00

International ...... $20.00 + costs

Compass Fee for Using Another Bank's ATM ...... $2.00/transaction

Deposit Correction Fee ...... $2.50/item

Direct Deposits ...... N/C

Extended Overdraft Service Charge

Should your account become overdrawn and continue with a negative balance for six (6) consecutive calendar days, an extended overdraft fee of $38 ($42 effective January 1, 2009) will be charged. Thereafter, if your account continues to maintain a negative balance, a fee of $7 per calendar day will be assessed beginning on the seventh (7th) calendar day and will continue until day thirty (30) of overdraft status or until the account is brought to a positive balance, whichever occurs first. This extended overdraft fee is in addition to any NSF fees you may incur as a result of items being presented against insufficient funds.

Garnishments, Levies, Court Orders ...... $75.00 + attorney fees

Inter-Account Transfer Fee ...... $10.00/transfer

Transfers funds from customer-designated account to cover potential overdrafts in checking account.

ISF Fee

International Transactions are those transactions using your debit card made outside of the United States. An International Service Fee ("ISF") amounting to 1% for ATM transactions and 3% of the transaction amount for transactions made some place other than an ATM will be posted to your account for any International Transaction, even those in US dollars. A full description of the currency conversion process is contained in this agreement on page 16.

Item Presented for Payment Against Insufficient Funds (NSF)

NSF Charge – Paid Item ...... $38.00

NSF Charge – Returned Item ...... $38.00

These charges are applied for processing items presented for payment against insufficient funds (NSF) with a maximum of six (6) charges per day. These charges are imposed on items created by check, in-person withdrawal, ATM withdrawal, or other electronic means.

New Account Closed Within 180 Days ...... $25.00

Non Staff-Assisted Call ...... $1.00/call over 15/month

Personalized Check Card Fee ...... $10.00

Reconcile Statement ................................................................................$25.00/hour

Research .........................................................$25.00/hour; $3.00/copy or fax

Return of Cancelled Checks .................................................$5.00/month

Returned Deposited Item ...........................................................$7.00/item

Rerun Deposited Item ................................................................$7.00/item

Rolled Coin ...................................................................................$0.10/roll

Special Statement* .............................................................................$5.00

Stop Payment Request ....................................................$30.00/request

Staff-Assisted Call ............................................$1.00/call over 5/month

Strapped Currency ..................................................................$0.20/each

Telephone Transfer Fee ...............................................$3.00/transfer

Temporary Checks (minimum two checks) ..................................$1.00

Wire Transfers
   Incoming (Customer) .............................................................$12.00
   Manual Outgoing (Customer) ...............................................$20.00
   Manual Outgoing (Repetitive) ...............................................$18.00
   with Confirmation:
      Fax/E-mail ........................................................................$23.00
      Mail ....................................................................................$25.00
      Phone .................................................................................$25.00
   Manual Outgoing (Non-Customer) .........................................$45.00
   International:
   Incoming ..................................................................................$15.00
   Outgoing ..................................................................................$45.00
   Confirmation of incoming or outgoing:
      Fax/E-mail ..........................................................................$3.00
      Mail ......................................................................................$5.00
      Phone ...................................................................................$5.00

*A special statement may include, but not be exclusive to, the following: daily statements, duplicate statements, hold statements and statement printouts.

---

### Additional services and/or fee schedules available upon request.

---

Note: The above noted fees and service charges are not set bank-wide. These prices are driven by the competition in your local market.

Welcome to Compass Bank, Member FDIC. Following is your Deposit Account Agreement and certain additional disclosure information, including our Consumer Privacy Disclosure. Please read this information carefully and keep it with your other financial records.

## Consumer Deposit Account Agreement

This Agreement covers any type of deposit account (as defined below) you may have with us now, or in the future, that is used primarily for personal, family or household purposes. By opening your account, by conducting any transaction involving your account, or by maintaining your account after receipt of this Agreement, you agree to the terms in this Agreement. This Agreement includes not only this document but also our current interest and service charge schedule, disclosure for interest-earning consumer accounts, and disclosure for noninterest-earning consumer accounts. This Agreement also includes any new or amended provisions and disclosures we may provide concerning your account. All of these documents together are a contract between you and us.

### 1. DEFINITIONS

The following terms and definitions apply when used in this Agreement. Some terms used in this Agreement but not defined below have the meaning assigned to them in the Uniform Commercial Code in effect in the state where we maintain your account.

**Account or Deposit Account.** Any type of checking, savings, money market, or NOW account to which funds may be deposited. Time deposits are excluded from this definition and are not covered by this Agreement.

**Account Owner or Owner.** Each person named in our records as an account owner with respect to an account, including any trustee, custodian, guardian, conservator or other representative acting in that capacity.

**ATMs.** Automated teller machines.

**Attorney-in-Fact.** An agent designated under a valid power of attorney. We reserve the right, in our sole discretion, not to honor any power of attorney. An attorney-in-fact representing an account owner does not become an owner of an account and will not have rights in an account at the owner's death as a result of the agent's capacity as an attorney-in-fact.

**Authorized Signer.** Each person who has signed a signature card with respect to an account in any capacity, including any trustee, custodian, guardian, conservator, attorney-in-fact, or other representative acting in that capacity.

**Available Balance.** The balance of funds in your account that is available for immediate withdrawal. Unlike the posted balance, the available balance reflects any holds placed on your account, including the restrictions described in the Funds Availability Disclosure included with this Agreement. Your available balance may be more or less than the amount of your posted balance, but does not include any credit available under any Compass Bank Overdraft Protection Line of Credit you may have.

**Business Days.** Although many of our branch offices are open on Saturdays, for purposes of this Agreement, our business days are Monday through Friday, excluding holidays.

**Dormant Account.** An account will be considered dormant if, for one year or more in the case of checking and NOW accounts, or for two years or more in the case of savings and money market accounts: no transaction activity has been conducted on the account, no correspondence regarding the account has been received by us, and no account owner has otherwise indicated an interest in the account.

**Individual Account.** An account owned by one party as indicated on our records, also referred to as a single-party account. At the death of the owner of a single-party account, ownership passes as part of the owner's estate unless the owner has chosen a P.O.D. account by designating one or more beneficiaries of the account.

**Item.** A check, substitute check, draft, withdrawal order, payment order, or other similar instrument, order or instruction, whether oral, written or electronic, either for the deposit of funds to your account or for the payment of funds from your account. Items include debits and credits for point-of-sale, ATM, and Check Card transactions.

**Joint Account.** A deposit account with more than one account owner. There are three types of Joint Accounts:

1. A Joint Account with right of survivorship so that, at the death of an owner, ownership of the account passes to the surviving owner(s), and not to the deceased owner's estate;
2. A Joint Account with right of survivorship and P.O.D. by designating one or more beneficiaries of the account, so that at the death of the last surviving owner, ownership passes to P.O.D. beneficiaries and is not part of the last surviving owner's estate; or
3. A Joint Account without right of survivorship, so that at the death of any owner, the deceased owner's ownership interest passes as part of a deceased owner's estate.
   **Joint Accounts will be presumed to be with right of survivorship (type (1) above) unless applicable law requires that you make an affirmative designation in order for right of survivorship status to apply.**

**P.O.D. Account.** A deposit account payable on request to one or more owners during their lifetime and on the death of the last surviving owner, to one or more beneficiaries and not to any owner's estate.

**Posted Balance.** The balance of funds in your account based solely on items that have been posted as credits or debits to your account. Unlike the available balance, the posted balance does not reflect any holds placed on your account. Your posted balance may be more or less than the amount of your available balance, but does not include any credit available under any Compass Bank Overdraft Protection Line of Credit you may have.

**Service Charges.** Any charge, fee, or similar amount due to us, whether for a service we may provide or for a particular condition or status of your account or any item relating to your account, which has been disclosed by us in this Agreement or in any schedule of service charges included in this Agreement. Other charges, fees, and similar amounts due to us, but not disclosed in this Agreement, may apply under other agreements you may have with us.

**Single Party Account.** An account owned by one party as indicated on our records. At the death of the owner of a single party account, ownership passes as part of the owner's estate unless the owner has chosen a P.O.D. account by designating one or more beneficiaries of the account.

**Substitute Check.** A paper reproduction of an original check that (1) contains an image of the front and back of the original check; (2) bears a MICR line containing all the information appearing in the MICR line of the original check at the time the original check was converted to an electronic image; (3) conforms in paper stock, dimension and otherwise with industry standards; (4) includes a legend stating, "This is a legal copy of your check. You can use it the same way you would use the original check"; and (5) is suitable for automated processing in the same matter as the original check.

**Totten Trust Account.** A deposit account in the name of one or more owners as trustee for one or more beneficiaries where the relationship is established by the form of the deposit account and there are no assets of the trust other than the sums on deposit in the deposit account. This type of account is a form of P.O.D. account.

**We, Our, Us, Compass, and Compass Bank.** Compass Bank or any other affiliate bank of Compass Bancshares, Inc. For purposes of Section 8 only, these terms also include the directors, officers, and employees of Compass Bank and its affiliates.

**You, Your, and Yours.** The account owner or, if the account is a multiple party account, any and all account owners, and all authorized signers.

## 2. ACCOUNT OPERATIONS

**Owners.** You appoint all other account owners and authorized signers of a multiple party account as your authorized agents for all purposes relating to your account including, but not limited to, endorsing checks, stopping payment, making deposits, making withdrawals, obtaining account information, making transfers from the account, closing the account, or pledging or assigning the account. A withdrawal from your joint account by any account owner or authorized signer will discharge our obligation to you with respect to the amount withdrawn, regardless of the source or ownership of the funds in the account. Any account owner of a joint account may add a new owner or authorized signer to the account. We may, but are not required to, honor a request by you to prevent a withdrawal or transfer by any other account owner or authorized signer or to remove another account owner or authorized signer from the account. A service charge may apply if we honor the request, and you agree to indemnify us and hold us harmless from any loss or damage to you or anyone else that results from our honoring the request. You may be asked to sign additional documents or agreements in connection with the request.

**Assignment of Account.** No pledge, assignment, or other transfer of any account, whether by gift or otherwise, shall be binding on us unless acknowledged by us in writing. Unless we agree otherwise in writing, the account will remain subject to our rights of set off even after we receive notice of the transfer. Accounts are transferable only on our records. We reserve the right not to acknowledge or accept any attempted transfer of an account.

**Authorization to Pay and Debit the Account.** You authorize us to pay or withdraw funds from the account, without any notice to you, on the order of any account owner or authorized signer or on the order of any personal representative of any account owner (even if appointed in a state or country other than the one in which we maintain your account). You authorize us to honor orders to pay or withdraw funds received by us from any of these persons in writing, orally, or electronically (including by telephone).

**Powers of Attorney.** We may, but are not required to, honor orders and instructions concerning your account by an attorney-in-fact for any account owner or an authorized signer, or by a personal representative of an account owner. We may require that a power of attorney be executed on a form acceptable to us, that the power of attorney contain language satisfactory to us and/or that the attorney-in-fact present the original power of attorney before we honor the orders or instructions of the attorney-in-fact. We may restrict the types and dollar amount of transactions an attorney-in-fact may conduct. We may terminate acceptance of a power of attorney at any time and for any reason and without notice to any account owner or any other person. If we honor the orders and instructions of the attorney-in-fact, account transactions conducted by the

12

attorney-in-fact and the instructions and orders of the attorney-in-fact are binding on all account owners. If we accept a power of attorney, we may continue to recognize and honor the authority of the attorney-in-fact until we receive written notice of revocation or termination of authority and have had a reasonable time to act on it.

**Service Charges; Other Charges.** You acknowledge that you have been provided our current schedule of service charges and, if applicable, interest rates for your account. You agree that all service charges and any interest rates applicable to the account may be changed by us from time to time as set forth in Section 14. You agree that we may debit from your account, even if your account is dormant, abandoned, or unclaimed, without any further notice or demand, all service charges applicable to your account, as well as charges for the purchase of checks, drafts, and other products or services ordered by you from or through us. We shall not be liable for failing to pay any item presented against your account if the available balance is insufficient to pay the item, even if the insufficient available balance results solely from debiting these service and other charges from your account.

**Order of Payment.** If two or more items are presented for payment from your account on the same day, we may pay or charge the items to your account in any order without regard to any contrary instructions from you, even if paying a particular item or items causes the available balance for your account to be insufficient to pay one or more other items that otherwise could have been paid. We may pay items drawn on us, debit your account for any service charges and other amounts that you owe us under this Agreement or otherwise, and we may exercise any rights of set off we may have against the account before we pay any other item. If an item was initiated at a point-of-sale terminal, you agree that we may charge the amount of the item to your account or place a hold on your account in the amount requested by the merchant immediately upon authorization of the point-of-sale transaction, even though we have not then actually received the item for payment.

## 3. ACCOUNT STATEMENTS AND NOTICES

**Periodic Statements.** If we have a deliverable address on file for you, we will mail or deliver to you periodic statements for your deposit account at approximately monthly intervals unless we specify to you another interval period when you open your account or thereafter. The account statement will describe each item by item number (where appropriate), amount, and date of debit or credit. For certain types of accounts, the periodic statement may be accompanied by the items or a facsimile of those items listed on the statement, unless the item or an image of the item is unavailable for any reason [for example, when an item is electronically presented (or re-presented) for payment against your account]. If we comply with the foregoing provisions of this Section, you agree that the statement and items all have been made available to you in a reasonable manner.

**Mailing and Availability.** Periodic statements, canceled checks (if applicable to your account), and written notices of dishonor or return of unpaid deposited items, or any other notice or communication, may be mailed to you at the address shown in our records or a forwarding address for you if one is on file with the U.S. Postal Service. However, we will **not** mail any account information to an address that the U.S. Postal Service has informed us is "undeliverable" or otherwise invalid. We use reasonable efforts to maintain the **first** statement(s) returned as undeliverable for sixty (60) days, or such longer period of time as may be required by applicable law, after which time we may dispose of the statement and original items. However, we retain printable versions of your account statements for seven (7) years, or longer periods as may be required by applicable law. You agree to give us written notice of any change of your address. We may, but are not required to, change the address for you in our records if the U.S. Postal Service notifies us of a new address for you, and you waive any and all claims against us that arise in connection with any mail forwarded to you or sent to an address for you supplied to us by the U.S. Postal Service. Any account owner or authorized signer of a joint account may change the mailing address for your account. Notice to any one account owner shall constitute notice to all joint account owners in a joint account. We may make statements, canceled checks (if applicable to your account), notices or other communications available to you by holding all or any of these items for you, or delivering all or any of these items to you, in accordance with your request or instructions.

**Errors; Unauthorized Transactions and Forgeries.** Our records regarding your accounts will be deemed correct unless you timely establish with us that we made an error. It is essential that any account errors (including missing deposits), unauthorized transactions, alterations, unauthorized signatures, forgeries, encoding errors, posting errors (such as debits or credits posted twice, debits posted as credits or credits posted as debits), or any other improper transactions on your account (collectively referred to as "exceptions") be reported to us as soon as reasonably possible. Otherwise, we may not be liable for the exceptions. You agree that you will carefully examine each account statement or notice you receive and report any exceptions to us promptly after you receive the statement or notice. You agree to act in a prompt and reasonable manner in reviewing your statement or notice and reporting any exceptions to us. If you do not report an exception to us within thirty (30) days after we send the statement or notice to you, you agree that we will not be liable to you for any loss you suffer related to that exception. This means that, if you do not report exceptions to us within thirty (30) days after we send the statement or notice to you, we will not reimburse you for any loss you suffer, including, but not limited to, any amounts lost as a result of: paying any unauthorized, forged, or altered item, or paying any other item altered or forged by the same wrongdoer if

we paid the other item before we received notice of any of these exceptions from you. Except as provided by applicable law, you also agree that we will not be required to reimburse you for any exceptions caused by your own negligence. Different rules may apply to items that are electronic fund transfers. In any case, you agree promptly to repay us any amount credited to your account in error, and you authorize us to debit your account to obtain payment of any erroneous credit.

**Record Retention.** We will retain any item paid on your account for a period of fifteen (15) business days from the date the item posts to your account. We will retain copies of those items for seven (7) years.

## 4. ACCOUNT TRANSACTIONS

**Signatures; Facsimile Signatures.** We may rely on each signature on a signature card for the account or on prior authorized items in all transactions connected with the account. If you use a facsimile signature or other mechanical or electronic device for signing or authenticating items drawn on your account, you assume the entire risk that the facsimile signature or device may be used improperly or by an unauthorized person. We will not reimburse you or any other person for items drawn in this fashion by any unauthorized person or by any person who exceeds his or her authority to do so, and we may honor all of these type items presented to us. You agree to indemnify and hold us harmless from all losses resulting from our honoring an item in any instance in which the item bears or purports to bear a facsimile signature resembling a signature on file with us, regardless of by whom or by what means the actual or purported signature was affixed to the item.

**Pre-authorized Items.** If you give information about your account to any person who represents to you that, in the ordinary course of its business, it will present unsigned items for payment or initiate transfers from your accounts, then any item initiated by that person will be deemed authorized by you and may be charged to your account. You assume the entire risk that the information you furnished may be used improperly or by an unauthorized person. We will not reimburse you or any other person for items drawn in this fashion by any unauthorized person or by any person who exceeds his or her authority to do so, and we may honor all of these type items presented to us.

**Wire Transfers.** When we accept a wire transfer payment order instructing payment to you or to your account, we will notify you of our receipt of payment by indicating the amount in your account statement. If the payment order does not specify an account, we may deposit the payment into any account that you maintain with us (including multiple party accounts). Your account statement will be the only notice of receipt which we will provide you, and no interest will be paid on wire transfer payments deposited into your account unless the account otherwise pays interest. You agree to pay all charges for wire transfer services stated in our schedule of service charges, as amended from time to time. Payment orders will be not accepted until executed by us. We reserve the right to refuse to accept any payment order. If there is ever any inconsistency or conflict between the account number and the name of a recipient on an instruction or payment order, we may rely exclusively on the account number and bank identification number contained in a payment order rather than the name. Amendments to a payment order must be provided to us at least three business days prior to our execution of the payment order. We may record any telephone conversations or data transmissions that initiate or amend payment orders. The change rate on a return payment order shall be the rate in effect at the time the return is received.

**Insufficient Available Balance and Overdrafts.** If your available balance is insufficient to pay the total amount of items presented against your account, we may, at our option, return any of the items unpaid or pay any or all of the items, even though payment will cause an overdraft of your account. We may return any item at any time if your available balance is insufficient to pay that item, even if we previously have permitted overdrafts. You are not entitled to rely on any prior act by us with respect to your account. Our election to pay overdrafts does not establish a course of dealing between you and us or modify the terms of this Agreement. You agree that, if your available balance is insufficient to pay any item presented against your account, you promptly will pay both our service charge for handling and processing that item and the amount of any overdraft without further notice or demand. Your failure to pay these amounts promptly may result in additional service charges to your account. Each account owner will be jointly and severally liable for the charges regardless of which account owner is responsible for their occurrence. In the event you fail to pay the amount of any overdraft and all associated service charges and we refer your overdrawn account to an attorney for collection, you agree to pay all reasonable expenses, including without limitation, attorney's fees and court costs incurred by us as a result of your account being overdrawn.

**Inter-Account Transfers.** If you are an owner of two or more consumer accounts that we allow to be linked, you may, by separate agreement, designate one of those accounts as a secondary account from which funds may be transferred to cover items (individually and collectively called a "covered item") presented for payment out of another, primary account. If you make this designation, either at the time you open your accounts or later and if the available balance in the primary account is insufficient to pay the amount of any covered item at the time of presentment, then we will automatically transfer from the secondary account into the primary account the specific amount necessary to pay that covered item. You agree to pay the currently applicable service charge each time funds are transferred out of your secondary account and into your

14

primary account to pay a covered item. We will have no obligation to pay any covered item if the combined available balances in the secondary account and primary account at the time the covered item is presented to us for payment are insufficient to pay the covered item or if the secondary account is in dormant, inactive, or frozen status. In this situation, if no funds are transferred, you will not be assessed any service charge for the transfer, but your primary account will be subject to the provisions regarding insufficient available balances and overdrafts discussed above. Your designation of primary and secondary accounts will not affect whether any electronic transaction is authorized for payment. If an electronic transaction requires authorization at the time of the transaction (e.g., point-of-sale, ATM and Check Card transactions), the authorization will be based on the available balance in the primary account and not on the available balance in the secondary account, regardless of any designation of a secondary account.

**Stop Payment Orders.** You may request us to stop payment on any check, draft, or similar written order or instruction drawn on your account by giving us the information we may request, including the account number, the item number, the date of the item, the payee of the item, and the exact amount of the item, and by paying our stop payment service charge. We will search for your item by computer, so it is essential that all information you give us be accurate. To be effective, we must receive any stop payment order in time to afford us a reasonable opportunity to act. We will confirm your oral stop payment order in writing, and the information included in our written confirmation will be conclusively presumed to be correct unless you notify us within fourteen (14) days of the date of the confirmation. Confirmed stop payment orders will be continued in effect for a period of two (2) years from the date the initial oral stop payment order was placed. A confirmed stop payment order will expire at the end of the two-year period unless you revoke it at an earlier date or renew it in writing for an additional two-year period and pay our stop payment service charge. You may not stop payment on an item if we have verified to the payee that the available balance in your account is sufficient to pay such item, or if we have accepted that item by payment or otherwise. Any account owner or authorized signer may place a stop payment order, and we are not required to release a stop payment order unless requested to do so by the account owner or the authorized signer who requested it. You agree to indemnify us and hold us harmless from and against any loss, damages, and expenses (including attorney's fee) we may incur by reason of our refusal to pay any item upon which you have stopped payment. For stop payment orders on pre-authorized electronic funds transfers, please refer to the Electronic Fund Transfer Disclosure Statement in this booklet.

**Illegal Transactions.** You agree that you will not use your account for any transaction that is illegal in the jurisdiction where you live, in the jurisdiction where the transaction is consummated, or in any other jurisdiction affected by the transaction. You agree that it is your responsibility to determine the legality of each of your transactions in all applicable jurisdictions before entering into the transaction. You acknowledge and agree that we have no obligation to monitor, to review or to evaluate the legality of transactions on your account. You also agree that you will not use your account in connection with any Internet or online gambling transaction, whether or not gambling is legal in any applicable jurisdiction. We reserve the right to return any item that we believe is related to an illegal transaction, an Internet or online gambling transaction or a high-risk transaction. To the fullest extent permitted by law, you agree to pay for any item that you authorized, even if the transaction related to that item is determined to be illegal.

## 5. DEPOSITS, COLLECTIONS AND PAYMENT OF ITEMS

**Deposits.** We may require a minimum initial deposit to open an account. You may make additional deposits of any amount of $1.00 or more accompanied by a completed deposit slip (unless your deposit is by electronic funds transfer) either in person, by mail, at an ATM, a night depository, or by electronic funds transfer. We may charge for deposits, and we also may refuse to accept for deposit or collection any item you offer for deposit, accept all or any part of a deposit for collection only, or limit the amount of the deposit. If your deposit is other than cash, for example, checks, we may without prior notice to you (except where prior notice is required by law) place a hold on the account for the amount of deposited items for the approximate period of time it takes us to verify that the items will be paid. During the hold period, interest-bearing accounts will earn interest in accordance with the interest schedule. Items accepted for deposit and drawn on a non-U.S. institution may be subject to a service charge. We may accept an item for deposit to your account from anyone and without question or verifying the authority of the person making the deposit. Credit for any item we accept for deposit to your account, including funds that are deposited by electronic transfer, is provisional and may be revoked if the item is not finally paid, for any reason, in cash or its equivalent. Our policy on the availability of deposits for withdrawal is described in the Funds Availability Disclosure portion of this booklet.

**Collection as Agent.** Items delivered to us for deposit or collection are received by us as your agent for collection and at your risk. We may accept an item for collection only (such as a returned deposited item or an item drawn on a non-U.S. institution) and impose a service charge for attempting collection of the item. In situations where we accept an item for collection only, we will not give you cash or an official check for the items until the items have been paid. We are obligated only to exercise ordinary care in handling and collecting items delivered to us for deposit or collection. We shall not be liable for the misconduct, neglect,

insolvency, mistake, or fault of other persons or entities, or for loss or destruction of any item in transit or in the possession of others or for loss of use as a result of theft, fire, or other event beyond our reasonable control. If any item deposited to your account is payable by a payor that is not a bank, we may send the item directly to that payor. Items payable through another bank may be sent directly to that bank or to collecting agents who likewise shall have the right to send the items directly to the bank on which they are drawn or at which they are payable. Payment of these items may be accepted in cash or drafts and neither we nor any collecting agents shall be liable for failure to collect such drafts. Each collecting agent is deemed to be your agent. No collecting agent shall be liable for loss arising from any act or omission of another agent.

**Joint Deposits.** If an account is a joint account or a P.O.D. account (including a Totten trust account), our rights and liabilities for payment of any sums on deposit shall be governed by the laws of the state in which we maintain your account.

**Deposits by Minors, Agents or Trustees.** A deposit accepted from or on behalf of a minor, at our option, may be paid to or for the minor, and the payment shall be valid even though not executed by the minor's guardian, custodian, or legal representative. Where a deposit is accepted from an agent, trustee, or other representative, we do not have to inquire as to the authority of the representative, and the deposit may be paid to the account owner or to the representative without inquiring as to the disposition of the deposit.

**Uniform Transfer to Minors Act (UTMA) Deposits.** A gift of money to a minor named as beneficiary of an UTMA account is irrevocable, will be considered made in accordance with the provisions of applicable state statutes governing uniform transfers to minors, and shall include all interest earned on the account.

**Check Endorsement Standards.** If you deposit checks into your account, you are responsible for the condition of the back of the check when it is deposited. The back of the check is used during the check collection process to record the identification of banks processing the check. Most of the back of the check is reserved for bank use. You agree that the endorsement of the check must be contained in the payee endorsement area, which is limited to 1½ inches from the trailing edge of the check on the back. The trailing edge of the check is defined as the left side of the check looking at it from the front. Any writing, stamp, or marking outside of the payee endorsement area may delay the proper return of any unpaid check you have deposited. You agree to indemnify us from any loss or liability, including attorney's fees, that may be caused by your failure to adhere to the endorsement standards of the Federal Reserve System.

**Foreign Currencies.** Deposits in foreign currencies will be converted to U.S. dollars at the exchange rate in effect at the time of final collection. You will be responsible for verification of any exchange rate information provided by us in advance of final collection. Exchange rates may fluctuate significantly in a short period of time. You bear all exchange risk related to deposits of foreign currency.

**ATM Depositories, Night Depositories, Direct Deposit, and Deposits by Mail.** Our ATMs, night depositories, direct deposit service, and deposit by mail service are for your convenience. We are not accountable for deposits made in this manner until the deposit is actually accepted and processed by our authorized employees. Deposits made in this manner will be posted to your account on the date accepted by our authorized employees. Our records are conclusive proof of what deposits we received from you through ATM depositories, night depositories, or the mail service. If any direct deposit is recalled, we are authorized to reverse the deposit without prior notice to you, except as otherwise required by law.

**Chargebacks.** In the event a deposited item drawn on us (an "on us" item) is determined by us not to be payable for any reason or a deposited item drawn on any other payor is returned to us for any reason, without regard to whether the other payor returned the item to us before its deadline to do so, we may charge the item (a "chargeback item") to your account or to any account of which you are an owner (including any multiple party account) or an authorized signer. We may debit all or part of a chargeback item to your account even if doing so results in or causes an overdraft of your account and regardless of whether the item can be physically returned to you. You waive notice of dishonor in connection with any item that is not finally paid in full and that we charge back to your account. We may recover from you any amount withdrawn by you against a chargeback item. In the event that our debit of all or part of a chargeback item results in or causes an overdraft of your account, we may obtain and retain possession of the item, if it is available, until we recover from you the amount of any overdraft of your account and for a reasonable time thereafter. If our debit of all or part of a chargeback item that is an "on us" item does not result in or cause an overdraft of your account, our deadline for return to you of the item, if it is available, shall be six business days after we make such determination. If we are notified that any item for which you received payment or credit to your account is not properly payable, you agree that, without notice to you, we may authorize the drawee bank to hold the item and try to obtain payment. We will not initially decide whether a deposited item has been improperly returned; if you believe that a deposited item has been improperly returned, you should contact us immediately. We will not be responsible for failing to pay any item presented against your account before a deposit becomes available for withdrawal, as set forth above, if the available balance in your account, without regard to such deposit, is insufficient to pay the item, as provided in Section 4.

**Service Charges; Error Correction.** We may debit a service charge from your account for each deposited item that: is returned to us unpaid (whether for the first or a subsequent time); bears an unauthorized signature; prior to deposit, has been altered, erased, defaced or mutilated; or is incorrectly

described on the deposit slip. Errors in posting, addition, subtraction and calculation, whether by you or us, are subject to correction by us at any time; provided that we may not be obligated to correct certain errors if you fail to notify us of the exceptions in a timely manner as described in Section 3. You agree to repay us promptly any amount credited to your account in error, and you authorize us to charge your account or any other account of which you are an account owner, to obtain payment of any erroneous payment or credit.

**Stale and Postdated Checks; Miscellaneous.** We may, in our discretion and without notice to you, either pay or return any check that is presented to us for payment more than six (6) months after the date of that check. We also may, in our discretion and without notice to you, either pay or return any check we receive before the date on that check unless you have complied with any applicable statute regarding postdated checks and you have provided us with notice of the postdating in time for us to have a reasonable opportunity to act on it before the check is presented to us for payment. Your notice about any postdated check must be given in the same manner as a stop payment order and must provide the same information required for stop payment orders. Each postdated item covered by a notice of postdating will be subject to a service charge. We may disregard any information on an item drawn on your account other than the signature of the authorized signer, the amount of the item, the date of the item (subject to the provisions of this Agreement regarding stale and postdated checks), the account number, the endorsements, and any other information which appears in magnetic ink at the bottom of the check. We are not bound by any other information on the check, including terms such as "Payee's endorsement required," "Not good for more than $ (amount)," "Void if not paid in (number) days," and similar language. We shall have the right, but not the obligation, to process any item that is materially incomplete or has been altered.

## 6. WITHDRAWALS

You may withdraw part or all of your account's available balance. Any account owner or authorized signer of a multiple party account may withdraw all or part of the available balance in the account regardless of who deposited the funds into the account. We accept no responsibility or obligation, except as required by law, to supervise or review the use of your account.

**Restrictions on Withdrawals.** Your account may be subject to certain transaction limitations, which are shown in the disclosure provided to you at the time you opened your account. We may at any time and without prior notice to you (except where prior notice is required by law) establish or change transaction limitations for any account. If these limitations are exceeded, you will be subject to any charges in effect at the time. In addition, we may stop paying interest on an interest-bearing account, or we may close the account without prior notice to you (except where prior notice is required by law). We also may require you to provide notice before you may withdraw money from certain types of accounts.

Without prior written notice to you, we may place a hold on your account to cover a claim against your account, or we may pay the source of the claim when we receive any notice, claim, or court order which we believe may affect your account (such as liens, garnishments, attachments, levies, injunctions, or other orders of a court or other governmental agency), regardless of the form or manner in which we receive the notice, claim, or court order and regardless of whether we are a named party to the notice, claim, or court order. We will not be responsible for refusing to let you withdraw funds from the account or refusing to pay items presented against your account while the hold is in effect or after we have paid funds to the source of the claim.

In the event of any controversy with respect to your account, such as a claim against funds in your account or a dispute over who has the right to make withdrawals from the account or who is the owner of the funds on deposit in the account, we may refuse to pay any funds to anyone until we are satisfied that the controversy is resolved or we may continue to honor the authority of account owners and authorized signers as reflected on our records. We will not be responsible for any damages you may suffer as a result of our refusal to allow you or anyone else to withdraw funds due to the controversy or our allowing any existing owner or authorized signer to continue to conduct transactions on the account during the controversy. We also may pay or offer to pay the account balance to a court of appropriate jurisdiction, naming all of the claimants to the account as defendants in an interpleader action. You agree to reimburse us for all expenses we incur in an interpleader action, including attorney's fees and costs, and we may obtain reimbursement of those expenses from your account without notice to you.

## 7. SUB-ACCOUNTS

We may establish two "sub-accounts" on our books for certain deposit accounts. If we elect to establish the sub-accounts, it will not affect the other terms and conditions of your account or this Agreement, the Federal Deposit Insurance protection afforded on your account, the interest (if any) paid on your account, the service charges imposed in connection with your account, or the Truth in Savings disclosure given to you. Both of the sub-accounts will remain your accounts, but will be used by us internally to manage your funds. The first sub-account will qualify as and be treated as a "savings deposit account" for the purposes of Federal Reserve Board regulations. You authorize us to transfer funds between the two sub-accounts consistent with Federal Reserve Board regulations. As such, we must advise you that the regulations require that we reserve the right to require at least seven days' written notice prior to the withdrawal or transfer of funds from the

savings sub-account. We do not currently exercise that right with respect to these savings sub-accounts. In the event we determine to exercise that right, we will close the savings sub-account and transfer all funds back to your current account and cease the sub-account agreement. Your deposit and withdrawal capabilities are not affected by our election to establish the sub-account.

## 8. ARBITRATION

By opening or maintaining the account, you agree that if a dispute of any kind arises under this Agreement or relates to your account or any transactions involving your account, either you or we can choose to have that dispute resolved by binding arbitration. **This arbitration provision limits your ability to litigate claims in court and your right to a jury trial. You should review this section carefully.** You will not have the right to participate as a class representative or member of any class of claimants for any claim subject to arbitration. Arbitration is usually an informal proceeding in which disputes are decided by one or more neutral arbitrators who receive the evidence at a hearing and then issue a binding ruling in the form of an award. You and we understand that discovery and other procedures in arbitration may be more limited than discovery in court proceedings and that the ability to modify, vacate, or appeal an award by an arbitrator(s) is limited.

You and we agree, upon written demand made by you or us, to submit to binding arbitration all disputes, controversies, and claims, whether based on contract, fraud, tort, intentional tort, statute, regulation, constitution, common law, equity, or any other legal basis or theory, and whether preexisting, present, or future, that arise from or relate to this Agreement, the account, any transaction involving the account, or any advertisements, promotions, or oral or written statements related to this Agreement or the account, the relationships that result from this Agreement (including, to the fullest extent permitted by applicable law, relationships with third parties who are not parties to this Agreement or this arbitration provision), or the scope or enforceability of this Agreement (collectively, a "Claim"). All parties retain the right to seek relief in a small claims court for disputes or claims within the scope of the jurisdiction of the small claims court. You or we may choose either the American Arbitration Association ("AAA") or the National Arbitration Forum ("NAF"), within ten (10) days of the written demand for arbitration, to conduct any arbitration under this Agreement, or you and we may agree upon a different arbitrator. In any event, any arbitration under this Agreement shall be conducted in accordance with the applicable arbitration rules of the arbitrator or arbitration organization ("Rules"). If an arbitrator other than the AAA is chosen, the Rules of the AAA will be applied to any circumstance that is not addressed by the Rules of the chosen arbitrator. In the event of any inconsistency between this Agreement and the Rules to be used for an arbitration, such inconsistency shall be resolved in favor of this Agreement. This arbitration provision is made pursuant to a transaction involving interstate commerce, and the Federal Arbitration Act (the "FAA") shall apply to the construction, interpretation, and enforceability of this Agreement notwithstanding any other choice of law provision contained in this Agreement.

Either you or we may initiate arbitration by giving written notice of the intention to arbitrate to the other party and by filing notice with the AAA or the NAF in accordance with the Rules in effect at the time the notice is filed. The demand for arbitration may be made before or after commencement of any litigation. You should contact the AAA at 800-778-7879 or www.adr.org, or the NAF at 800-474-2371 or www.arb-forum.com, for more information about arbitration. If for any reason the AAA or the NAF is unable or unwilling to serve as arbitration administrator, or you and we are unable to agree on another arbitrator, we will substitute another national or regional arbitration organization.

Demand for arbitration under this Agreement must be made before the date when any judicial action upon the same Claim would be barred under any applicable statute of limitations; otherwise, the claim also is barred in arbitration. Any dispute as to whether any statute of limitations, estoppel, waiver, laches, or other doctrine bars the arbitration of any Claim shall be decided by arbitration in accordance with the provisions of this Agreement.

A Claim by, or on behalf of, other persons will not be considered in, joined with, or consolidated with, the arbitration proceedings between you and us, and a Claim shall not be arbitrated on a class action, private attorney general, or other representative basis. Any dispute regarding the prohibitions in the prior sentence shall be resolved by the arbitrator(s) in accordance with this agreement.

Nothing in this arbitration provision shall limit the right of you or us, whether before, during, or after the pendency of any arbitration proceeding, to exercise any self-help remedies, such as set off or repossession and sale of collateral, or to obtain provisional or ancillary remedies or injunctive or other traditionally equitable relief, such as filing an interpleader action. You and we agree that the taking of these actions or any other participation in litigation by you or us does not waive any right that either you or we have to demand arbitration at any time with respect to any subsequent or amended Claim filed against you or us after commencement of litigation between you and us.

Where the aggregate of all Claims by both you and us does not exceed $100,000, any expedited procedures provided in the Rules ("Expedited Procedures") shall apply, and a single arbitrator shall decide the Claims. Where the aggregate of all Claims by both you and us exceeds $100,000, a panel of three arbitrators

shall decide all Claims. Each arbitrator, whether or not acting under Expedited Procedures, shall be an active member in good standing of the bar for any state in the continental United States and shall be either: actively engaged in the practice of law for at least 5 years, or a retired judge.

You and we agree that the arbitrator(s): shall limit discovery to matters directly relevant to the arbitrated dispute; shall grant only relief that is based upon and consistent with substantial evidence and applicable substantive law; shall have authority to grant relief only with respect to Claims asserted by or against you individually; shall not have any authority to require, as part of any relief granted, that you and we continue any relationship we may have under this Agreement or otherwise; and shall provide a brief written explanation of the basis for the award upon the request of either party and shall make specific findings of fact and conclusions of law to support any arbitration award that exceeds $25,000. Unless inconsistent with applicable law, each party shall bear the expense of its respective attorney, expert, and witness fees, regardless of which party prevails in the arbitration. Upon written request by you, for claims up to $50,000, we will pay to the AAA or NAF the portion of the arbitration filing fee that exceeds the cost of filing a lawsuit in the federal court where you live. Upon written request by you, we may elect, at our sole discretion, to pay or advance some or all of any remaining arbitration fees and other costs. The arbitrator will decide whether we or you ultimately will be responsible for paying any fees or other costs in connection with the arbitration. Any arbitration proceedings shall be conducted in the federal judicial district of your residence. Judgment upon any award rendered in arbitration may be entered in any court having jurisdiction.

If you or we are seeking to bring a joined, consolidated, or class action and if the portion of this arbitration provision that prohibits the arbitration of joined, consolidated, or class actions is deemed invalid or unenforceable, then the entire arbitration provision shall be void and unenforceable. If any portion of this arbitration provision other than the prohibition against the arbitration of joined, consolidated or class actions is deemed invalid or unenforceable, the remaining portions of this arbitration provision will remain valid and enforceable. This arbitration provision shall survive termination of this Agreement and the closing of your Account.

## 9. WAIVER OF JURY TRIAL

**This provision limits your right to a jury trial. You should review this section carefully.**
If (i) neither you nor we seek to compel arbitration of any dispute we have related to this Agreement, your account, or any transactions involving your account, or (ii) some or all of the arbitration clause is unenforceable and we are in a dispute in a court of law, then each of us agrees to waive any right we may have to a jury trial to the extent allowable under the laws of the state that govern this Agreement.

## 10. DORMANT AND ABANDONED/UNCLAIMED ACCOUNTS

Dormant accounts may be subject to a service charge based on the dormant status. In the case of interest-bearing accounts that become dormant, we also may reduce the rate of interest or cease paying interest as disclosed on the applicable schedule of service charges and in accordance with applicable state law. We may be required to transfer the balance in any account that remains dormant, or that is otherwise considered "abandoned" or "unclaimed" for the period of time described by the laws of the state where we maintain your account (or, if applicable, the laws of the state of your last residence as shown on our records) to that state as "abandoned" or "unclaimed" property.

## 11. SET OFF

You acknowledge that, except as otherwise prohibited by law, we have the right to set off against your account any indebtedness or other obligations which you owe us, at any time, without any further notice to or demand on you, whether the indebtedness or other obligations exist at the time the account is opened or arise later. The indebtedness includes, without limitation, all charges and overdrafts incurred on any account you hold with us. You agree that we may set off against the account any claim which we have against you without regard to the source or ownership of the funds on deposit in the account and without requirement that the claim be owed to us by all of the account owners. You also agree that, to the extent allowed by law, we may set off any indebtedness or other obligations which you owe us under this Agreement against any other account or property in which you have an ownership interest that is in our possession or control.

## 12. WAIVERS

You waive and agree that we may waive certain legal requirements called presentment, demand for payment, protest, notice of protest, and notice of dishonor with respect to any and all items for which you received payment or credit from us. No departure by us from the provisions of this Agreement or any waiver of any fees and charges with respect to your Account shall constitute a waiver by us of any further right to impose any charges or enforce the provisions of this Agreement or a course of dealing different from the terms of this Agreement.

## 13. OTHER SERVICES

If you have chosen to receive any of our other Banking Services offered in connection with your account, such as Check Cards, ATM cards, overdraft lines of credit, and PC banking, we may provide the specific terms and conditions of the additional service to you in a separate agreement or disclosure.

## 14. INTEREST; INTEREST REPORTING

Interest will be paid on interest-bearing accounts at the times and at the rates adopted from time to time by us. On each interest payment date, interest will be paid only if, on that date, the ledger balance for the account is equal to or more than the minimum amount required by us in order for you to receive interest on that account. At any time and without prior notice to you (except where prior notice is required by law), we may change these rates and minimum ledger balance amounts or discontinue the payment of interest. The originally effective interest rates and required minimum ledger balance amounts are shown on the interest schedule provided to you at the time you opened your account, and a schedule containing current interest rates and required minimum ledger balance amounts is available to you upon request. Interest paid to you is reportable to the Internal Revenue Service as having been received by the first account owner shown on the signature card maintained for the account. We may be required to withhold a portion of your interest payment and remit it to the Internal Revenue Service.

## 15. CHANGES TO ACCOUNT STATUS

**Conversion to Business Accounts.** We reserve the right, with advance notice, to change your consumer account to a business account if we determine that it is used for business purposes (meaning that the account is not used primarily for personal, family, or household purposes). Your account may be considered a business account if it fits into one or more of the following examples: your account has a business name; deposits include credit card drafts; your account has over 100 withdrawals per month; deposits regularly contain over $2,500 in cash; or your account has over 10 deposits per month. If we convert your consumer account to a business account, we will provide you with an agreement containing the terms and conditions for business accounts.

**Changing Checking or Savings Plans.** If you should change from one checking or savings plan to another during the statement period, your account will be subject to the periodic charges and fees and requirements of the new plan for the entire period.

## 16. APPLICABLE LAW

Except as otherwise provided by law, this Agreement and all accounts are governed by the laws of the state where we maintain your account and applicable federal laws and regulations in effect from time to time and are subject to any applicable automated or other clearinghouse rules and regulations. A determination that any provision of this Agreement is unenforceable or invalid shall not affect the enforceability or validity of any other provision of this Agreement.

For purposes of this Agreement, your account will be deemed to be maintained in the state where you opened your account. Your account is considered to have been opened: if you opened your account in person, at the branch office where you opened your account; if you opened your account by mail, at the location where the mail was received by us; or if you opened your account electronically (including by telephone) and your address is in a state where we have branch offices, in the state of your address at the time you opened your account; or if otherwise, in Alabama.

## 17. ADDITIONAL PROVISIONS

**Closing Your Account.** Either we or you can close your account at any time, for any reason or for no reason, without the necessity of prior written notice. If we close your account, we will notify you by mail or telephone that we have closed your account unless your account has had a zero balance for thirty (30) days or more. We may (but do not have to) mail you a check for the available balance in your account, or you may pick up a check for the available balance at our office. Written notice that the account has been closed and a check, if any, will be sent to any address shown on our records for you, or if the account is a multiple party account, to any account owner to whom we elect to send it. Once we have closed your account, you agree that we can:

- Refuse to honor any checks you have written or any other items which are presented to us for payment after we have closed your account.
- Refuse to collect any check you have deposited in your account, to collect any check you have deposited to your closed account, or to accept any automated deposit to your account.
- Assess any service charge otherwise applicable against any remaining balance in your account.

We are not responsible to you for any damages you may suffer as a result of your account being closed. If you attempt to make a deposit to an account we closed due to nonpayment of an overdraft or otherwise, we may collect the deposit and set off your indebtedness to us and collect a service charge from the amount you deposited. Any funds in excess of $1.00 will be returned to you.

**Survival of this Agreement.** All provisions of this Agreement, including, but not limited to the arbitration provisions contained in Section 8, shall survive the termination of this Agreement or closure of your account(s) by either party for actions arising in connection with this Agreement or your account(s).

**Amendments to this Agreement.** We may amend this Agreement from time to time upon giving prior notice to you. Amendments of this Agreement may include modifying and deleting existing provisions and

adding new provisions. We agree to provide you notice of any amendment (except an amendment benefiting you) at least thirty (30) days, or a longer period if required by law, before that amendment becomes effective by mailing you notice of the amendment to the last address shown on our records, by making the notice available with the periodic statement of your account (as applicable), or by posting notice of the amendment in our offices. We may, but are not required to, give you notice if the amendment will be to your benefit. If there is more than one account owner, we will send the notice of amendment to only one of you.
By continuing to maintain your account or obtaining services or products relating to this Agreement or your account after the amendment becomes effective, you agree to the amendment of this Agreement. We also may, in our sole discretion, discontinue certain kinds of services, products and accounts, and place restrictions on certain types of accounts. If we discontinue the kind of account you have, we can transfer your account balance to another type of account. In that case, we will mail you a notice at least thirty (30) days before the transfer takes effect. By continuing to maintain your account after the transfer takes effect, you expressly agree to the change in the kind of account you have.

## Funds Availability Disclosure

Our policy is to make funds that you deposit in your account available on the day of deposit for the payment of checks presented through normal check collection channels. Funds deposited into your account generally can be withdrawn by other means on the following business day. However, Compass will restrict the withdrawal of funds for outgoing wire transfer and the purchase of cashier's or official checks and money orders, based on the availability schedule listed below.

### DEFINITIONS

To assist you in understanding this policy we have provided definitions of terms commonly used in the banking industry and in this policy.

**Financial Institution:** A commercial bank, savings bank, savings and loan association, or credit union.
**Business Days:** Compass' business days are Monday through Friday, excluding federal holidays. Business days relate to our ability to collect checks through normal check collection channels. However, most Compass Bank branches are open on Saturdays to serve many of your banking needs.
**Routing Number:** The number on the bottom of checks that identifies the location of the financial institution on which the check is drawn. Exhibit A shows where to find the routing number for a personal and business check.

### Exhibit A

PERSONAL CHECK        BUSINESS CHECK

 

**Federal Reserve Bank Cities:** Cities in which the Federal Reserve System offers check processing. Federal Reserve Bank City checks can be identified by a zero in the fourth position of the routing number.
**Federal Reserve Bank check-processing region:** The geographical area served by a Federal Reserve Bank City for purposes of its check-processing activities.

### DETERMINING THE AVAILABILITY OF A DEPOSIT

Generally, if you make a deposit with one of our tellers before 2:00 PM, or at one of our automated teller machines before 1:00 PM, or at one of our night depository facilities before 7:00 AM, on a business day we are open, we will consider that day to be the day of deposit. Otherwise, we may consider that the deposit was made on the next business day we are open. However, in many locations we are able to offer you later times for same-business-day deposits. Please check for specific times that are posted in each banking office and displayed on ATM message screens.

We will consider that the deposit was made on the next business day for the purpose of determining availability if you make a deposit:
1. With one of our tellers after the posted cutoff time; OR
2. At our night depository after the posted cutoff time (or after 7:00 AM Monday through Friday if a cutoff time is not posted) or any time on Saturday, Sunday or a holiday; OR
3. At a Compass automated teller machine after the cutoff time displayed on that ATM's message screen Monday through Friday or any time on a Saturday, Sunday or a holiday.

### AVAILABILITY SCHEDULE FOR WIRE TRANSFERS, CASHIER'S OR OTHER OFFICIAL CHECKS AND MONEY ORDERS

This availability schedule applies when determining the availability assigned to deposited checks for withdrawing such funds in the form of an outgoing wire transfer or purchase of cashier's or other official

checks and money orders.

The availability assigned to checks which are deposited depends on the type of check and the location of the financial institution on which the check is drawn.

1. Cash, wire transfer, pre-authorized credits, and funds from the following deposited checks are available on the first business day after the day of your deposit.
   a. U.S. Treasury checks.
   b. Federal Reserve Bank checks, Federal Home Loan Bank checks, and postal money orders.
   c. Checks drawn on other Compass Bank accounts that are maintained at branches located in the same Federal Reserve Bank check-processing region as your account.
   d. Checks drawn on any financial institution located in the state where we maintain your account (excluding any Texas institution whose routing number begins with 1113) or any financial institution in a Federal Reserve Bank City.

2. Funds from the following deposited checks are also available for cash withdrawal on the first business day after the day of your deposit, if you make the deposit in person to one of our tellers **and use a special deposit ticket made available in our lobby offices from any bank teller.**
   a. State or local government checks from the state where we maintain your account that are payable directly to you.
   b. Certified checks, cashier's checks and other checks drawn directly by a financial institution that are payable directly to you.

3. Checks drawn on financial institutions outside the state where we maintain your account and outside of Federal Reserve Bank Cities, except those checks identified in Section 4 below, will be available on the second business day after the day of your deposit. If we maintain your account in Texas, checks drawn on financial institutions whose routing number begins with 1113, 1122, 1123, and 1163 will also be available for cash withdrawal on the second business day after the day of deposit.

4. Checks drawn on financial institutions whose routing numbers begin with any of the following sets of numbers will be available for cash withdrawal on the third business day after the day of your deposit.

| 0215 | 0911 | 0921 | 1022 | 1113 |
| 0216 | 0912 | 1011 | 1023 | 1122 |
| 0812 | 0913 | 1012 | 1031 | 1123 |
| 0815 | 0914 | 1019 | 1041 | 1163 |
| 0865 | 0915 | 1021 | 1112 | 1214 |

## LONGER DELAYS MAY APPLY

In some cases, we will not make all of the funds you deposit by check available for cash withdrawal, payment of checks, approval of wire transfer, or the purchase of cashier's or other official checks or money orders, at the times stated above. We will notify you at the time you make your deposit, or if your deposit is not made directly with a bank teller or if we decide to delay availability after you have left the premises, we will mail you the notice no later than the first business day following the day of deposit. Our Notice of Delayed Funds Availability will tell you when funds from the deposited check(s) will be available.

Depending on the type of check that you deposit, funds may not be available until the fifth business day after the day of your deposit. However, the first $100 of these deposits with delayed availability will not be subject to the longer delay.

In addition, funds may not be available from any deposited check for up to the eleventh business day after the day of your deposit under the following circumstances:
- Your account has been opened less than 30 days.
- We believe a check you deposited will not be paid.
- You deposit one or more checks that total to more than $5,000 on any one day.
- You redeposit a check that has been previously returned unpaid.
- You have overdrawn your account repeatedly in the last six months.
- There is an emergency, such as a failure of communications or computer equipment.

If you will need the funds from a deposit at a specific time, you should ask us if the funds will be available at that time.

## Electronic Fund Transfer Disclosure Statement

The following disclosures are made in accordance with the federal law regarding electronic payments, deposits, transfers of funds and other electronic transfers to and from your account(s). There may be limitations on account activity that restrict your ability to make electronic fund transfers. Any such limits are disclosed in the appropriate agreements governing your account. The separate agreement and disclosure statement governing your use of a Compass Check Card or Compass ATM card initially will be provided to you either at the time you open an account or by mail after you open an account, and it will control if there is any conflict between that particular agreement and disclosure statement and this Disclosure Statement.

1. **DEFINITIONS:** Electronic Fund Transfer: Any transfer of funds, other than a transaction originated by

check, draft or similar paper instrument, that is initiated through an electronic terminal, telephone, computer or magnetic tape to instruct us to debit or credit an account. Electronic Fund Transfers include such electronic transactions as direct deposits or withdrawals of funds, automated teller machine transfers, transfers initiated by telephone, and Check Card transactions. Pre-authorized Electronic Fund Transfer: An Electronic Fund Transfer that you have authorized in advance to recur at substantially regular intervals, for example, direct deposits into or withdrawal of funds out of your account.

**2. YOUR LIABILITY:** Authorized Transfers: You are liable for all Electronic Fund Transfers that you authorize, whether directly or indirectly. Unauthorized Transfers: Tell us at once if you believe your account has been or may be subject to unauthorized Electronic Fund Transfers. Telephone us immediately at the number provided in Section 3 below to keep your possible losses to a minimum. You could lose all the money in your account(s) (plus the amount of funds available in an overdraft line of credit).

If you tell us within two (2) business days after learning of the loss or theft of your Check Card, ATM card, or other account access device, or after learning of any other unauthorized transfers from your account involving your Check Card, ATM card, or other account access device, you can lose no more than $50 if Electronic Fund Transfers are made without your permission. For these transactions, if you DO NOT tell us within two (2) business days after learning of the loss, theft or unauthorized use, and we can establish that we could have prevented the unauthorized transfer(s) if you had told us in time, you could lose as much as $500.

Your liability limits for Electronic Fund Transfers involving unauthorized Visa Check Card purchases are different from your liability limits noted here. Please refer to your agreement and disclosure statement for your Compass Check Card for these limits.

Also, if your periodic account statement shows unauthorized transfers and you DO NOT tell us within sixty (60) days after the statement was mailed to you, you may not get back any money you lose after the sixty (60) day period if we can prove that we could have prevented the unauthorized transfer(s) if you had told us in time. If an extenuating circumstance (such as extended travel or hospitalization) prevents you from promptly notifying us of a suspected lost or stolen card or other access device or of any other suspected unauthorized transfer(s), the time periods specified in this Section 2 may be extended for a reasonable period.

**3. OUR TELEPHONE NUMBER AND ADDRESS:** If you believe your account(s) has been or will be subject to unauthorized Electronic Fund Transfers, CALL: 1-800-266-7277 and make the appropriate selection from the voice menu, OR WRITE: Compass Bank, Customer Service Department, P.O. Box 10566, Birmingham, Alabama 35296.

**4. COMPASS BANK BUSINESS DAYS:** Monday through Friday, excluding holidays.

**5. ACCOUNT ACCESS:** The types of Electronic Fund Transfers that you may make depend upon specific account type(s) and the services which you obtain, as well as the specific types of Electronic Fund Transfers you have authorized.

**6. CHARGES:** Except as may be provided by a specific agreement with us, there is no additional charge for making Pre-authorized Electronic Fund Transfers. However, each Pre-authorized Electronic Fund Transfer will be subject to the regular account service charges, if any, in accordance with the terms of the related account(s) in effect from time to time.

**7. YOUR DOCUMENTATION OF TRANSFERS:**

a. Receipts: Each time you make a transaction at our automated teller machine, you will have the option to obtain a receipt.

b. Pre-authorized Transfers: If you have arranged to have direct deposits made to your account, you may call us to determine if the deposit has been made. If you have arranged for regular payments of varying amounts to be made from your account, the person you agree to pay should tell you ten (10) days before each payment the amount of the payment and when it will be made.

c. Periodic Statements: You will receive a statement of your account each month you make an Electronic Fund Transfer. Otherwise, you will receive a statement at least quarterly. Your periodic statement will show the details of any Electronic Fund Transfer you made and the details of any Pre-authorized Transfers to or from your account that you instructed us to make.

**8. YOUR RIGHT TO STOP PAYMENT:** If you have authorized us to make regular Pre-authorized Electronic Fund Transfer payments out of your account, you may stop any payment by CALLING US at: 1-800-266-7277 and making the appropriate selection from the voice menu, or by WRITING US at: Compass Bank, Customer Service Department, P.O. Box 10566, Birmingham, Alabama 35296. You must notify us in time for us to receive your request at least three (3) business days before the payment is scheduled to be made. You must provide us with sufficient information to identify the payment, as well as other information we may request. If you deliver your stop payment request by telephone, you must confirm your stop payment order to us in writing within twenty-one (21) days of your oral stop payment order. An oral stop payment request will not be binding on us after twenty-one (21) days if you fail to provide the required written confirmation. We also require that you provide us within twenty-one (21) days of our receipt of your oral or written stop payment order a copy of your written notice to the payee revoking the payee's authority to electronically obtain payments from your account. If we do not receive a copy of that notice from you within

twenty-one (21) days of our receipt of your oral or written stop payment request, your stop payment request will no longer be binding on us. In order to fulfill your stop payment request on any Pre-authorized Electronic Fund Transfer, we may, in our discretion, but are not required to, stop all payments to the particular payee, or we may, in our discretion, notify you that your stop payment request cannot be fulfilled other than by closing your account. If you properly request us to stop payment and we fail to do so, we will reimburse you for losses or damages you suffer, if any, caused by our failure to stop payment as requested. Please see your agreement and disclosure statement for your Compass Check Card or Compass ATM card for different requirements that may apply to stop payment of any Pre-authorized Electronic Fund Transfer involving use of those cards or the account numbers on those cards.

**9. OUR FAILURE TO MAKE TRANSFERS:** If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will reimburse you for any losses or damages that you suffer as a result of our failure to act according to our agreement with you. However, there are some exceptions where we will not be liable, such as, but not limited to, the following: if, through no fault of ours, other than exercise of our right of set off, you do not have money in your account to cover the transfer; if the transfer would exceed the available credit of any overdraft line of credit you may have; if the money in your account is being held subject to legal process or other encumbrance restricting transfers to or from your account; if we have received notice of a dispute as to the rights of parties to the accounts or their creditors or representatives and we have placed a hold on the account until resolution of the dispute; or if circumstances beyond our control prevent the transfer despite our reasonable precautions.

**10. DISCLOSURE OF INFORMATION TO THIRD PARTIES:** We may disclose information to third parties about your account and the transfers you make as described in our Consumer Privacy Disclosure contained in this booklet, as amended or modified from time to time.

**11. IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS:**
Telephone or write us, as soon as you can, at the telephone number or address in Section 3 above, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than sixty (60) days after we sent you the FIRST statement on which the error or problem appeared. Your inquiry must include: your name and account number; AND a description of the error or the transfer you are unsure about, and as clearly as you can, an explanation of why you believe there is an error or why you need more information; AND the dollar amount of the suspected error. If you tell us orally, we may require that you send us your inquiry in writing within ten (10) business days. We will investigate your inquiry and will correct any error promptly. We will tell you the results of our investigation within ten (10) business days [twenty (20) business days for claims on accounts open less than thirty (30) calendar days] after we hear from you; however, we may take up to forty-five (45) calendar days [ninety (90) calendar days for claims on accounts open less than thirty (30) calendar days, foreign-initiated transaction claims, and point-of-sale transaction claims] to investigate your questions. If we need additional time to investigate, we will provisionally re-credit your account within ten (10) business days [twenty (20) business days for claims on accounts open less than thirty (30) calendar days] for the amount you think is in error so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your inquiry in writing, and do not receive your written inquiry within ten (10) business days, we may choose not to provisionally re-credit your account. If we find that there was no error, we will send you a written explanation within three (3) business days after we finish our investigation. You may ask for copies of the documents we used.

## Taxpayer Identification Numbers (Backup Withholding)

The Internal Revenue Service (IRS) is responsible for insuring that all persons pay the correct amount of federal income tax. In order to accomplish this task, they must match the income reported by businesses for individuals (salary, interest, dividends, etc.) to the income shown on individual tax returns. Taxpayer Identification Numbers (for individuals, their Social Security Numbers) are used as the basis for matching these records. A federal law requires all payers of interest (such as a bank) to report interest paid to individuals by Taxpayer Identification Number. Therefore, you must provide your correct Taxpayer Identification Number to us so that we may meet these reporting requirements. This law also stipulates that should a bank or other payer of interest not have your correct Taxpayer Identification Number on file, then 28% of interest, dividends and other payments made to you must be withheld and forwarded to the IRS to insure that taxes on this income are paid. This advance payment is known and referred to by the IRS as "backup withholding." Backup withholding is not an additional tax. Rather, the amount of taxes you normally would owe will be reduced by the amount of tax withheld. If an overpayment of taxes results from backup withholding, a refund may be obtained from the IRS.

Unless the IRS has instructed us to withhold from your interest and dividend payments, you can avoid this 28% backup withholding by providing us with your correct Taxpayer Identification Number. Additionally, you must certify that the Taxpayer Identification Number you provide us is correct and that you have not been advised by the IRS that you are subject to backup withholding. The IRS is empowered to impose penalties on you and us if your correct Taxpayer Identification Number is not provided. (Please see "Penalties" later in this section.)

## HOW BACKUP WITHHOLDING WORKS

Unless you are an exempt recipient (see Exempt Recipient section) you are subject to backup withholding if: you fail to furnish us your Taxpayer Identification Number, OR the IRS notifies us that you furnished an incorrect Taxpayer Identification Number, OR the IRS notifies us that you are subject to backup withholding (under Section 3406(a)(1)(C) of the Internal Revenue Code[1]), OR for an interest or dividend account opened after December 31, 1983, you fail to certify to us that you are NOT subject to backup withholding, or fail to certify your **Taxpayer Identification Number** is correct.

**How to Avoid Backup Withholding:** When you open an account with us, we will provide you with the necessary forms to complete in order to provide and certify your Taxpayer Identification Number. TO AVOID BACKUP WITHHOLDING, all you have to do is provide us with your correct Taxpayer Identification Number and sign the certification statement to certify that the number you are providing is correct and that you are not subject to backup withholding.

**Taxpayer Identification Number:** If you are an individual, your Taxpayer Identification Number is your Social Security Number. If you are not an individual, the number is your Employer Identification Number. In all instances, the number you give us should be the number of the owner of the account.

**Guidelines for Determining the Proper Identification Number to Give to Compass:** Social Security Numbers have nine digits separated by two hyphens: i.e., 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. Employer Identification Numbers have nine digits separated by only one hyphen: i.e., 00-0000000. The table below will help you determine the number to give to us.

| THIS TYPE OF ACCOUNT: | GIVE THE SOCIAL SECURITY NUMBER OF: |
|---|---|
| 1. An individual account | The individual |
| 2. Two or more individuals (joint/multiple party account) | The actual owner of the account. This person's name should be listed first on the account |
| 3. Husband and wife (joint/multiple party account) | The first person listed on the account |
| 4. Custodian account of a minor (Uniform Transfer to Minors Act) | The minor |
| 5. Adult and minor (joint/multiple party account) | The adult or, if the minor is the only contributor, the minor |
| 6. Account in the name of a guardian or committee for a designated ward, minor, or incompetent person | The ward, minor, or incompetent person |
| 7.a. The usual revocable savings trust account (grantor is also trustee) | The grantor-trustee |
| 7.b. So-called trust account that is not a legal or valid trust under State law | The actual owner |
| 8. A valid trust or estate | Legal entity (Do not furnish the identifying number of the personal representative or trustee unless the legal entity itself is not designated in the account title.) |

**Obtaining a Number.** If you don't have a Taxpayer Identification Number or you don't know your number, obtain Form SS-5, Application for a Social Security Number Card, or Form SS-4, Application for Employer Identification Number, at the local office of the Social Security Administration or the Internal Revenue Service and apply for a number. When you get a number, submit a new form to us.

**Exempt Recipients.** Payees specifically exempted from backup withholding on ALL payments include the following:

- A corporation.
- A financial institution.
- An organization exempt from tax under Section 501(a), or an individual retirement plan.
- The United States or any agency or instrumentality thereof.
- A State, the District of Columbia, a possession of the United States, or any subdivision or instrumentality thereof.

[1]NOTE: Section 3406(a)(1)(C) of the Internal Revenue Code basically requires backup withholding if you have underreported to the IRS interest or dividend payments you received, or if you failed to file a tax return which would have included reportable interest or dividend payments. The IRS will notify you before they instruct us to withhold for either of these reasons.

- Compass Insurance Agency, Inc.
- Compass Mortgage Corporation
- Capital Investment Counsel, Inc.
- St. Johns Investment Management Company (also doing business as St. Johns Wealth Management)
- Stavis, Margolis Advisory Services, Inc.

This disclosure statement takes the place of all previous notices or statements of the above-listed companies, or their predecessor companies, involving privacy and use of consumer information and is subject to change at any time. This disclosure statement is provided under the federal Gramm-Leach-Bliley and Fair Credit Reporting Acts. Compass affiliates also will comply with any applicable state laws that impose additional requirements relating to privacy and use of consumer information.

## COLLECTION OF INFORMATION

We collect, retain, and use information about you when we reasonably believe that it will help conduct our business or provide products, services, and other opportunities to you. For example, we use your information to protect and administer records, accounts, and funds; to comply with certain laws and regulations; to help us design and improve our products and services; and to understand your financial needs so we can provide you with quality products and superior service. Information about you is collected from several sources, such as:

- information you provide in applications for products and services and through other means (for example: assets, income, and debts);
- information about your transactions and experiences with us and our affiliates (for example: account balances, account activity and usage, and payment history);
- information we receive from consumer reporting agencies and other outside sources (for example: creditworthiness, credit history, and employment verification); and
- information we gather at your request or with your consent from third parties (for example: to assist us with servicing your account(s), providing special services to you, or preparing offers for other products).

## OUR INFORMATION-SHARING PRACTICES WITH OUTSIDE PARTIES

We may disclose customer information we collect, as described above in "Collection of Information," to nonaffiliated third parties as permitted by law. For example, we may disclose customer information about you to credit reporting agencies, in response to a subpoena or court order, as required by certain federal and state laws, to help complete a transaction initiated by you, and pursuant to your request or authorization. We also may disclose customer information we collect to companies that perform services or functions on our behalf — such as account processing, check printing, marketing services, and consulting services — and to other financial institutions with which we have joint marketing agreements — such as banks, insurance providers, commercial or consumer leasing companies, securities brokers or dealers, and investment companies. Joint marketing agreements with other financial institutions allow us to bring information to you about financial products and services that are different from those we provide. We require our service providers and those with which we jointly market financial products or services to adhere to confidentiality standards governing the privacy of your information. These companies may use and disclose the information we provide to them only for the purposes for which it is provided or as otherwise permitted by law.

**We do not sell your customer information to outside marketers to allow them to independently solicit you for a product unless we first ask your permission to send your information.**

## OUR INFORMATION-SHARING PRACTICES WITHIN THE COMPASS FAMILY OF COMPANIES
- **Information About Our Experiences and Transactions With You**

The Compass family of companies consists of financial service providers such as banks, insurance agencies, brokerage companies, leasing companies and other financial services companies that work together to serve you. These companies are our affiliates. By sharing your information with our affiliates, we are able to serve you more efficiently and conveniently. We are permitted by law to share with our affiliates information about our own transactions and experiences with you and your accounts. This type of information includes, but is not limited to, identification information, account balances, account transactions and payment history information. For example, our affiliates may use transaction and experience information to provide you with information about additional products and services, to evaluate and improve existing products and services, and to help identify you as our customer to prevent unauthorized access to your information. **If you choose to limit marketing (see box on next page), then our affiliates will not use any information we share with them about your transactions and experiences with us to make a marketing solicitation to you.** This will not prevent us from sharing this type of information with them, but will restrict their use of that information. This restriction will not apply in certain circumstances, such as if you currently do business with one of our affiliates or if you ask to receive information or offers from them.

- A foreign government, a political subdivision of a foreign government, or any agency or instrumentality thereof.
- An International organization or any agency or instrumentality thereof.
- A dealer in securities or commodities registered in the U.S. or a possession of the U.S.
- A real estate investment trust.
- A common trust fund operated by a bank under Section 584(a).
- An exempt charitable remainder trust, or a nonexempt trust described in Section 4947(a)(1).
- An entity registered at all times under the Investment Company Act of 1940.
- A foreign central bank of issue.

Payments of dividends and patronage dividends not generally subject to backup withholding include the following:
- Payments to nonresident aliens subject to withholding under Section 1441.
- Payments to partnerships not engaged in a trade or business in the U.S. and which have at least one nonresident partner.
- Payments of patronage dividends where the amount received is not paid in money.
- Payments made by certain foreign organizations.

Payments of interest not generally subject to backup withholding include the following:
- Payments of interest on obligations issued by individuals. Note: You may be subject to backup withholding if this interest is $600 or more and is paid in the course of the payer's trade or business and you have not provided your correct Taxpayer Identification Number to the payer.
- Payments of tax-exempt interest (including exempt-interest dividends under Section 852).
- Payments described in Section 6059(b)(05) to nonresident aliens.
- Payments on tax-free covenant bonds under Section 1451.
- Payments made by certain foreign organizations.

If you are uncertain whether you qualify as an exempt recipient, call your accountant or the Internal Revenue Service.

To avoid possible withholding, exempt recipients should complete the form(s) provided by Compass and should check the box captioned Exempt Recipients. The form should also contain your Taxpayer Identification Number, and the certification statement must be signed. The form must then be returned to Compass.

## PENALTIES

1. **Penalty for Failure to Furnish Taxpayer Identification Number:** If you fail to furnish your taxpayer identification number to a payer, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.
2. **Failure to Report Certain Dividend and Interest Payments:** If you fail to include any portion of an includible payment for interest, dividends, or patronage dividends in gross income, such failure will be treated as being due to negligence and will be subject to a penalty of 5% on any portion of an underpayment attributable to that failure unless there is clear and convincing evidence to the contrary.
3. **Civil Penalty for False Information With Respect to Withholding:** If you make a false statement with no reasonable basis that results in no imposition of backup withholding, you are subject to a penalty of $500.
4. **Criminal Penalty for Falsifying Information:** Falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

## Compass Consumer Privacy Disclosure

### Our Commitment to Your Privacy

The Compass family of companies values your trust and respects the privacy of your personal financial information. As part of our commitment to you, we want you to be informed about our policies to protect and safeguard your information.

We are committed to protecting your privacy and maintaining the security of your information. When we share information within or outside the Compass family of companies, we follow strict security standards, maintain confidentiality policies, and comply with applicable laws regarding the use of customer information. Our aim is always to deliver improved service and quality products to meet your needs.

## INFORMATION ABOUT OUR PRIVACY DISCLOSURE

This disclosure describes our privacy practices applicable to the information of our individual customers who obtain a product or service primarily for personal, family, or household purposes. This disclosure is made on behalf of the following companies in the Compass family:
- Compass Bank
- Compass Brokerage, Inc.
- Compass Consulting and Benefits, Inc.
- Compass Financial Corporation

**Information That Is Not About Our Experiences and Transactions With You**

We also may share certain information with our affiliates in the Compass family that is considered credit information but is not information about our own transactions and experiences with you. Examples of this type of information include:

- information in an application, such as your income, marital status and assets;
- information we obtain to verify representations made by you, such as your open lines of credit;
- information we obtain from a consumer credit report, such as your credit score and credit history; and
- information we obtain from a person or company regarding its employment, credit, or other relationship with you, such as your employment history.

Our affiliates may use this information in determining your eligibility for consumer loans, brokerage services, insurance, and similar products and services they offer. **If you choose to limit marketing (see box below), then we will not share any of this type of credit for information with our affiliates to use for credit purposes, such as determining your eligibility for or soliciting you for their products or services.** This will prevent us from sharing your credit information with our affiliates except for other uses, such as performing technical or operational support services. Examples of technical and operational support services include preparation of account statements, data processing services, and underwriting services.

---

**Your Choice to Limit Marketing**

You may limit our affiliates from marketing their products or services to you based on information that we share with them, such as your income, your account history with us, and your credit score.
**To limit these marketing offers call us toll-free at 1-800-275-7219.**

---

**Things You Should Know About Making A Choice to Limit Marketing By Our Affiliates**

**As long as you remain a customer, you only have to tell us once to limit marketing by our affiliates based on information we share with them.** If you have chosen to "opt out" of our sharing credit information with affiliates in past years and have continued to be a customer, your "opt out" will now also limit marketing based on other information we share, as described in this disclosure. Joint account holders may limit sharing of information for each other. If we receive a request to limit information sharing for only one joint account holder, we can continue to share information about other account holders.

If you stop doing business with us, your choice to limit marketing by our affiliates will continue to apply to the information we have collected while you were a customer for as long as that information remains on our systems. If you become a customer again after you have stopped doing business with us, however, you will have to tell us again to limit marketing by our affiliates based on information we share about you related to your new account(s). This is because we remove all information about former customers, including choices to restrict marketing, from our systems after a period of time in order to safeguard the information.

**Other Types of Information**

Certain trust and fiduciary account information maintained by Compass Bank's trust division (known as the Compass Bank Wealth Management Group) may be subject to special protections from disclosure under applicable fiduciary laws and our own policies and practices to carefully safeguard such information.

We may receive health or medical information about you, for example, in connection with an application for insurance. We will not use health and medical information, or share that information with our affiliates, except as necessary or appropriate to process your application or transaction, provide services requested by you, or to maintain your account information. We will comply with all applicable laws or regulations restricting the disclosure of health or medical information.

**SECURITY OF YOUR INFORMATION**

Our commitment to the privacy of your information includes maintaining the security of your information. We use physical, electronic, and procedural safeguards to help prevent unauthorized access to customer information. We periodically test and update our safeguards to help ensure the protection and integrity of our customer information.

We train and regularly educate our employees about the importance of maintaining the confidentiality of customer information and the proper handling of customer information. All of our employees are governed by a code of conduct that authorizes access to customer information for business purposes only and includes strict standards for keeping your information confidential.

**MAINTAINING ACCURATE INFORMATION**

Our procedures help assure that your financial information is accurate, current, and complete. You play an important part in helping us maintain accurate records by always reviewing your account statements, notices, payment coupons, tax reporting, and other information that we provide you. You also may have access to information about your account(s) through our customer service department and, if applicable, our

Web site. If you ever believe any information we have about you is not complete or correct, please call us or follow the instructions on your account statement, if any.

### FORMER CUSTOMERS
Our policies and practices for the collection and disclosure of information about individual customers contained in this Consumer Privacy Disclosure apply to both current and former customers.

### ONLINE BANKING PRIVACY
We employ proven processes and technologies to protect the privacy and security of your information when you bank online with us, such as firewalls, encryption techniques, and authentication procedures. If you visit our Web site, we may put a "cookie" or similar file on your hard drive to facilitate navigation and personalize your experience. By using cookies, we can collect technical and navigational information, such as computer browser type, Internet protocol address and other computer identification information and match that with pages visited and time spent on our Web pages. This helps us improve our Web site. When you use our online banking services, we also may use information in the cookie or similar file to match the Internet browser and computer you use with your online account for security purposes. We do not knowingly collect, maintain, or use personal information from our Web sites about children under the age of 13. For more information about our online security practices, please visit our Web site at: www.compassbank.com.

Para una version en espanol de nuestra politica de privacidad, pongase en contacto con su sucursal local de Compass o visite www.compassbank.com.

## Important Information About Your Checking Account (Check 21)

### Substitute Checks and Your Rights
#### What is a substitute check?
To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account. However, you have rights under other laws with respect to those transactions.

#### What are my rights regarding substitute checks?
In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, NSF fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest-bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other laws.

If you use this procedure, you may receive a refund of up to $2,500 or the amount of the substitute check, whichever is less, (plus interest if your account earns interest) within 10 business days after we received your claim and the remainder of your refund (plus interest if your account earns interest) not later than 45 calendar days after we received your claim.

We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your account.

#### How do I make a claim for a refund?
If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact us at: Compass Bank, Attention: Electronic Banking, P.O. Box 10566, Birmingham, AL 35296 or telephone number 1-800-378-2379.

You must contact us within 40 calendar days of the date that we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

Your claim must include –
- A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);

- An estimate of the amount of your loss;
- An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and
- A copy of the substitute check or the following information to help us identify the substitute check: the check number, the name of the person to whom you wrote the check and the amount of the check.

## Visa Check Card Agreement and Disclosure Statement

This Agreement and Disclosure Statement governs the use of your Visa Check Card. You do not have to sign this Agreement but you should sign the Card as soon as you receive it – it helps protect against unauthorized use of your Card. By retaining or using the Card or by authorizing anyone else to use the Card, you have agreed to the terms of this Agreement. Please read this Agreement carefully and keep it for future reference.

### 1. DEFINITIONS:

- ATM – refers to automated teller machines.
- Card – refers to your Visa Check Card, which accesses your Deposit Account.
- Deposit Account or Account – refers to each of your Compass Bank checking or savings accounts that is tied to or may be accessed by using the Card.
- Network – refers to each of the various card processing networks in which we participate, which may include the INTERLINK, PLUS, STAR, and Visa networks. We will notify you of any changes to the networks in which we participate.
- PIN – refers to the personal identification number required for certain uses of your Card.
- POS Transaction – refers to a "point-of-sale" Card transaction for the purchase of goods or services conducted with a PIN.
- Primary Checking Account – refers to your Compass Bank checking account described in Section 8 as follows.
- Unauthorized Use – refers to a transfer from your Deposit Account initiated using either your Card or the account number for your Card by someone other than yourself where that person had no actual authority to initiate the transfer and you received no benefit from the transfer. There is no unauthorized use if: (a) you allow someone to use your Card, the account number for your Card, or your PIN, even if that person transfers more than you authorized, unless you have notified us that transfers by that person are no longer authorized; or (b) we initiate the transfer.
- Visa Transaction – refers to a Card transaction conducted without a PIN at either a merchant's terminal connected to or a financial institution participating in the Visa Network.
- We, us and our – refer to Compass Bank.
- You, your and yours – refer to each owner of a Deposit Account.

### 2. USE OF YOUR CARD:
Each transaction on your Card is considered an "item" under the Deposit Account agreement applicable to that transaction, and will be subject to the terms of that agreement. To protect the use of your Card, you will be provided with a PIN, which must be used on all ATM Transactions and POS Transactions. You should not disclose your PIN to anyone. If the security or confidentiality of your PIN is compromised, you should notify us at once by calling 1-800-239-5175.

Your Card will allow you to conduct:
- ATM Transactions: Your Card may be used with a PIN:
  - At any Compass ATM, to make cash withdrawals from each Deposit Account(s) and to transfer funds between multiple Deposit Accounts;
  - At any ATM connected to the Networks, to make cash withdrawals directly from your Primary Checking Account;
  - To make deposits to each Deposit Account at any Compass ATM.
- POS Transactions: Your Card may be used with a PIN to access funds in your Primary Checking Account to purchase goods or services and to obtain cash at any merchant that participates in the Interlink or Star Networks.
- Visa Transactions: Your Card also may be used without a PIN to access funds in your Primary Checking Account to purchase goods or services at any merchant that accepts Visa debit cards, and to make cash withdrawals from the tellers at those banks and other financial institutions that participate in the Visa Network and accept Visa debit cards.

POS Transactions and Visa Transactions are accepted solely at the option of individual business establishments, banks and other financial institutions, and you agree that we will not be liable to you for refusal by any such business, bank or financial institution to honor the Card.

You can overdraw your Deposit Account using your Card. We may allow one or more ATM Transactions, POS Transactions or Visa Transactions, even though your Deposit Account has an available balance that is insufficient to cover the transaction. The fact that a transaction is completed is no guarantee or representation that you have sufficient funds in your Deposit Account to cover the transaction.

### 3. PREAUTHORIZED RECURRING TRANSFERS; STOPPING PAYMENT ON TRANSACTIONS:
If you use your Card or the account number for your Card to authorize in advance any recurring payments from your Deposit Account (for example, a monthly gym membership fee) and later wish to stop one or more of these payments, you should contact the merchant/biller directly. If the merchant/biller fails to stop the

recurring payments, contact us at 1-800-239-5175. If you wish to stop a particular payment, you must notify us as provided in the agreement for the Deposit Account from which this payment is made in time for us to receive your request three (3) business days or more before the payment is scheduled to be made. Your Card may have to be cancelled in order to stop recurring payments. If we cancel your Card in order to stop any payment, we may charge you the stop-payment fee provided in the applicable Deposit Account agreement.

## 4. HOLDS FOR AUTHORIZED TRANSACTIONS:

**We may place a hold on your Deposit Account for a Card transaction:** When you use your Card for certain transactions (including every POS and many Visa Transactions), the merchant accepting your Card may request advance authorization of that transaction. If we authorize a transaction, we may place a temporary "hold" on your Deposit Account for the amount of the authorized transaction, which we refer to as a "POS hold." A POS hold is not payment for an authorized transaction. We will make payment for a transaction only after the actual transaction is presented to us physically or electronically.

**Release of POS holds:** Any POS hold on your Deposit Account will be released upon the earlier of: (a) the day we: (i) receive the actual transaction, (ii) post that transaction to your Account for payment, and (iii) match the authorization of that transaction to the actual transaction; or (b) three (3) business days after the date we authorized that transaction. The release of the POS hold will be in the form of a credit to your Deposit Account for the amount of the hold. **Credits for released POS holds and payments for Card transactions are posted separately to your Account, and the credit for any particular POS hold is not used to pay the particular transaction for which the hold was placed.**

**Effect of an authorization hold:** Each POS hold will reduce the available balance in your Deposit Account by the amount of the hold. In the event the available balance in your Deposit Account is insufficient to pay items posted to your Account, we may assess and you agree to pay a service charge for each item (including a transaction on your Card) presented against insufficient funds (an "NSF fee"). An insufficient available balance in your Deposit Account may result in whole or in part from a POS hold or from NSF fees charged to that Account.

**Authorization requests by merchants:** Under the Visa rules governing Card transactions, merchants generally are permitted to request authorization only for the actual amount of a transaction. However, certain kinds of merchants in specified situations are permitted to request authorization for a Card transaction in an amount different from the amount of the actual transaction. For example, restaurants and drinking establishments may request authorization for the estimated amount of a transaction, and others may request authorization for an amount up to 20% over the amount of the actual bill in order to cover an anticipated tip. When we receive an authorization request from a merchant, we do not receive information from which to determine whether the request covers the actual amount of a transaction, an estimated amount, or whether the merchant's request exceeds the amount permitted by the Visa rules.

For example:

- If you use your Card to pay for a $50 dinner, the restaurant may request authorization for a $60 transaction, as permitted by the Visa rules.
- If you use your Card at a drinking establishment to order drinks totaling $10, the establishment might request authorization for a $50 transaction in anticipation that you will place additional orders. Even though this practice may not be permitted by the Visa rules, we cannot make this determination at the time we receive the authorization request.
- Card terminals used for "pay at the pump" gasoline purchases will check for authorization before the amount of any purchase is determined. Authorization will be given only if the available balance in your Deposit Account equals or exceeds a certain designated amount, which may vary among merchants and change from time to time. Because authorization is based on this designated amount (not the amount of your intended purchase), authorization may be declined even though the available balance in your Deposit Account is sufficient to cover your intended purchase. To avoid authorizations that may exceed the amount of your intended purchase, you may pay inside the station rather than at the pump. If we authorize a Card transaction, the POS hold will be for the amount requested by the merchant, which may be in excess of the amount of the actual transaction or the amount permitted by the Visa rules. **Because each POS hold reduces the available balance in your Deposit Account, any authorization request by a merchant for an amount that exceeds the amount of the actual transaction may cause you to have insufficient funds to pay items posted to your Deposit Account, and may cause you to incur NSF fees for those items.**

**5. ILLEGAL TRANSACTIONS:** You agree that you will not use your Card for any transaction that is illegal in the jurisdiction where you live, in the jurisdiction where the transaction is consummated, or in any other jurisdiction affected by the transaction. You agree that it is your responsibility to determine the legality of each transaction in all applicable jurisdictions before entering into such transaction. Display of the Visa logo or any other logo by any person accepting the Card does not indicate that the transaction is legal in all applicable jurisdictions. You acknowledge and agree that we have no obligation to monitor, to review or to evaluate the legality of your Card transactions. You also agree that you will not use your Card in connection

with any Internet or online gambling transaction or lottery ticket purchase, whether or not the same is legal in any applicable jurisdiction. We reserve the right to decline any transaction that we, in our sole discretion, believe is an illegal transaction, an Internet or online gambling transaction, lottery ticket purchase or a high-risk transaction. To the fullest extent permitted by law, you agree to pay for any Card transaction that you authorized, even if that transaction is determined to be illegal.

## 6. LIMITATIONS ON FREQUENCY AND DOLLAR AMOUNT OF TRANSACTIONS:

- Although you may have several deposit accounts with us, you can use your Card to access only those Deposit Accounts that we, at your request, have set up for use with your Card. To add or remove Deposit Accounts, please contact us.
- If your Deposit Accounts include a savings or money market deposit account, federal law permits you to have no more than a total of three (3) POS Transactions and Visa Transactions per month from such an account, as described in the agreement for these Deposit Accounts.
- For security reasons, there are restrictions imposed on your Card that may limit your ability to use your Card. Some of these restrictions, which are designed to detect and prevent unauthorized use of your Card, cannot be disclosed. Unless you request or we notify you otherwise, we may place the following daily limitations on the withdrawals and other transactions you may perform:
- Total cash withdrawals at ATMs – $500 per day or available balance, whichever is less.
- Total POS Transactions – $6,000 per day or available balance, whichever is less.
- Platinum Check Cards and clients in the Preferred Client Program may have higher daily ATM and POS limits.

The daily period to which these limitations apply shall commence at 12:00 midnight on each day and end at 12:00 midnight on the following day. We may add to, remove from or otherwise change our limitations at any time and without notice to you. Because of the limitations imposed by some non-Compass ATMs and in the event of equipment failure or unavailability, you may not be able to withdraw or to access funds even though you have not exceeded these limitations.

All deposits made through a Compass ATM are subject to verification and proof, and are accepted in accordance with the terms of the agreement for the Deposit Account and our Funds Availability Policy.

**7. FEES FOR USE OF THE CARD:** Other than the International Service Fee described in the next paragraph, we do not charge any fees for the use or initial issuance of the Card, but each Deposit Account is subject to any service charges or fees otherwise applicable to that Account. If you request and we issue you a replacement Card, we may charge you the fee provided in our fee schedule. We will not charge you a fee to use your Card at a Compass ATM, but operators of other ATMs and cash-dispensing devices, their Networks, and merchants may charge you a fee. Some cash-dispensing devices appear to be ATMs, but actually may process certain transactions as POS Transactions. If you use your Card multiple times at one of these cash-dispensing devises, some transactions may be processed as POS Transactions and others as ATM Transactions. For the purposes of any fee-rebate offer that we may make to you, ATM fees do not include the International Service Fee described below or any fee assessed in connection with any POS Transaction.

"International Transactions" include any transaction that you make using your Card in a foreign currency and any transaction made using your Card outside of the United States of America, even if that transaction is made in U.S. dollars. If you make a transaction in a currency other than U.S. dollars, Visa will convert the amount of that transaction into U.S. dollars according to its own currency conversion procedures in effect at that time. The exchange rate used to convert the currency is either a rate selected by Visa from the range of rates available in wholesale currency markets on the applicable processing date (which rate may differ from the rate the entity itself receives), or the government-mandated exchange rate in effect on the applicable processing date. The exchange rate in effect on the applicable processing date may differ from the exchange rate in effect on the date you used your Card or Account. The amount (in U.S. dollars) of any credit associated with a particular foreign currency transaction is likely to differ from the amount (in U.S. dollars) of the original transaction due to differences in the applicable rates, which may vary daily. We may charge you an International Service Fee (sometimes referred to as an "ISF") equal to one percent (1%) of the U.S. dollar amount of any International Transaction that is made at an ATM and three percent (3%) of the U.S. dollar amount of any International Transaction at some place other than an ATM, whether that transaction was originally made in U.S. dollars or was made in another currency and converted to U.S. dollars by Visa. In either case, the International Service Fee will be calculated on the U.S. dollar amount provided to us by Visa and will be charged to the same Account to which the transaction is posted at the same time the International Transaction posts to that Account. The same conversion process and fee may apply if any International Transaction is reversed or credited back to your Account.

**8. CHECKING ACCOUNT REQUIREMENT:** At the time you requested your Card, you designated the checking account to which all POS Transactions and Visa Transactions on your Card would be posted, and this checking account is referred to as your Primary Checking Account in this Agreement. You may request us to change your Primary Checking Account, but at all times at least one of your Deposit Accounts must

be a Compass Bank checking account. If your Primary Checking Account is closed and you have no other checking account tied to your Card, then your use of the Card will be terminated automatically, even if you have other Deposit Accounts tied to the Card. If you have several checking accounts tied to your Card and, at the time your Primary Checking Account is closed, you have failed to designate another checking account as your new Primary Checking Account, then you authorize us to designate one of your other checking accounts as your new Primary Checking Account.

**9. POSTING OF DEPOSITS:** Each ATM deposit made by the ATM's posted cutoff time on any business day we are open will be posted to your Deposit Account on the date of receipt; otherwise, it will be posted on our following business day. The cutoff times for deposits may differ from cutoff times for other transactions.

**10. OUR BUSINESS DAYS:** Our business days are Monday through Friday, excluding holidays.

**11. DOCUMENTATION OF TRANSACTIONS:** Each time you use your Card, you will receive or be given the option to obtain a receipt for that transaction. For each Deposit Account, you also will receive a periodic account statement, which will show you the details of all transactions and transfers made with your Card during the covered period. If during a particular month or months you did not have any Card transactions, you may receive a quarterly account statement.

**12. YOUR RESPONSIBILITY FOR TRANSACTIONS USING THE CARD:** Subject to the limitations described in Section 14 below, you agree that you are responsible for all transactions using the Card.

**13. YOUR CARD IS LOST, STOLEN OR SUBJECT TO ANY UNAUTHORIZED USE:** You agree to notify us immediately if your Card is lost or stolen, or if you believe either your Card or the account number for your Card is subject to any unauthorized use. You also agree to take any reasonable actions we may request to prevent unauthorized Card use. You should provide this notice by calling or writing us at: 1-800-239-5175 OR Compass Bank, Attention Customer Service, P.O. Box 10566, Birmingham, Alabama 35296. Telephoning is the best way to keep your possible losses down.

**14. YOUR LIABILITY FOR UNAUTHORIZED TRANSACTIONS USING THE CARD OR CARD ACCOUNT NUMBER:** Contact us AT ONCE if you believe that your Card has been lost, stolen or subject to unauthorized use, as provided in Section 13 above. You could lose all the money in your Deposit Accounts (plus any funds in an overdraft line of credit).

For Unauthorized ATM and POS Transactions: If you believe your Card has been lost, stolen or subject to unauthorized use, and you tell us within two (2) business days after learning of the loss, theft, or possible unauthorized use, you can lose no more than $50 if someone used your Card and PIN without your permission. For these transactions, if you DO NOT tell us within two (2) business days after learning of the loss, theft or unauthorized use, and we can prove we could have stopped someone from using your Card if you had told us in time, you could lose as much as $500.

For Unauthorized Visa Transactions: If the unauthorized transaction was a Visa Transaction, we agree to extend the benefits provided by the Visa Zero Liability program in effect at the time of the unauthorized use, as long as you notify us within a reasonable period of time after the loss or theft of your Card or any unauthorized use of it. We will determine, in our sole discretion, the reasonableness of any particular period of time based on the circumstances. If your own fraudulent action or gross negligence contributes to the unauthorized use of your Card for a Visa Transaction, then your liability for that use will be determined as provided above in "For Unauthorized ATM and POS Transactions." Gross negligence includes but is not limited to your failure to fulfill your obligations under this Agreement, such as your obligations to review your statements and to report any lost or stolen Card or unauthorized use.

Also, if your periodic statement shows transfers that you did not make and you DO NOT tell us within sixty (60) days after the statement was mailed to you, you may not get back any money you lost after the sixty (60) day period if we can prove that we could have stopped someone from using your Card if you had told us in time. If an extenuating circumstance (such as extended travel or hospitalization) prevents you from promptly notifying us of suspected loss, theft or unauthorized use of your Card, the time periods specified in this paragraph may be extended for a reasonable period.

**15. OUR LIABILITY FOR FAILURE TO MAKE TRANSFERS:** If we do not complete a transfer to or from your Deposit Account on time or in the correct amount according to our agreement with you, we will be liable for all your damages proximately caused by such failure. However, there are some exceptions where we will not be liable, including but not limited to the following:

- If, through no fault of our own, you do not have enough funds in your Deposit Account to make the transfer;
- If the transfer would exceed the available credit of any overdraft line of credit you may have;
- If your Deposit Account is subject to legal process or other encumbrance restricting transfers to or from your Account;

34

- If there is a dispute about ownership of your Deposit Account and we place a hold on the Account until the dispute is resolved;
- If the ATM terminal has insufficient cash to complete the transaction;
- If the terminal, system or other equipment was not working properly and you knew about the malfunction when you started the transfer; or
- If, despite reasonable precautions taken by us, circumstances beyond our control prevent the transfer from being completed.

**16. DISCLOSURE OF INFORMATION TO THIRD PARTIES:** We may disclose information to third parties about your Deposit Account and the transfers you make as described in our Consumer Privacy Disclosure, which we may change, amend, or modify from time to time. You were provided a copy of Compass Bank's Consumer Privacy Disclosure in connection with your Deposit Account, and you will be provided a copy of any updates to that Disclosure. You also may obtain a copy at any of our branches.

**17. IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS:**
Telephone us at 1-800-239-4357 or write to Compass Bank, Attention Customer Service, P.O. Box 10566, Birmingham, Alabama 35296, as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than sixty (60) days after we sent you the FIRST statement on which the error or problem appeared.
1. Tell us your name and the account number for each Deposit Account.
2. Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send your inquiry in writing within ten (10) business days. We will tell you the results of our investigation within ten (10) business days after we hear from you, and will correct any error promptly. If we need more time, however, it may take up to forty-five (45) calendar days [ninety (90) calendar days for claims on accounts open less than thirty (30) calendar days, foreign-initiated transaction claims, and point-of-sale transaction claims] to investigate your inquiry. If we decide to do this, we will provisionally recredit your Account within ten (10) business days [twenty (20) business days for claims on Accounts open less than thirty (30) calendar days] for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your inquiry in writing and we do not receive such written inquiry within ten (10) business days, we may not provisionally recredit your Deposit Account. The time periods provided above may be extended as follows:
- For errors involving Deposit Accounts open less than thirty (30) calendar days, POS Transactions, and foreign-initiated transactions, we may take up to ninety (90) days to investigate your complaint or inquiry.
- For new Accounts, we may take up to twenty (20) days to provisionally recredit your Deposit Account.

We will tell you the results of our investigation within three (3) business days of completing our investigation. If we find that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**18. CHANGES TO AND TERMINATION OF THIS AGREEMENT:** We may change the terms of this Agreement at any time by giving you notice of the change. These changes may include modifying or deleting existing terms and adding new terms. Subject to the requirements of applicable law, any changes to this Agreement will become effective at the time stated in our notice to you. By retaining or using the Card or by authorizing anyone else to use the Card after the effective date of any change, you will have agreed to the changed terms of this Agreement. We will send notice of any changes to you at your last address shown on our records. No change to any term or condition of this Agreement shall be effective unless accepted or authorized by us in writing. Either you or we may terminate this Agreement in its entirety at any time, but termination shall not affect any of your existing obligations under this Agreement. The Card is our property, is nontransferable and must be surrendered to us upon demand.

**19. CONDITIONS UNDER WHICH ATTORNEY'S FEES AND OTHER CHARGES MAY BE IMPOSED:** To the extent permitted by applicable law, you shall be liable to us for all costs and damages resulting from any breach of this Agreement; provided, however, that your liability to us for unauthorized use of the Card shall be determined as provided in Section 14 on the previous page. If you fail to pay any amounts due under this Agreement and your debt is referred to an attorney(s), not one of our salaried employees, for collection or other enforcement proceedings, whether by suit or otherwise, and the unpaid balance of the debt exceeds $300, you agree to pay all reasonable expenses permitted by applicable law, including but not limited to, court costs and attorney's fees set by the court.

**20. GOVERNING LAW; SEVERABILITY:** This Agreement and any claim, dispute or controversy arising from or relating to this Agreement, the Card, or any amounts contracted for, charged or received under this Agreement, whether based on contract, tort, fraud and other intentional torts, statute, regulation, constitution, common law and/or equity, are governed by the laws of the state in which your initial Primary Checking Account was opened (without regard to internal principles of conflicts of law) and applicable federal law. If any provision of this Agreement is found to be invalid or unenforceable, the remaining provisions will remain in full force and effect.

**21. ARBITRATION:** You agree that our issuance of the Card and performance of the related services provided under this Agreement take place in and substantially affect interstate commerce, and are irrevocably tied to your Deposit Accounts. You also agree that any dispute arising out of or relating in any way to this Agreement shall be settled by binding arbitration, according to the terms provided in the agreement for your Deposit Account. You also agree to give up the right to seek remedies in court, including the right to a jury trial.

36

Compass Bank, a member of the BBVA Group

Member FDIC
TSB-C (06/08)



Tab 3

**BBVA** Compass

# Consumer Deposit
# Account Agreement



## Consumer Deposit Account Agreement

1. Definitions                                          1

2. Dispute Resolution                                   2

3. Account Operations                                   4

4. Account Statements and Notices                       6

5. Account Transactions                                 7

6. Deposits, Collections, and Payment of Items          8

7. Withdrawals                                          10

8. Sub-accounts                                         11

9. Dormant and Abandoned/Unclaimed Accounts            11

10. Set Off                                             12

11. Waivers                                             12

12. Other Services                                     12

13. Interest; Interest Reporting                       12

14. Changes to Account Status                          12

15. Applicable Law                                     12

16. Additional Provisions                              12

17. Electronic Banking Services                        13

Electronic Fund Transfer Disclosure Statement          16

Funds Availability Disclosure                          17

Taxpayer Identification Numbers                         18
(Backup Withholding)

Important Information About Your                        21
Checking Account (Check 21)

Welcome to Compass Bank, Member FDIC. This booklet contains your Deposit Account Agreement and certain additional disclosure information. Please read this information carefully and keep it with your other financial records.

## Consumer Deposit Account Agreement

This Agreement covers any type of deposit account (as defined below) you may have with us now, or in the future, that is used primarily for personal, family or household purposes. By opening your account, by conducting any transaction involving your account, or by maintaining your account after receipt of this Agreement, you agree to the terms in this Agreement. This Agreement includes not only this document but also your signature card, the Consumer Products Terms and Conditions Booklet, your Relationship Summary Form and the Miscellaneous Fees and Charges Disclosure. This Agreement also includes any new or amended provisions and disclosures we may provide concerning your account. All of these documents together are a contract between you and us.

**YOUR ATTENTION IS DRAWN TO THE ARBITRATION AND WAIVER OF JURY TRIAL PROVISIONS IN SECTION 2. IF A DISPUTE ARISES BETWEEN US, YOU OR WE MAY REQUIRE THAT IT BE RESOLVED THROUGH ARBITRATION, RATHER THAN THROUGH JURY TRIAL**

Unless otherwise expressly agreed in writing, our relationship with you will be that of debtor and creditor. No fiduciary, quasi-fiduciary or other special relationship exists between you and us. Any internal policies or procedures that we may maintain in excess of reasonable commercial standards and general banking usage are solely for our own benefit and shall not impose a higher standard of care than otherwise would apply in their absence. There are no third-party beneficiaries to this Agreement.

Spanish Language Preference: If you express a preference for Spanish as your preferred language for communication with us, we may not be able to accommodate this preference at all of our branches or in the case of any particular product and service. Where we can accommodate Spanish as your preferred language, communications in Spanish are provided as a courtesy only, and English will be the language controlling and governing your banking relationship with us. The English version of this Agreement, as well as the English versions of any other account documents that may be available in Spanish, shall be the official, governing account documents. However, as a courtesy, at your request, and for your convenience only, we may, at account opening and thereafter, provide you with unofficial Spanish translations of the official English versions of certain account documents

## 1. DEFINITIONS

The following terms and definitions apply when used in this Agreement. Some terms used in this Agreement but not defined below have the meaning assigned to them in the Uniform Commercial Code in effect in the state where we maintain your account.

**Account or Deposit Account.** Any type of checking, savings, money market, or NOW account to which funds may be deposited. Time deposits are excluded from this definition and are not covered by this Agreement.

**Account Owner or Owner.** Each person named in our records as an account owner with respect to an account, including any trustee, custodian, guardian, conservator or other representative acting in that capacity.

**ATMs.** Automated teller machines.

**Attorney-in-Fact.** An agent designated under a valid power of attorney. We reserve the right, in our sole discretion, not to honor any power of attorney. An attorney-in-fact representing an account owner does not become an owner of an account and will not have rights in an account at the owner's death as a result of the agent's capacity as an attorney-in-fact.

**Authorized Signer.** Each person who has signed a signature card with respect to an account in any capacity, including any trustee, custodian, guardian, conservator, attorney-in-fact, or other representative acting in that capacity.

**Available Balance.** The balance of funds in your account that is available for immediate withdrawal. Unlike the posted balance, the available balance reflects any holds placed on your account, including the restrictions described in the Funds Availability Disclosure included with this Agreement. Your available balance may be more or less than the amount of your posted balance, but does not include any credit available under any Compass Bank Overdraft Protection Line of Credit you may have.

**Business Days.** Although many of our branch offices are open on Saturdays, for purposes of this Agreement, our business days are Monday through Friday, excluding holidays.

**Dormant Account.** An account will be considered dormant if, for one year or more in the case of checking and NOW accounts (two years or more for an account maintained in Florida), or for two years or more in the case of savings and money market accounts (one year or more for an account maintained in Texas or California): no transaction activity has been conducted on the account, no correspondence regarding the account has been received by us, and no account owner has otherwise indicated an interest in the account.

**Individual Account.** An account owned by one party as indicated on our records, also referred to as single-party account. At the death of the owner of a single-party account, ownership passes as part of the owner's estate unless the owner has chosen a P.O.D. account by designating one or more beneficiaries of the account.

**Item.** A check, substitute check, draft, withdrawal order, payment order, or other similar instrument, order or instruction, whether oral, written or electronic, either for the deposit of funds to your account or for the payment of funds from your account. Items include debits and credits for point-of-sale, ATM, and Check Card transactions.

1

**Joint Account.** A deposit account with more than one account owner. There are three types of Joint Accounts:

1. A Joint Account with right of survivorship so that, at the death of an owner, ownership of the account passes to the surviving owner(s), and not to the deceased owner's estate;
2. A Joint Account with right of survivorship and P.O.D. by designating one or more beneficiaries of the account, so that at the death of the last surviving owner, ownership passes to P.O.D. beneficiaries and is not part of the last surviving owner's estate; or
3. Joint Account without right of survivorship, so that at death of any owner, the deceased owner's ownership interest passes as part of a deceased owner's estate.

**Joint Accounts will be presumed to be with right of survivorship (type (1) above) unless applicable law requires that you make an affirmative designation in order for right of survivorship status to apply. Not all types of Joint Accounts are available in all states.**

**P.O.D. Account.** A deposit account payable on request to one or more owners during their lifetime and on the death of the last surviving owner, to one or more surviving beneficiaries and not to any owner's estate. If two or more beneficiaries survive, the sums on deposits belong to them in equal, undivided shares.

**Posted Balance.** The balance of funds in your account based solely on items that have been posted as credits or debits to your account. Unlike the available balance, the posted balance does not reflect any holds placed on your account. Your posted balance may be more or less than the amount of your available balance, but does not include any credit available under any Compass Bank Overdraft Protection Line of Credit you may have.

**Service Charges.** Any charge, fee, or similar amount due to us, whether for a service we may provide or for a particular condition or status of your account or any item relating to your account, which has been disclosed by us in this Agreement or in any schedule of service charges included or incorporated by reference in this Agreement. Other charges, fees, and similar amounts due to us, but not disclosed in this Agreement, may apply under other agreements you may have with us.

**Substitute Check.** A paper reproduction of an original check that (1) contains an image of the front and back of the original check; (2) bears a MICR line containing all the information appearing in the MICR line of the original check at the time the original check was converted to an electronic image; (3) conforms in paper stock, dimension and otherwise with industry standards; (4) includes a legend stating, "This is a legal copy of your check. You can use it the same way you would use the original check."; and (5) is suitable for automated processing in the same manner as the original check.

**Totten Trust Account.** A deposit account in the name of one or more owners as trustee for one or more beneficiaries where the relationship is established by the form of the deposit account and there are no assets of the trust other than the sums on deposit in the deposit account. This type of account is a form of P.O.D. account.

**We, Our, Us, BBVA Compass, Compass, and Compass Bank. Compass Bank, Member FDIC, or any other affiliate bank of BBVA Compass Bancshares, Inc.** For purposes of Section 2 only, these terms also include the directors, officers, and employees of Compass Bank and its affiliates.

**You, Your, and Yours.** The account owner or, if the account is a multiple-party account, any and all account owners, and all authorized signers.

### 2. DISPUTE RESOLUTION
**A. Subsection A applies if you reside in a state other than California and we do not maintain your account in California**

#### ARBITRATION
By opening or maintaining the account, you agree that if a dispute, claim or controversy of any kind arises out of or relates to this Agreement or to your account or any transactions involving your account, or any service or product related to your account, either you or we can choose to have that dispute resolved by binding arbitration. **This arbitration provision limits your ability to litigate claims in court and your right to a jury trial. You should review this section carefully. You will not have the right to participate as a class representative or member of any class of claimants for any claim subject to arbitration.** Arbitration is a more informal proceeding in which disputes are decided by one or more neutral arbitrators who issue a binding ruling in the form of an award. You and we understand that discovery and other procedures in arbitration may be more limited than discovery in court proceedings and that the ability to modify, vacate, or appeal an award by an arbitrator(s) is strictly limited.

You and we agree, upon written demand made by you or us, to submit to binding arbitration all disputes, controversies, and claims, whether based on contract, fraud, tort, intentional tort, statute, regulation, constitution, common law, equity, or any other legal basis or theory, and whether pre-existing, present, or future, that arise out of or relate to (a) this Agreement, your account, any transaction involving your account, any service or product related to your account, or any advertisements, promotions, or oral or written statements related to this Agreement or your account, (b) the relationships that result from this Agreement (including, to the fullest extent permitted by applicable law, relationships with third parties who are not parties to this Agreement or this arbitration provision), (c) your relationship with us that relates to this Agreement or any other agreement or relationship you have with us that is not also subject to a different agreement to arbitrate, or (d) the validity, interpretation, scope or enforceability of this Agreement or the interpretation or scope of the Arbitration Clause (collectively, a "Claim"). All parties retain the right to seek relief in a small claims court for disputes or claims within the jurisdictional limits of the small claims court. At the option of the first to commence arbitration, you or we may choose to have the arbitration conducted by JAMS ADR ("JAMS") or the American Arbitration Association ("AAA"), or you and we may agree upon a different arbitrator. In any event, any arbitration under this Agreement shall be conducted in writing in accordance with the AAA Rules ("Rules"). You agree that this arbitration provision is made pursuant to a transaction involving interstate commerce, and the Federal Arbitration Act (the "FAA") shall apply to the construction, interpretation, and enforceability of this Agreement notwithstanding any other choice of law provision contained in this Agreement.

Either you or we may initiate arbitration by giving written notice of the intention to arbitrate to the other party and by filing notice with JAMS or the

2

AAA in accordance with the Rules in effect at the time the notice is filed. The notice shall set forth the subject of the dispute and the relief requested, at a minimum. The demand for arbitration may be made before or after commencement of any litigation. You should contact the AAA at 800-778-7879 or www.adr.org or JAMS at 800-352-5267, www.jamsadr.com for more information about arbitration. If for any reason the AAA or JAMS is unable or unwilling to serve as arbitration administrator, or you and we are unable to agree on another arbitrator, we will substitute another national or regional arbitration organization.

Demand for arbitration under this Agreement must be made before the date when any judicial action upon the same Claim would be barred under any applicable statute of limitations; otherwise, the Claim also is barred in arbitration. Any dispute as to whether any statute of limitations, estoppel, waiver, laches, or similar other doctrine bars the arbitration of any Claim shall be decided by arbitration in accordance with the provisions of this Agreement.

You cannot join together in a dispute with anyone other than persons who use your account, although this limitation does not affect the ability of a purely governmental entity to institute any enforcement action. Even if other people have disputes similar to a dispute that you and we have, those people and their disputes cannot be part of any arbitration between you and us. **A Claim by, or on behalf of, other persons will not be considered in, joined with, or consolidated with, the arbitration proceedings between you and us, and a Claim may not be arbitrated on a class action, private attorney general, or other representative basis.** Notwithstanding anything to the contrary in this Agreement, any dispute regarding the prohibitions in this paragraph or about the enforceability of the arbitration clause shall be resolved by a court and not by the arbitrator(s).

Where the aggregate of all Claims by both you and us does not exceed $250,000, any expedited procedures provided in the Rules ("Expedited Procedures") shall apply and a single arbitrator shall decide the Claims. Where the aggregate of all Claims by both you and us exceeds $250,000, a panel of three arbitrators shall decide all Claims. Each arbitrator, whether or not acting under Expedited Procedures, shall be an active member in good standing of the bar for any state in the continental United States and shall be either: (a) actively engaged in the practice of law for at least 5 years or (b) a retired judge.

You and we agree that the arbitrator(s): (a) shall limit discovery to non-privileged matters directly relevant to the arbitrated dispute; (b) shall grant only relief that is based upon and consistent with substantial evidence and applicable substantive law; (c) shall have authority to grant relief only with respect to Claims asserted by or against you individually; (d) shall provide a brief written explanation of the basis for the award upon the request of either party and shall make specific findings of fact and conclusions of law to support any arbitration award that exceeds $25,000.

Upon written request by you, for claims up to $50,000, we will pay to the AAA or JAMS the portion of the arbitration filing fee that exceeds the cost of filing a lawsuit in the federal court where you live. Upon written request by you, we may elect, at our sole discretion, to pay or advance some or all of any remaining arbitration fees and other costs. The arbitrator will decide whether we or you ultimately will be responsible for paying any filing, administrative or other fees in connection with the arbitration. If you are the prevailing party in the arbitration, the arbitrator(s) may order us to pay some or all of your attorney, expert, and/or witness fees. Any arbitration proceedings shall be conducted in the federal judicial district where we maintain your account. Judgment upon any award rendered in arbitration may be entered in any court having jurisdiction.

If you or we are seeking to bring a joined, consolidated, or class action and if the portion of this arbitration provision that prohibits the arbitration of joined, consolidated, or class actions is deemed invalid or unenforceable, then the entire arbitration provision shall be void and unenforceable and severed from the rest of this Agreement. If any portion of this arbitration provision other than the prohibition against the arbitration of joined, consolidated or class actions is deemed invalid or unenforceable, then that portion will be severed and the remaining portions of this arbitration provision will remain valid and enforceable including the prohibition against the arbitration of joined, consolidated or class actions. Nothing in this arbitration provision shall limit your or our right, whether before, during, or after the pendency of any arbitration proceeding, to exercise any self-help remedies, such as set-off or repossession and sale of collateral, or to obtain provisional remedies (including but not limited to, injunctive relief or interpleader relief). You and we agree that the taking of these actions or any other participation in litigation by you or us does not waive any right that either you or we have to demand arbitration at any time with respect to any subsequent or amended Claim filed against you or us after commencement of litigation between you and us. This arbitration provision shall survive termination of this Agreement and the closing of your Account.

### WAIVER OF JURY TRIAL
**This provision limits your rights to a jury trial. You should review this section carefully.** If (i) neither you nor we seek to compel arbitration of any dispute we have related to this Agreement, your account, or any transactions involving your account, or (ii) some or all of the arbitration clause is unenforceable and we are in a dispute in a court of law, then each of us agrees to waive any right we may have to a jury trial to the extent allowable under the laws of the state that govern this Agreement.

**Attorneys' Fees.** In any action between you and us in court, the prevailing party shall be entitled to recover its reasonable attorneys' fees expended in the prosecution or defense of the court action from the other party.

### B. Subsection B applies if you either reside in California or we maintain your account in California

### JUDICIAL REFERENCE & WAIVER OF JURY TRIAL
By opening or maintaining the account, you agree that if a dispute, claim or controversy of any kind arises out of or relates to this Agreement or to your account or any transactions involving your account, or any service or product related to your account, it will be resolved by judicial reference pursuant to the provisions of the California Code of Civil Procedure, Sections 638-645.1 inclusive, unless the dispute, claim or controversy is part of a class action. **This judicial reference provision limits your ability to litigate claims in court and your right to a jury trial. By agreeing to**

judicial reference, you and we waive, and shall not have, any right to a jury trial. You should review this section carefully. Judicial reference is a proceeding in which disputes are decided by a judicial referee who receives the evidence at a hearing and then issues a statement of decision upon which a judgment is based. You and we agree that the referee shall have the power to decide all issues of fact and law and report his/her statement of decision hereon, and to issue all legal and equitable relief appropriate under the circumstances before him/her.

Either you or we may initiate judicial reference by giving written notice of the intention to initiate judicial reference to the other party and by proceeding in accordance with California Code of Civil Procedure Section 638.

You and we agree, upon written demand made by you or us, to submit to judicial reference all disputes, controversies, and claims, whether based on contract, fraud, tort, intentional tort, statute, regulation, constitution, common law, equity, or any other legal basis or theory, and whether pre-existing, present, or future, that arise out of or relate to this Agreement, the account, any transaction involving the account, any service or product related to your account, or any advertisements, promotions, or oral or written statements related to this Agreement or the account, the relationships that result from this Agreement (including, to the fullest extent permitted by applicable law, relationships with third parties who are not parties to this Agreement or this judicial reference provision), or the validity, interpretation, and scope of this Agreement (collectively, a "Claim"). All parties retain the right to seek relief in a small claims court for disputes or claims within the jurisdictional limits of the small claims court.

You and we agree that a single referee who is a retired California state or federal court judge shall be appointed by the court pursuant to California Code of Civil Procedure 640 and shall preside over the reference proceeding and try all issues, whether of fact or law. If the parties are unable to agree upon a referee within ten (10) days of a written request to do so by any party, then any party may thereafter seek to have a referee appointed pursuant to the California Code of Civil Procedure, Sections 638 and 640, including submitting to the court up to three nominees who are retired state or federal court judges.

You and we shall be entitled to discovery, and the referee shall oversee discovery and may enforce all discovery orders in the same manner as any trial court judge.

Demand for judicial reference under this Agreement must be made before the date when any judicial action upon the same Claim would be barred under any applicable statute of limitations; otherwise, the claim also is barred in judicial reference. Any dispute as to whether any statute of limitations, estoppel, waiver, laches, or other doctrine bars the judicial reference of any Claim shall be decided by the judicial referee in accordance with the provisions of this Agreement.

A claim by, or on behalf of, other persons will not be considered in, joined with, or consolidated with, the judicial reference proceedings between you and us. Any such claim will be resolved in a court of proper jurisdiction.

Nothing in this judicial reference provision shall limit the right of you or us, whether before, during, or after the pendency of any judicial reference proceeding, to exercise any self-help remedies, such as set off or repossession and sale of collateral, or to obtain provisional or ancillary remedies or injunctive or other traditionally equitable relief, such as filing an interpleader action. You and we agree that the taking of these actions or any other participation in litigation by you or us does not waive any right that either you or we have to demand judicial reference at any time with respect to any subsequent or amended Claim filed against you or us after commencement of litigation between you and us.

You and we agree that the referee shall not have any authority to require, as part of any relief granted, that you and we continue any relationship we may have under this Agreement or otherwise; and shall provide a statement of decision stating the disposition of each claim and a concise written explanation of the basis for the award. The referee's statement of decision shall contain written findings of fact and conclusions of law, and the court shall enter judgment thereon pursuant to California Code of Civil Procedure Sections 644(a) and 645. The decision of the referee shall then be appealable as if made by the court.

Unless inconsistent with applicable law, each party shall bear the expense of its respective attorney, expert, and witness fees, regardless of which party prevails in the judicial reference. Except for any filing fee if you initiate judicial reference proceedings, we will pay all of the remaining judicial reference fees and other costs, including the referee's fees where required by law. The referee will decide whether we or you ultimately will be responsible for paying any fees or other costs in connection with the judicial reference. Any judicial reference proceedings shall be conducted in the federal judicial district of your residence, and you will be given the opportunity to attend the proceeding and be heard. Judgment upon any statement of decision rendered in judicial reference may be entered by the court that appointed the judicial referee or any other court with jurisdiction.

If any portion of this judicial reference provision is deemed invalid or unenforceable, the remaining portions of this judicial reference provision will remain valid and enforceable. This judicial reference provision shall survive termination of this Agreement and the closing of your Account.

**Attorneys' Fees.** In any action between you and us regardless of whether it is proceeding in court or in judicial reference, unless inconsistent with applicable law, each party shall bear the expense of its respective attorney, expert, and witness fees, regardless of which party prevails in the matter.

### 3. ACCOUNT OPERATIONS
**New Account Verification and Other Inquiries.** We may make inquiries that we consider appropriate and use third party services to help us verify your identity, obtain information regarding your previous banking relationships and determine if we should open, maintain, collect or close your account. We may also report the status, history and/or closure of your account to third-party services.

**Identification.** To help the government fight the funding of terrorism and money laundering activities, federal law requires us to obtain, verify, and

4

record information that identifies each person who opens an account. For these reasons and for our internal purposes, when you apply for an account, we will ask for information that will allow us to identify you. We may also ask for your driver's license or other identifying documents.

**Owners.** You appoint all other account owners and authorized signers as your authorized agents for all purposes relating to your account including, but not limited to, endorsing checks, stopping payment, making deposits, making withdrawals, obtaining account information, making transfers from the account, closing the account, or pledging or assigning the account. A withdrawal from your account by any account owner or authorized signer will discharge our obligation to you with respect to the amount withdrawn, regardless of the source or ownership of the funds in the account. Any account owner of a multiple party account may add a new owner or authorized signer to the account. We may require a new signature card before any change in ownership or authorized signers becomes effective. We may, but are not required to, honor a request by you to prevent a withdrawal or transfer by any other account owner or authorized signer or to remove another account owner or authorized signer from the account. A service charge may apply if we honor the request, and you agree to indemnify us and hold us harmless from any loss or damage to you or anyone else that results from our honoring the request. You may be asked to sign additional documents or agreements in connection with the request.

**Assignment of Account.** No pledge, assignment, or other transfer of any account, whether by gift or otherwise, shall be binding on us unless acknowledged by us in writing. Unless we agree otherwise in writing, the account will remain subject to our rights of set off even after we receive notice of the transfer. We are not required to accept or recognize an attempted assignment of your account or any interest in it, including a notice of security interest, except as required by law.

**Accounts are Transferable Only on Our Records.** We reserve the right not to acknowledge or accept any attempted transfer of an account.

**Authorization to Pay and Debit the Account.** You authorize us to pay or withdraw funds from the account, without any notice to you, on the order of any account owner or authorized signer or on the order of any personal representative, guardian, conservator or custodian of any account owner (even if appointed in a state or country other than the one in which we maintain your account). You authorize us to honor orders to pay or withdraw funds received by us from any of these persons in writing, orally, or electronically (including by telephone).

**Powers of Attorney/Agents.** We may, but are not required to, honor orders and instructions concerning your account by an attorney-in-fact for any account owner or an authorized signer, or by a personal representative, guardian, conservator or custodian of an account owner. You should notify us in advance if you plan to use a power of attorney involving your account. We may require that a power of attorney be executed on a form acceptable to us, that the power of attorney contain language satisfactory to us and/or that the attorney-in-fact present the original power of attorney before we honor the orders or instructions of the attorney-in-fact. We may restrict the types and dollar amount of transactions an attorney-in-fact may conduct. We may terminate acceptance of a power of attorney at any time and for any reason and without notice to any account owner or any other person. If we honor the orders and instructions of the attorney-in-fact, account transactions conducted by the attorney-in-fact and the instructions and orders of the attorney-in-fact are binding on all account owners. If we accept a power of attorney, we may continue to recognize and honor the authority of the attorney-in-fact until we receive written notice of revocation or termination of authority and have had a reasonable time to act on it. We assume no duty to monitor the actions of your attorney-in-fact to ensure that (s)he acts for your benefit.

If you make your checkbook, your checking account number, your ATM or check card, or personal identification numbers and/or security codes available to any third person for the purpose of transacting business on your account, you agree to assume full responsibility for any errors or wrongdoing performed or caused by such third person. You are responsible to us for any actions of such third person, regardless of whether those actions exceed the authority given.

**Service Charges; Other Charges.** You acknowledge that you have been provided our current schedule of service charges and, if applicable, interest rates for your account. You agree that all service charges and any interest rates applicable to the account may be changed by us from time to time as set forth in this Agreement. You agree that we may debit from your account, even if your account is dormant, abandoned, or unclaimed, without any further notice or demand, all service charges applicable to your account, as well as charges for the purchase of checks, drafts, and other products or services ordered by you from or through us. You agree that if your account is closed during a statement cycle, at account closing, we may charge all service charges not yet posted to your account for that statement cycle. We shall not be liable for failing to pay any item presented against your account if the available balance is insufficient to pay the item, even if the insufficient available balance results solely from debiting these service and other charges from your account.

**Processing and Posting Order.** You authorize and agree that we may, in our sole discretion, determine the order that we process and post credits, debits and holds to your account. You also authorize and agree that the order and/or manner in which we process and post credits, debits and holds may vary by the product, service, account type or type of transaction. You also authorize and agree that we are allowed to pay or authorize some credits, debits, and holds, and decline or return others, in any order we deem appropriate. The order in which we post credits, debits and holds to your account may not be the same as the order in which you make the withdrawals from or deposits to your account. You agree that any order in which we process and post credits, debits and holds to your account will not be an abuse of discretion. If two or more items are presented for payment from your account on the same day, we may pay or charge the items to your account in any order without regard to any contrary instructions from you, even if paying a particular item or items causes the available balance for your account to be insufficient to pay one or more other items that otherwise could have been paid, which may result in the occurrence of additional or other service charges that otherwise may not have occurred. We may pay items drawn on us, debit your account for any service charges and other amounts that you owe us under this Agreement or otherwise, and we may exercise any rights of set off we may have against the account before we pay any other item.

If an item was initiated at a point-of-sale terminal or is a VISA transaction or ATM transaction, you agree that we may charge the amount of the item

to your account or place a hold on your account in the amount requested by the merchant immediately upon authorization of such transaction, even though we have not then actually received the item for payment. We will make payment for a transaction only after the actual transaction is presented to us physically or electronically. Each such hold will reduce the Available Balance in your account by the amount of the hold.

**Telephone Calls: Calling, Monitoring and Recording.** When you give a telephone number directly to us or place a telephone call to us, you consent and authorize us to place calls to you at that number. You understand that a "telephone number" includes, but is not limited to, a cell phone or other wireless device number and "calls" include, but are not limited to, telephone calls, prerecorded or artificial voice message calls, text messages, and calls made by an automatic telephone dialing system from us or our affiliates and agents. As examples, we may place calls to you about fraud alerts, deposit holds, and amounts you owe us (collection calls) on your accounts. This express consent applies to each telephone number that you provide to us now or in the future and permits such calls regardless of their purpose. Calls and messages may incur charges from your communications provider.

You consent and authorize us to monitor, and to record, telephone conversations and other electronic communications you have with us and with our representatives for reasonable business purposes, including security and quality assurance. We will not remind you that we may be monitoring or recording a call at the outset of the call unless required by law to do so.

## 4. ACCOUNT STATEMENTS AND NOTICES

**Periodic Statements.** If we have a deliverable address on file for you, we will mail or deliver to you periodic statements for your deposit account at approximately monthly intervals unless we specify to you another interval period when you open your account or thereafter. The account statement will describe each item by item number (where appropriate), amount, and date of debit or credit. For certain types of accounts, the periodic statement may be accompanied by the items or a facsimile of those items listed on the statement, unless the item or an image of the item is unavailable for any reason, for example, when an item is electronically presented (or re-presented) for payment against your account. If we comply with the foregoing provisions of this Section, you agree that the statement and items all have been made available to you in a reasonable manner. We will not be responsible for any indirect, special or consequential damages under any circumstances for our inability to provide copies of checks. Our liability, if any, will not exceed the face amount of the check in question.

**Mailing and Availability.** Periodic statements and canceled checks, to the extent we have agreed to provide either of them for your account, and written notices of dishonor or return of unpaid deposited items, or any other notice or communication, may be mailed to you at the address shown in our records or a forwarding address for you if one is on file with the U.S. Postal Service. However, we will **not** mail any account information to an address that the U.S. Postal Service has informed us is "undeliverable" or otherwise invalid. We use reasonable efforts to maintain the **first** statement(s) returned as undeliverable for sixty (60) days, or such longer period of time as may be required by applicable law, after which time we may dispose of the statement and original items. However, we retain printable versions of your account statements for seven (7) years, or longer periods as may be required by applicable law. You agree to give us written notice of any change of your address. Periodic statements, and written notices of dishonor or return of unpaid deposited items, or any other notice or communication, may be delivered to you electronically if you have agreed to receive such notices and communications electronically. Notify us promptly if you do not receive your statement by the date you normally would expect to receive it. We may, but are not required to, change the address for you in our records if the U.S. Postal Service notifies us of a new address for you, and you waive any and all claims against us that arise in connection with any mail forwarded to you or sent to an address for you supplied to us by the U.S. Postal Service. Any account owner or authorized signer of a joint account may change the mailing address for your account. Notice to any one account owner shall constitute notice to all joint account owners in a joint account. We may make statements, canceled checks (if applicable to your account), notices or other communications available to you by holding all or any of these items for you, or delivering all or any of these items to you, in accordance with your request or instructions. If we hold statements or notices to you at your request or because you fail to provide us with a current address, they will be deemed delivered to you when they are prepared (for held statements), mailed (for returned mail) or otherwise made available to you.

**Errors; Unauthorized Transactions and Forgeries.** Our records regarding your accounts will be deemed correct unless you timely establish with us that we made an error. It is essential that any account errors (including missing deposits), unauthorized transactions, alterations, unauthorized signatures, unauthorized or forged endorsements, forgeries, encoding errors, posting errors (such as debits or credits posted twice, debits posted as credits or credits posted as debits), unauthorized or disputed fees (of any kind) or any other improper transactions on your account (collectively referred to as "exceptions") be reported to us as soon as reasonably possible. Otherwise, we may not be liable for the exceptions. You agree that you will carefully examine each account statement or notice you receive and report any exceptions to us promptly after you receive the statement or notice. You agree to act in a prompt and reasonable manner in reviewing your statement or notice and reporting any exceptions to us. If you do not report an exception to us within thirty (30) days after we send or make the statement or notice available to you, you agree that we will not be liable to you for any loss you suffer related to that exception and that you cannot later dispute the transaction amounts and information contained in the statement. This means that, if you do not report exceptions to us within thirty (30) days after we send or make the statement or notice available to you, we will not reimburse you for any such disputed amounts or any loss you suffer, including, but not limited to, any amounts lost as a result of: paying any unauthorized, forged, or altered item, or paying any other item altered or forged by the same wrongdoer if we paid the other item before we received notice of any of these exceptions from you. Except as provided by applicable law, you also agree that we will not be required to reimburse you for any exceptions caused by your own negligence. Different rules may apply to items that are electronic fund transfers. In any case, you agree to repay us promptly any amount credited to your account in error, and you authorize us to debit your account to obtain payment of any erroneous credit.

6

**Record Retention.** We will retain any item paid on your account for a period of fifteen (15) business days from the date the item posts to your account. We will retain copies of those items for seven (7) years.

## 5. ACCOUNT TRANSACTIONS

**Signatures; Facsimile Signatures.** We may rely on each signature on a signature card for the account or on prior authorized items in all transactions connected with the account. We are not required to act upon instructions received by fax transmission, voice mail or e-mail. If you use a facsimile signature or other mechanical or electronic device for signing or authenticating items drawn on your account, you assume the entire risk that the facsimile signature or device may be used improperly or by an unauthorized person. We will not reimburse you or any other person for items drawn in this fashion by any unauthorized person or by any person who exceeds his or her authority to do so, and we may honor all of these type items presented to us. You agree to indemnify and hold us harmless from all losses resulting from our honoring an item in any instance in which the item bears or purports to bear a facsimile signature resembling a signature on file with us, regardless of by whom or by what means the actual or purported signature was affixed to the item. You agree that signatures by your authorized agents (e.g., persons acting under a power of attorney) are valid, even if the principal-agent relationship is not indicated on the check or instruction.

**Check Signature Verification.** We may process certain checks mechanically, based on the information encoded on the items. Although we may review checks from time to time, you agree that reasonable commercial standards do not require us to do so.

**Items not Bearing Your Signature.** If you give information about your account to a third-party who represents to you that, in the ordinary course of its business, it will present unsigned items, remotely created checks or demand drafts, (i.e., items which do not bear your actual signature, but purport to be drawn with your authorization) for payment or initiate transfers from your accounts, then any item initiated by that person will be deemed authorized by you, even though they do not contain your signature and may exceed the amount you authorized to be charged, and may be charged to your account. This provision shall not obligate us to honor such items. We may refuse to honor such items without cause or prior notice, even if we have honored similar items in the past. You assume the entire risk that the information you furnished may be used improperly or by an unauthorized person. We will not reimburse you or any other person for items drawn in this fashion by any unauthorized person or by any person who exceeds his or her authority to do so, and we may honor all of these type items presented to us.

**Wire Transfers.** When we accept a wire transfer payment order instructing payment to you or to your account, we will notify you of our receipt of payment by indicating the amount in your account statement. If the payment order does not specify an account, we may deposit the payment into any account that you maintain with us (including joint accounts). Your account statement will be the only notice of receipt which we will provide you, and no interest will be paid on wire transfer payments deposited into your account unless the account otherwise pays interest. You agree to pay all charges for wire transfer services stated in our schedule of service charges, as amended from time to time. Payment orders will not be accepted until executed by us. We reserve the right to refuse to accept any payment order. If there is ever any inconsistency or conflict between the account number and the name of a recipient on an instruction or payment order, we may rely exclusively on the account number and bank identification number contained in a payment order rather than the name. If you give us a payment order that is erroneous in any way, you agree to pay the amount of the order whether or not the error could have been detected by any security procedure we employ. Amendments to a payment order must be provided to us at least three business days prior to our execution of the payment order. We may record any telephone conversations or data transmissions that initiate or amend payment orders. The change rate on a return payment order shall be the rate in effect at the time the return is received.

**Insufficient Available Balance and Overdrafts.** If your available balance is insufficient to pay the total amount of items presented against your account, we may, at our option, return any of the items unpaid or pay any or all of the items, even though payment will cause an overdraft of your account. We may return any item at any time if your available balance is insufficient to pay that item, even if we previously have permitted overdrafts. You are not entitled to rely on any prior act by us with respect to your account. Our election to pay overdrafts does not establish a course of dealing between you and us or modify the terms of this Agreement. You agree that, if your available balance is insufficient to pay any item presented against your account, you will pay promptly both our service charge for handling and processing that item and the amount of any overdraft without further notice or demand. Your failure to pay these amounts promptly may result in additional service charges to your account. We may use subsequent deposits and other credits to the account to cover any overdraft and any charges existing in your account. Each account owner will be jointly and severally liable for the charges regardless of which account owner is responsible for their occurrence. In the event you fail to pay the amount of any overdraft and all associated service charges and we refer your overdrawn account to an attorney for collection, you agree to pay all reasonable expenses, including without limitation, attorney's fees and court costs, incurred by us as a result of your account being overdrawn. These charges are imposed on items created by check, in-person withdrawal, ATM withdrawal, or other electronic means.

**Inter-Account Transfers.** If you are an owner of two or more consumer accounts that we allow to be linked, you may, by separate agreement, designate one of those accounts as a secondary account from which funds may be transferred to cover items (individually and collectively called a "covered item") presented for payment out of another, primary account. If you make this designation, either at the time you open your accounts or later; and if the available balance in the primary account is insufficient to pay the amount of any covered item at the time of presentment, then we will automatically transfer from the secondary account into the primary account the specific amount necessary to pay that covered item. You agree to pay the currently applicable service charge each time funds are transferred out of your secondary account and into your primary account to pay a covered item. We will have no obligation to pay any covered item if the combined available balances in the secondary account and primary account at the time the covered item is presented to us for payment are insufficient to pay the covered item, provided however, in our sole discretion, we may either: (i) transfer the available funds in your secondary account to the primary account and pay the item, although it may cause an overdraft subject to the provisions regarding overdrafts discussed above; or (ii) not transfer the available funds from your secondary account to your primary account,

and your primary account will be subject to the provisions regarding insufficient funds and overdrafts discussed above. We will have no obligation to pay any covered item if the secondary account is in dormant, inactive, or frozen status. In this situation, if no funds are transferred, you will not be assessed any service charge for the transfer, but your primary account will be subject to the provisions regarding insufficient available balances and overdrafts discussed above.

Stop Payment Orders. You may request us to stop payment on any check, draft, or similar written order or instruction drawn on your account by giving us the information we may request, including the account number, the item number, the date of the item, the payee of the item, and the exact amount of the item, and by paying our stop payment service charge. We will search for your item by computer, so it is essential that all information you give us be accurate. To be effective, we must receive any stop payment order in time to afford us a reasonable opportunity to act. We will confirm your oral stop payment order in writing, and the information included in our written confirmation will be conclusively presumed to be correct unless you notify us within fourteen (14) days of the date of the confirmation. Confirmed stop payment orders will be continued in effect for a period of two (2) years from the date the initial oral stop payment order was placed or such other period of time as required or under applicable law, regulation or rule (including, but not limited to, the UCC as enacted under any applicable law, regulations issued by the Federal Reserve Board and rules issued by the National Clearinghouse Association). A confirmed stop payment order will expire at the end of the two-year period unless you revoke it at an earlier date or renew it in writing for an additional two-year period and pay our stop payment service charge. You may not stop payment on an item if we have verified to the payee that the available balance in your account is sufficient to pay such item, or if we have accepted that item by payment or otherwise. Any account owner or authorized signer may place a stop payment order, and we are not required to release a stop payment order unless requested to do so by the account owner or the authorized signer who requested it. You agree to indemnify us and hold us harmless from and against any loss, damages, and expenses (including attorney's fee) we may incur by reason of our refusal to pay any item upon which you have stopped payment. For stop payment orders on pre-authorized electronic funds transfers, please refer to the Electronic Fund Transfer Disclosure Statement in this booklet.

Illegal Transactions. You agree that you will not use your account for any transaction that is illegal in the jurisdiction where you live, in the jurisdiction where the transaction is consummated, or in any other jurisdiction affected by the transaction. You agree that it is your responsibility to determine the legality of each of your transactions in all applicable jurisdictions before entering into the transaction. You acknowledge and agree that we have no obligation to monitor, to review or to evaluate the legality of transactions on your account. You also agree that you will not use your account in connection with any Internet or online gambling transaction, whether or not gambling is legal in any applicable jurisdiction. We reserve the right to refuse or return any item that we believe is related to an illegal transaction, an Internet or online gambling transaction or a high-risk transaction. To the fullest extent permitted by law, you agree to pay for any item that you authorized, even if the transaction related to that item is determined to be illegal.

## 6. DEPOSITS, COLLECTIONS, AND PAYMENT OF ITEMS

Deposits. We may require a minimum initial deposit to open an account. You may make additional deposits of any amount of $1.00 or more accompanied by a completed deposit slip (unless your deposit is by electronic funds transfer) either in person, by mail, at an ATM, a night depository, or by electronic funds transfer. We may charge for deposits, and we also may refuse to accept for deposit or collection any item you offer for deposit, accept all or any part of a deposit for collection only, or limit the amount of the deposit. If your deposit is other than cash, for example, checks, we may without prior notice to you (except where prior notice is required by law) place a hold on the account for the amount of deposited items for the approximate period of time it takes us to verify that the items will be paid. During the hold period, interest-bearing accounts will earn interest in accordance with the interest schedule. Items accepted for deposit and drawn on a non-U.S. institution may be subject to a service charge. We may accept an item for deposit to your account from anyone and without questioning or verifying the authority of the person making the deposit. Any item that we cash or accept for deposit may be subject to later verification and final payment. We may deduct funds from your account if an item is lost (unless such item was lost due to Compass Bank's negligence), stolen or destroyed in the collection process, if it is returned to us unpaid, or if it was improperly paid, even if you have already used the funds. Cash deposits are also subject to later verification. Credit for any item we accept for deposit to your account, including funds that are deposited by electronic transfer, is provisional and may be revoked if the item is not finally paid, for any reason, in cash or its equivalent. We may give cash back to any authorized account signer(s) or agent(s) in connection with items payable to any owner, whether or not the items have been endorsed by the owner. If you make a deposit or payment that is not accompanied by instructions indicating how or where it is to be credited, we may apply it at our discretion to any loan or deposit account any of you maintains with us. We may endorse and/or collect items deposited to your account without your endorsement, but may require your personal endorsement prior to accepting an item for deposit. If you deposit an item that bears the endorsements of more than one person or persons who are not known to us, we may refuse the item, require all endorsers to be present, or require that the endorsement be guaranteed by another financial institution acceptable to us before we accept the item.

Our policy on the availability of deposits for withdrawal is described in the Funds Availability Disclosure portion of this booklet.

Collection as Agent. Items delivered to us for deposit or collection are received by us as your agent for collection and at your risk. We may accept an item for collection only (such as a returned deposited item or an item drawn on a non-U.S. institution) and impose a service charge for attempting collection of the item. In situations where we accept an item for collection only, we will not give you cash or an official check for the items until the items have been paid. We are obligated only to exercise ordinary care in handling and collecting items delivered to us for deposit or collection. We shall not be liable for the misconduct, neglect, insolvency, mistake, or fault of other persons or entities, or for loss or destruction of any item in transit or in the possession of others or for loss of use as a result of theft, fire, or other event beyond our reasonable control. If any item deposited to your account is payable by a payor that is not a bank, we may send the item directly to that payor. Items payable through another bank may be sent

8

directly to that bank or to collecting agents who likewise shall have the right to send the items directly to the bank on which they are drawn or at which they are payable. Payment of these items may be accepted in cash or drafts and neither we nor any collecting agents shall be liable for failure to collect such drafts. Each collecting agent is deemed to be your agent. No collecting agent shall be liable for loss arising from any act or omission of another agent.

**Check Cashing For Others.** You should not use your account to cash checks for others who are not well known to you. Although we may make funds provisionally available to you and may take steps to determine whether a check will be paid, you are responsible for any loss that occurs if the check is returned to us for any reason (e.g., because it is counterfeit). Our employees cannot promise that checks drawn on or issued by us or other institutions, including cashier's checks, will be paid.

**ACH Credits.** Credit for an automated clearinghouse ("ACH") transfer is provisional until final payment is received by the payee's financial institution. Until that happens, the party originating the transfer is not deemed to have made payment to the beneficiary, and the payee's bank is entitled to a refund of the provisional credit. If we give you provisional credit for an ACH transfer, but do not receive final payment, you become obligated to us for the full amount without prior notice or demand. We are not required to give you a separate notice of our receipt of an ACH transfer. If we accept ACH credits to your account, you will receive notice of the credit on your next regular periodic statement. Although we may send notice of a non-ACH incoming funds transfer (e.g., a wire), we assume no obligation to do so. You also can contact us to determine if a transfer has been credited to your account.

**US Dollar Cash Deposit Limitations.** BBVA Compass will impose limitations on the amount of US dollar cash deposits by non-resident customers. Under this policy, if you are an individual who is not a US resident, the aggregate amount of US dollar cash deposits that may be made into your account during any calendar month is limited to $4,000. This limitation will not apply to deposits made by check or other non-cash deposits. At our discretion, we may at any time without prior written notice to you (except where prior notice is required by law) establish or change the aggregate US dollar cash deposit limit by posting the maximum US dollar limit in each of our banking centers. We reserve the right to refuse any US dollar cash deposit that exceeds, or would cause the aggregate of such deposits to exceed, our established aggregate US dollar cash deposit limitations.

**Joint Deposits.** If an account is a joint account or a P.O.D. account (including a "Totten" trust account), our rights and liabilities for payment of any sums on deposit shall be governed by the laws of the state in which we maintain your account.

**Deposits by Minors, Agents or Trustees.** A deposit accepted from or on behalf of a minor, at our option, and subject to applicable law may be paid to or for the minor, and the payment shall be valid even though not executed by the minor's guardian, custodian, or legal representative. Where a deposit is accepted from an agent, trustee, or other representative, we do not have to inquire as to the authority of the representative, and the deposit may be paid to the account owner or to the representative without inquiring as to the disposition of the deposit.

**Uniform Transfer to Minors Act (UTMA) Deposits.** A gift of money to a minor named as beneficiary of a UTMA account is irrevocable, will be considered made in accordance with the provisions of applicable state statutes governing uniform transfers to minors, and shall include all interest earned on the account.

**Check Endorsement Standards.** If you deposit checks into your account, you are responsible for the condition of the back of the check when it is deposited. The back of the check is used during the check collection process to record the identification of banks processing the check. Most of the back of the check is reserved for bank use. You agree that the endorsement of the check must be contained in the payee endorsement area, which is limited to 1-1/2 inches from the trailing edge of the check on the back. The trailing edge of the check is defined as the left side of the check looking at it from the front. Any writing, stamp, or marking outside of the payee endorsement area may delay the proper return of any unpaid check you have deposited. You agree to indemnify us from any loss or liability, including attorney's fees, that may be caused by your failure to adhere to the endorsement standards of the Federal Reserve System.

**Foreign Currencies.** Deposits in foreign currencies will be converted to U.S. dollars at the exchange rate in effect at the time of final collection. You will be responsible for verification of any exchange rate information provided by us in advance of final collection. Exchange rates may fluctuate significantly in a short period of time. You bear all exchange risk related to deposits of foreign currency.

**ATM Depositories, Night Depositories, Direct Deposit, and Deposits by Mail.** Our ATMs, night depositories, direct deposit service, and deposit by mail service are for your convenience. We are not accountable for deposits made in this manner until the deposit is actually accepted and processed by our authorized employees. Deposits made in this manner will be posted to your account on the date accepted by our authorized employees. Our records are conclusive proof of what deposits we received from you through ATM depositories, night depositories, or the mail service. If any direct deposit is recalled, we are authorized to reverse the deposit without prior notice to you, except as otherwise required by law. Your claim that an item was deposited, which is now missing, will not create a presumption that there is a missing item or that we failed to act with ordinary care.

**Chargebacks.** This section applies to items that you deposit or cash. In the event a cashed or deposited item drawn on us (an "on us" item) is determined by us not to be payable for any reason or a cashed or deposited item drawn on any other payor is returned to us for any reason, without regard to whether the other payor returned the item to us before its deadline to do so, we may charge the item (a "chargeback item") to your account or to any account of which you are an owner (including any joint account) or an authorized signer. We may debit all or part of a chargeback item to your account even if doing so results in or causes an overdraft of your account and regardless of whether the item can be physically returned to you. You waive notice of dishonor in connection with any item that is not finally paid in full and that we charge back to your account. We may recover from you any amount withdrawn by you against a chargeback item. In the event that our debit of all or part of a chargeback item results in or causes an overdraft of your account, we may obtain and retain possession of the item, if it is available, until we recover from you the amount of any overdraft of

your account and for a reasonable time thereafter. If our debit of all or part of a chargeback item that is an "on us" item does not result in or cause an overdraft of your account, our deadline for return to you of the item, if it is available, shall be six business days after we make such determination. If we are notified that any item for which you received payment or credit to your account is not properly payable, you agree that, without notice to you, we may authorize the drawee bank to hold the item and try to obtain payment. We will not initially decide whether a cashed or deposited item has been improperly returned; if you believe that a cashed or deposited item has been improperly returned, you should contact us immediately. We will not be responsible for failing to pay any item presented against your account before a deposit becomes available for withdrawal, as set forth above, if the available balance in your account, without regard to such deposit, is insufficient to pay the item, as provided in Section 5.

**Service Charges; Error Correction.** We may debit a service charge from your account for each deposited item that: is returned to us unpaid (whether for the first or a subsequent time); bears an unauthorized signature; prior to deposit, has been altered, erased, defaced or mutilated; or is incorrectly described on the deposit slip. Errors in posting, addition, subtraction and calculation, whether by you or us, are subject to correction by us at any time; provided that we may not be obligated to correct certain errors if you fail to notify us of the exceptions in a timely manner as described in Section 4. You agree to repay us promptly any amount credited to your account in error, and you authorize us to charge your account or any other account of which you are an account owner, to obtain payment of any erroneous payment or credit.

**Allocation of Deposits/Split Deposits.** You may request that the total amount of a deposit be allocated in portions and credited to into multiple accounts, which may include a loan account. We may, in our sole discretion, decline any split deposit request and require that the deposit be made into one account. If a hold (as described in the Deposits sub-section above) is placed on all or any portion of the deposit, the hold may be placed on any one account to which funds were deposited for the total amount of the hold, notwithstanding the split deposit. In the event a deposited item becomes a chargeback item, we may debit all or part of the chargeback item to any one account to which funds were deposited, even if doing so results in or causes an overdraft of the account.

**Stale and Postdated Checks and Checks Bearing Notations; Miscellaneous.** We may, in our discretion and without notice to you, either pay or return any check that is presented to us for payment more than six (6) months after the date of that check (a "stale-dated" check), even if the presentation occurs after the expiration of a stop payment order. We normally do not examine the date on checks presented for payment. You agree that we are not required to identify stale-dated checks or to seek your permission to pay them. We also may, in our discretion and without notice to you, either pay or return any check we receive before the date on that check unless you have complied with any applicable statute regarding postdated checks and you have provided us with notice of the postdating in time for us to have a reasonable opportunity to act on it before the check is presented to us for payment. Your notice about any postdated check must be given in the same manner as a stop payment order and must provide the same information required for stop payment orders. Each postdated item covered by a notice of postdating will be subject to a service charge. We may disregard any information on an item drawn on your account other than the signature of the authorized signer, the amount of the item, the date of the item (subject to the provisions of this Agreement regarding stale and postdated checks), the account number, the endorsements, and any other information which appears in magnetic ink at the bottom of the check. Although we are not obligated to, we may pay or accept checks and other items bearing restrictions or notations (e.g., "void after 6 months," "two signatures required," "payee's endorsement required," "not good for more than $(amount)," "void if not paid in (number) days," "payment in full," and the like), whether on the front or back, in any form or format. If you cash or deposit an item or write a check with such a notation, you agree that it applies only between you and the payee or maker. The notation will have no effect on us, and you agree to accept responsibility for payment of the item. We shall have the right, but not the obligation, to process any item that is materially incomplete or has been altered.

## 7. WITHDRAWALS

You may withdraw part or all of your account's available balance. Any account owner or authorized signer of a joint account may withdraw all or part of the available balance in the account, regardless of who deposited the funds into the account. We accept no responsibility or obligation, except as required by law, to supervise or review the use of your account.

**Restrictions on Withdrawals.** Your account may be subject to certain transaction limitations, which are shown in the disclosure provided to you at the time you opened your account. We may at any time and without prior notice to you (except where prior notice is required by law) establish or change transaction limitations for any account. If these limitations are exceeded, you will be subject to any charges in effect at the time. In addition, we may stop paying interest on an interest-bearing account, or we may close the account without prior notice to you (except where prior notice is required by law). We also may require you to provide notice before you may withdraw money from certain types of accounts. Although your signature card, resolutions or your checks may indicate that more than one signature is required on checks and for the withdrawal or transfer of funds, that notation is principally for your own purpose. We expressly disclaim a duty to enforce multiple signature requirements. As such, we expressly disclaim a duty to confirm that two or more (or any combination) of authorized users have approved any transaction. We may act upon the instructions or order of any one authorized signer.

All checks written on your account must be drawn in U.S. dollars. We may (but are not obligated to) require suitable identification and/or presentation of account ownership records for any withdrawal or account closure. At our discretion, we may require all of your signatures for the withdrawal of funds and/or the closing of any account. We may require noncustomers to present us with suitable identification, including valid photo identification, in connection with the cashing of your checks at one of our offices.

Cash withdrawal or payments at any branch may be restricted due to the limited amount of currency on hand. If we do not have sufficient cash for a large withdrawal or payment, we may make arrangements for a later cash payment or offer to make payment with a Bank check. We assume no responsibility to provide personal protection for customers who elect to carry large sums of money off of our premises. Without prior written notice

to you, we may place a hold on your account to cover a claim against your account, or we may pay the source of the claim when we receive any notice, claim, or court order which we believe may affect your account (such as liens, garnishments, attachments, levies, injunctions, or other orders of a court or other governmental agency), regardless of the form or manner in which we receive the notice, claim, or court order and regardless of whether we are a named party to the notice, claim, or court order. We will not be responsible for refusing to let you withdraw funds from the account or refusing to pay items presented against your account while the hold is in effect or after we have paid funds to the source of the claim.

**Conflicting Demands/Disputes.** If there is any controversy, dispute or uncertainty regarding the ownership of an account or its funds, there are conflicting demands over its ownership or control, we are unable to determine any person's authority to give us instructions, or we believe a transaction may be fraudulent or may violate any law, we may refuse to pay any funds to anyone until we are satisfied that the controversy, dispute or uncertainty is resolved, or we may continue to honor the authority of account owners and authorized signers as reflected on our records. Specifically, we may, in our sole discretion: (1) freeze the account and refuse transactions until we receive written proof (in form and substance satisfactory to us) of each person's right and authority over the account and its funds; (2) refuse transactions and return checks, marked "Refer to Maker" (or similar language); (3) require the signatures of all authorized signers for the withdrawal of funds, the closing of an account, or any change in the account regardless of the number of authorized signers on the account; (4) pay or offer to pay the account balance to a court of appropriate jurisdiction, naming all of the claimants to the account as defendants in an interpleader action (you agree to reimburse us for all expenses we incur in an interpleader action, including attorney's fees and costs, and we may obtain reimbursement of those expenses from your account without notice to you); and/or (5) continue to honor checks and other instructions given to us by persons who appear as authorized signers according to our records. The existence of the rights set forth above shall not impose an obligation on us to assert such rights or to deny a transaction. We will not be responsible for any damages you may suffer as a result of our refusal to allow you or anyone else to withdraw funds due to the controversy, dispute or uncertainty or our allowing any existing owner or authorized signer to continue to conduct transactions on the account during the controversy, dispute or uncertainty.

**Legal Process.** We may comply with any writ of attachment, execution, garnishment, tax levy, restraining order, subpoena, warrant or other legal process which we believe (correctly or otherwise) to be valid. If we are not fully reimbursed for our record research, photocopying and handling costs by the party that served the process, we may charge such costs to your account, in addition to our minimum legal process fee. You agree to reimburse us for any cost or expense, including attorney fees, which we incur in responding to legal process related to your accounts. We may not pay interest on any funds we hold or set aside in response to legal process. You agree that we may honor legal process that is served personally, by mail, or by facsimile transmission at any of our offices (including locations other than where the funds, records or property sought is held), even if the law requires personal delivery at the office where your account or records are maintained. You acknowledge that accounts opened with trust or fiduciary designations (e.g., "XYZ, Inc. - Client Trust Account") may be subject to levies and other legal process against your property unless our records clearly reflect the existence of an express written trust or court order.

Photocopies. Checks and other items are sometimes lost during processing or while in transit. If a photocopy of a check or other item that appears to be drawn on your account is presented to us for payment in place of the original, we may pay the photocopy if it is accompanied by a representation from another financial institution that the original item has been lost or destroyed.

## 8. SUB-ACCOUNTS

We may establish two "sub-accounts" on our books for certain deposit accounts. If we elect to establish the sub-accounts, it will not affect the other terms and conditions of your account or this Agreement, the Federal Deposit Insurance protection afforded on your account, the interest (if any) paid on your account, the service charges imposed in connection with your account, or the Truth in Savings disclosure given to you. Both of the sub-accounts will remain your accounts, but will be used by us internally to manage your funds. The first sub-account will qualify as and be treated as a "savings deposit account" for the purposes of Federal Reserve Board regulations. You authorize us to transfer funds between the two sub-accounts consistent with Federal Reserve Board regulations. As such, we must advise you that the regulations require that we reserve the right to require at least seven days' written notice prior to the withdrawal or transfer of funds from the savings sub-account. We do not currently exercise that right with respect to these savings sub-accounts. In the event we determine to exercise that right, we will close the savings sub-account and transfer all funds back to your current account and cease the sub-account agreement. Your deposit and withdrawal capabilities are not affected by our election to establish the sub-account.

## 9. DORMANT AND ABANDONED/UNCLAIMED ACCOUNTS

Dormant accounts may be subject to a service charge based on the dormant status. Charges are not reimbursed for inactive or dormant accounts that are later reclassified as "active." If funds are remitted to the state, you may file a claim with the state to recover the funds. For security reasons, we may refuse a withdrawal or transfer from accounts we internally classify as dormant if we cannot reach you in a timely fashion to confirm the transaction's authorization. In the case of interest-bearing accounts that become dormant, we also may reduce the rate of interest or cease paying interest as disclosed on the applicable schedule of service charges and in accordance with applicable state law. Once an account is classified as being in dormant status, you should contact the bank to request that the account be reclassified as "active." Simply conducting a transaction on an account classified as dormant will not necessarily cause the account to be reclassified as "active". We may be required to transfer the balance in any account that remains dormant, or that is otherwise considered "abandoned" or "unclaimed" for the period of time described by the laws of the state where we maintain your account (or, if applicable, the laws of the state of your last residence as shown on our records) to that state as "abandoned" or "unclaimed" property.

## 10. SET OFF

You acknowledge that, except as otherwise prohibited by law, we have the right to charge or set off against your account any indebtedness or other obligations which you or any owner owe us, at any time, without any further notice to or demand on you, whether the indebtedness or other obligations exist at the time the account is opened or arise later. The indebtedness includes, without limitation, all charges and overdrafts incurred on any account you hold with us. You agree that we may set off against the account any claim which we have against you without regard to the source or ownership of the funds on deposit in the account and without requirement that the claim be owed to us by all of the account owners. You also agree that, to the extent allowed by law, we may set off any indebtedness or other obligations which you owe us under this Agreement against any other account or property in which you have an ownership interest that is in our possession or control.

## 11. WAIVERS

You waive and agree that we may waive certain legal requirements called presentment, demand for payment, protest, notice of protest, and notice of dishonor with respect to any and all items for which you received payment or credit from us. No departure by us from the provisions of this Agreement or any waiver of any fees and charges with respect to your Account shall constitute a waiver by us of any further right to impose any charges or enforce the provisions of this Agreement or a course of dealing different from the terms of this Agreement.

## 12. OTHER SERVICES

If you have chosen to receive any of our other Banking Services offered in connection with your account, such as Check Cards, ATM cards, overdraft lines of credit, and online banking, we may provide the specific terms and conditions of the additional service to you in a separate agreement or disclosure.

## 13. INTEREST; INTEREST REPORTING

Interest will be paid on interest-bearing accounts at the times and at the rates adopted from time to time by us. On each interest payment date, interest will be paid only if, on that date, the ledger balance for the account is equal to or more than the minimum amount required by us in order for you to receive interest on that account. At any time and without prior notice to you (except where prior notice is required by law), we may change these rates and minimum ledger balance amounts or discontinue the payment of interest. The originally effective interest rates and required minimum ledger balance amounts are shown on the interest schedule provided to you at the time you opened your account, and a schedule containing current interest rates and required minimum ledger balance amounts is available to you upon request. Interest paid to you is reportable to the Internal Revenue Service as having been received by the first account owner shown on the signature card maintained for the account. We may be required to withhold a portion of your interest payment and remit it to the Internal Revenue Service.

## 14. CHANGES TO ACCOUNT STATUS

**Converting Your Account.** We reserve the right to change your consumer account to a business account if we determine that it is used for business purposes (meaning that the account is not used primarily for personal, family, or household purposes). Your account may be considered a business account if, among other reasons, it fits into one or more of the following examples: your account has a business name; deposits include credit card drafts; your account has over 100 withdrawals per month; deposits regularly contain over $2,500 in cash; or your account has over 10 deposits per month.

If we discontinue your type of account, we may convert your account to another type of accounts. We may also convert your account to another type of account based on our evaluation of how you use the account. If we convert your account, we will provide you with information containing the terms and conditions of your new account.

**Changing Checking or Savings Product/Account Type.** If you should change from one checking or savings product/account type to another during the statement period, your account will be subject to the periodic charges and fees and requirements of the new product/account type for the entire period.

## 15. APPLICABLE LAW

Except as otherwise provided by law, this Agreement and all accounts are governed by the laws of the state where we maintain your account and applicable federal laws and regulations in effect from time to time and are subject to any applicable automated or other clearinghouse rules and regulations. A determination that any provision of this Agreement is unenforceable or invalid shall not affect the enforceability or validity of any other provision of this Agreement. For purposes of this Agreement, your account will be deemed to be maintained in the state where you opened your account. Your account is considered to have been opened: if you opened your account in person, at the branch office where you opened your account; if you opened your account by mail, at the location where the mail was received by us; or if you opened your account electronically (including by telephone) and your address is in a state where we have branch offices, in the state of your address at the time you opened your account; or if otherwise, in Alabama.

## 16. ADDITIONAL PROVISIONS

**Checks.** Check prices vary according to the types of checks you select. You can obtain information on the current price of checks by contacting us. Check charges may vary from time to time without specific notice to you. You are responsible for verifying the accuracy of all information shown on your checks and deposit tickets. If you find an error, please notify us immediately. We are not liable for losses resulting from incorrectly printed checks or deposit tickets. If you do not purchase your checks through us, we may charge a fee for each check that rejects during processing due to poor quality or other reasons. You agree not to issue checks with features or marks that obscure, alter or impair information on the front or back of a check or that otherwise prevents us or another bank from capturing such information during automated check processing. You agree to safeguard your blank and cancelled checks, and to take reasonable steps to prevent their unauthorized use. If your checks are lost or stolen, you agree to notify us

immediately. For security reasons, we reserve the right to close your account and transfer the balance to a new account. If we do, all checks written but not yet paid may be returned to payees with notations such as "Account Closed" or "Refer to Maker." You will be responsible for issuing any replacement checks.

**Closing Your Account.** We reserve the right to close your account at any time, for any reason or for no reason, without the necessity of prior written notice. If we close your account, we will notify you by mail or telephone that we have closed your account unless your account has had a zero balance for thirty (30) days or more. If you have agreed to receive notices electronically, we may notify you electronically. We may (but do not have to) mail you a check for the available balance in your account, or you may pick up a check for the available balance at our office. Written notice that the account has been closed and a check, if any, will be sent to any address shown on our records for you, or if the account is a joint account, to any account owner to whom we elect to send it. Once we have closed your account, you agree that we can:

- Refuse to honor any checks you have written or any other items which are presented to us for payment after we have closed your account.
- Refuse to collect any check you have deposited in your account, to collect any check you have deposited to your closed account, or to accept any automated deposit to your account.
- Assess any service charge otherwise applicable against any remaining balance in your account.

We are not responsible to you for any damages you may suffer as a result of your account being closed. If you attempt to make a deposit to an account we closed due to non-payment of an overdraft or otherwise, we may collect the deposit and set off your indebtedness to us and collect a service charge from the amount you deposited. Any funds in excess of $1.00 will be returned to you.

We reserve the right to refuse your request to close your account, if your account is not in good standing. If you intend to close your account, you should notify us. Simply reducing your account balance to $0.00 is insufficient notice and may result in additional fees charged to your account. If you close your account you are responsible for transactions you initiated or authorized, including those that we receive after the account is closed.

**Indemnification.** Except as otherwise set forth in this Agreement, you agree to indemnify, defend and hold us harmless from all claims, actions, proceedings, fines, costs and expenses (including, without limitation, attorney fees) related to or arising out of: (a) your actions and omissions in connection with your accounts or our services, and (b) our actions and omissions, provided that they are taken/omitted in accordance with this Agreement or your instructions. This provision shall survive the termination of this Agreement.

**Survival of this Agreement.** All provisions of this Agreement, including, but not limited to the dispute resolution provisions contained in Section 2, shall survive the termination of this Agreement or closure of your account(s) by either party for actions arising in connection with this Agreement or your account(s).

**Amendments/Changes to this Agreement.** We may amend or change (add to, delete or alter) the terms of this Agreement from time to time upon giving prior notice to you. Amendments of this Agreement may include modifying and deleting existing provisions and adding new provisions. We agree to provide you notice of any amendment (except an amendment benefiting you) at least thirty (30) days, or a longer period if required by law, before that amendment becomes effective by mailing you notice of the amendment to the last address shown on our records, electronically if you have agreed to receive such notices electronically, by making the notice available with the periodic statement of your account (as applicable), by posting notice of the amendment in our offices, or by posting notice of the amendment on the BBVA Compass website or Online Banking (if applicable). We may, but are not required to, give you notice if the amendment will be to your benefit. If there is more than one account owner, we will send the notice of amendment to only one of you. By continuing to maintain your account, conducting a transaction or obtaining services or products relating to this Agreement or your account after the amendment becomes effective, you agree to the amendment of this Agreement. We also may, in our sole discretion, substitute services or discontinue certain kinds of services, products and accounts, and place restrictions on certain types of accounts. If we discontinue the kind of account you have, we can transfer your account balance to another type of account. In that case, we will mail you a notice at least thirty (30) days before the transfer takes effect. By continuing to maintain your account, conduct a transaction, or obtain services or products from us after the transfer takes effect, you expressly agree to the change in the kind of account you have.

**Severability.** If any one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal, or unenforceable for any reason, such holding shall not invalidate or render unenforceable any other provisions of this Agreement. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders unenforceable any provision hereof, and to the extent that such waiver is not permitted by applicable law, the parties intend that such provision be interpreted as modified to the minimum extent necessary to render such provision enforceable.

## 17. ELECTRONIC BANKING SERVICES

We may provide you with an ATM card, check card or other device or security code to access your account electronically or you may be required to create one or more security codes to access your account electronically. Please review the agreement that governs the use of and that comes with the card, device or the security code carefully.

You agree to use the card, device or security code only in the manner and for the purposes described in the applicable agreement. If you attempt to use the card, device or security code in any other manner or for any other purpose, we may reject the transaction, or at our discretion, we may complete it without incurring any obligation to honor the same type of transaction in the future. We may terminate a card, device or security code at any time without notice to you.

In order to prevent unauthorized access to your account, you agree to maintain the confidentiality and security of the card, device or security code. You agree to notify us immediately if you believe your card, device or security code may have become subject to unauthorized use. We may

13

suspend or cancel your card, device or security code even without receiving such notice from you if we suspect your card, device or security code is being used in an unauthorized or fraudulent manner. You agree that the use of the security code constitutes a commercially reasonable security procedure for you.

You understand that anyone who obtains your security codes may access your accounts and may initiate transactions on your accounts. If you permit any other person to use your card or your security code or other means to access your accounts, you are responsible for all transactions initiated by such person.

**BBVA Compass Mobile Banking.** BBVA Compass Mobile Banking Service allows customers to obtain certain services via a cell phone or other handheld mobile device, as described below (the "Mobile Banking Service"). This section of the Agreement contains the terms of use ("Terms of Use") that specifically apply to the Mobile Banking Service. BBVA Compass may assign or delegate any or all of its rights and responsibilities under these Terms of Use to one or more independent contractors or other third party service providers, and any rights or responsibilities so assigned or delegated may be exercised or performed by either BBVA Compass or its service provider. By using the Mobile Banking Service, you agree to all of the terms and conditions of this Agreement, specifically including but not limited to these Terms of Use.

In order to access the Mobile Banking Service, you must have (i) a handheld device that can send and receive information using the technology that supports this Mobile Banking Service (an "Eligible Mobile Device") and (ii) all information required to enroll, which will be described in the BBVA Compass Mobile Banking Application ("Mobile Application") at the time of enrollment. Eligible Mobile Devices necessary to obtain the Mobile Banking Service are described on the Bank's Web site at www.bbvacompass.com/go/mobile. BBVA Compass may update Eligible Mobile Devices from time to time. The technical standards required to access and use the Mobile Banking Service (the "Mobile Technical Standards") vary among the types of Eligible Mobile Devices and telecommunications carriers that support this Service. The Mobile Technical Standards are described on the Bank's Web site, and may be updated from time to time to reflect changes in the technology that supports the Mobile Banking Service.

With the Mobile Banking Service, you may use your Eligible Mobile Device to access certain accounts that are made available to you through the Mobile Application (each, a "Mobile Account"), and you may use your Eligible Mobile Device to (i) view balances and recent transactions for each Mobile Account; (ii) make immediate, one-time transfers of funds between your Mobile Accounts; and (iii) access additional services that may be available through a Mobile Application. Additional terms and conditions ("Addendum" or "Addenda") may apply in order to access certain additional services that may be available through a Mobile Application. Your use of the Mobile Banking Service will be governed by this Agreement, all Addenda and all other terms and conditions in agreements governing accounts you may have with us or services we provide to you.

We do not currently charge you any fee to register for or access the Mobile Banking Service or to download any Mobile Application. However, you may incur charges to receive internet, cellular or other data service on your Eligible Mobile Device. You may also incur charges from your telecommunications carrier when sending and receiving information in connection with your use of the Mobile Banking Service.

You are responsible for maintaining the security of your Mobile Device and any security code(s) you have created for the purpose of accessing the Mobile Banking Service, and you are responsible for all transactions you initiate or authorize using the Mobile Banking Service. If you allow any person to obtain or to use your Mobile Device or security code(s), you will have authorized that person to access your Mobile Accounts, and you agree that you will be bound by any agreements that person accepts or acknowledges electronically through the Mobile Banking Service. Notify us at once if the phone number for your Mobile Device is changed or service to your Mobile Device is terminated, or if you believe that your Mobile Device has been lost or destroyed, or if you believe that your security code(s) has been compromised, or that your Mobile Device or any of your Mobile Accounts have been accessed or used without your authorization, or if any periodic statement shows a transaction on a Mobile Account that you did not make, including any unauthorized transaction made via the Mobile Banking Service. Contacting us immediately by telephone will help you avoid responsibility for unauthorized transactions and will help you and us reduce possible losses.
Call us at: 1-800-273-1057, or write to us at:

BBVA Compass
Online Banking Support
P.O. Box 10566
Birmingham, AL 35296

You are granted a non-exclusive, non-licensable, non-transferable, personal, limited license to install and use the Mobile Application only on an Eligible Mobile Device that you own or control, solely for your personal use and as expressly permitted herein. It is solely your responsibility to download and install any Mobile Application that is identified on the BBVA Compass Web site as required in order to access the Mobile Banking Service through your Eligible Mobile Device. BBVA Compass has no responsibility to notify you of any changes to or new releases for any required Mobile Application.

You acknowledge that from time to time, the Mobile Banking Service may be delayed, interrupted or unavailable for an indeterminate period of time. BBVA Compass and its affiliates shall not be liable for any claim arising from or related to the Mobile Banking Service arising from any such delay, interruption or unavailability.

In no event will BBVA Compass or its affiliates be liable for indirect, consequential or special damages, including lost profits, arising from or related to the Mobile Banking Service, even if such damages were reasonably foreseeable and notice was given regarding them. These limitations will apply to all causes of action, whether arising from breach of contract, tort (including negligence) or any other legal theory. BBVA Compass disclaims all warranties with respect to any Mobile Application, whether express, implied or statutory, including without limitation implied warranties of merchantability, satisfactory quality, fitness for a particular purpose, accuracy, timeliness, and non-infringement of third party rights. You release BBVA

14

Compass, its service providers, and its affiliates from all claims and damages that may arise from or relate to your use of any Mobile Application. You agree not to reverse engineer, decompile, disassemble or attempt to learn the source code of any Mobile Application, and you may not redistribute any Mobile Application. All rights not expressly granted to you herein are reserved by us.

By identifying an Eligible Mobile Device for use with the Mobile Banking Service, BBVA Compass does not recommend, endorse or make any representation or warranty of any kind regarding the performance or operation of such device. You are responsible for the selection of an Eligible Mobile Device and for all issues relating to the operation, performance, and costs associated with such device with your telecommunications carrier.

BBVA Compass and its service providers have no obligation to correct any bugs, defects or errors in the Mobile Banking Service or Mobile Applications, or to otherwise support, maintain, improve, modify, upgrade or enhance the Mobile Banking Service or Mobile Applications. Subject to applicable law or regulations, BBVA Compass may terminate your use of the Mobile Banking Service, expand, reduce or suspend the type and/or dollar amounts of transactions allowed using the service, change the enrollment process, and/or change the transaction limits associated with the Mobile Banking Service at any time in its sole discretion without prior notice.

You acknowledge and agree that BBVA Compass may collect, transmit, store, and use technical, location, and login or other personal data and related information, including but not limited to technical information about your device, system and application software, and peripherals, and information regarding your location, that is gathered periodically to facilitate the provision of updates to Mobile Applications and product support, for security reasons, for marketing purposes, and for other service to you (if any) related to, or in connection with, the Mobile Banking Service.

You agree that you will not use the Mobile Banking Service or any services related thereto while driving. You assume all risk associated with the use of the Mobile Banking Service, including the use of any Mobile Application. You agree that you will not use the Mobile Banking Service or any services related thereto for any purposes prohibited by United States law; and shall not use or otherwise export or re-export the Mobile Application(s), except as authorized by United States law and the laws of the jurisdiction in which the Mobile Application(s) was obtained. You hereby represent and warrant (i) you are not located in a country that is subject to a U.S. Government embargo, or has been designated by the U.S. Government as a "terrorist supporting" country; and (ii) you are not listed on any U.S. Government list of prohibited or restricted parties.

In any instance where you are not subject to this Agreement or the terms of this Agreement are deemed not to apply, then the laws of the state in which each Mobile Account was opened, without regard to its conflicts of laws rules, shall govern these Terms of Use.

By enrolling in the Mobile Banking Service, you consent to receiving and accepting the terms and conditions of these Terms of Use and any Addenda or amendments to it electronically, including, but not limited to, via email, text message or through the Mobile Application. In the event any amendment requires prior notice to you, we may notify you via email at the email address you have provided to us for use with the Mobile Banking Service. This email may include any new or different terms and conditions or provide you with a link to a Web site containing such new or different terms and conditions. For any information that you have agreed to receive electronically, we have no obligation to provide you or any other owner or authorized signer on the related account with a paper copy of the communication unless and until your consent for electronic communications is withdrawn as described below. We reserve the right, but assume no obligation, to provide a paper copy of any communication that you have agreed to receive electronically. We may, but are not required to, make available paper copies of any communications that were provided to you electronically. We reserve the right, subject to applicable law, to charge a fee to provide a paper copy of any communication previously delivered to you electronically. You may call us at 1-800-273-1057 to find out about the availability of a paper copy of any particular communication, and the amount of any fee you will be charged for that paper copy. You may withdraw your consent to having these Terms of Use and any Addenda or amendments to it provided to you electronically by contacting us by telephone at 1-800-273-1057. However, if you do so, we will automatically unenroll you from the Mobile Banking Service. It is solely your responsibility to assure that the email address you have provided to us in connection with your use of the Mobile Banking Service is current and accurate. You may make changes to this email address by signing in to BBVA Compass Online Banking and accessing the Service Center tab. Any change to your email address will be effective immediately.

BBVA Compass reserves the right to terminate your access to the Mobile Banking Service or any portion of it in its sole discretion, without notice and without limitation, except as may be required by law.

**ATM Safety and Security.** The following are some tips on exercising care when using an ATM:
- If there are any suspicious circumstances, do not use the ATM.
- If you notice anything suspicious while transacting business at the ATM, cancel the transaction, pocket your Card and Leave.
- Be careful when using the ATM and be aware of the surroundings, especially at night or in an isolated area.
- Park near the ATM in a well-lighted area.
- At night, have someone accompany you when possible.
- Do not approach a dark ATM.
- Do not accept assistance from anyone while using the ATM.
- Do not display your cash; pocket it and then count it later in the safety of your home or office.
- Be sure to save your transaction receipts and check them against your statements regularly.
- Prepare deposits at home to minimize your time at the ATM.
- Make sure you safeguard your PIN. Do not write your PIN on your Card or carry it in your wallet or purse.
- Always secure your Card just as you would cash, check and credit cards.
- Do not to disclose or otherwise make your Card or PIN available to others.
- Immediately report all crimes to local law enforcement and to the ATM operator.

## ELECTRONIC FUND TRANSFER DISCLOSURE STATEMENT

The following disclosures are made in accordance with the federal law regarding electronic payments, deposits, transfers of funds and other electronic transfers to and from your account(s). There may be limitations on account activity that restrict your ability to make electronic fund transfers. Any such limits are disclosed in the appropriate agreements governing your account. The separate agreement and disclosure statement governing your use of a BBVA Compass Check Card or BBVA Compass ATM card initially will be provided to you either at the time you open an account or by mail after you open an account, and it will control if there is any conflict between that particular agreement and disclosure statement and this Disclosure Statement. Any authorized signer on your account may act alone in conducting electronic fund transactions, regardless of the number of required signers indicated on the account's signature card. If you use an ATM that is not operated by us, you may be charged a fee by us, the operator and/or the automated transfer network.

1.  **Definitions:** Electronic Fund Transfer: Any transfer of funds, other than a transaction originated by check, draft or similar paper instrument, that is initiated through an electronic terminal, telephone, computer or magnetic tape to instruct us to debit or credit an account. Electronic Fund Transfers include such electronic transactions as direct deposits or withdrawals of funds, automated teller machine transfers, transfers initiated by telephone, and Check Card transactions. Preauthorized Electronic Fund Transfer: An Electronic Fund Transfer that you have authorized in advance to recur at substantially regular intervals; for example, direct deposits into or withdrawal of funds out of your account.

2.  **Your Liability:** Authorized Transfers: You are liable for all Electronic Fund Transfers that you authorize, whether directly or indirectly. Unauthorized Transfers: Tell us at once if you believe your account or PIN is lost or stolen or has been or may be subject to unauthorized Electronic Fund Transfers. Telephone us immediately at the number provided in Section 3 below to keep your possible losses to a minimum. You could lose all the money in your account(s) (plus the amount of funds available in an overdraft line of credit). If you tell us within two (2) business days after learning of the loss or theft of your Check Card, ATM card, or other account access device, or after learning of any other unauthorized transfers from your account involving your Check Card, ATM card, or other account access device, you can lose no more than $50 if Electronic Fund Transfers are made without your permission. For these transactions, if you DO NOT tell us within two (2) business days after learning of the loss, theft or unauthorized use, and we can establish that we could have prevented the unauthorized transfer(s) if you had told us in time, you could lose as much as $500. If you are a California resident, you will not be liable for the $500 amount described in the prior sentence for unauthorized Check Card or ATM transactions; however, if you fail to report an unauthorized use that appears on a periodic statement within 60 days of our transmittal of your periodic statement, then you may be liable for the amount of each unauthorized transfer that occurs after the close of the 60 days and before you provide notice to us, unless the delay in notifying us was due to extenuating circumstances beyond your reasonable control.

    Your liability limits for Electronic Fund Transfers involving unauthorized Visa® Check Card purchases are different from your liability limits noted here. Please refer to your agreement and disclosure statement for your Compass Check Card for these limits.

    Also, if your periodic account statement shows unauthorized transfers and you DO NOT tell us within sixty (60) days after the statement was mailed to you, you may not get back any money you lose after the sixty (60) day period if we can prove that we could have prevented the unauthorized transfer(s) if you had told us in time. If an extenuating circumstance (such as extended travel or hospitalization) prevents you from promptly notifying us of a suspected lost or stolen card or other access device or of any other suspected unauthorized transfer(s), the time periods specified in this Section 2 may be extended for a reasonable period.

3.  **Our Telephone Number and Address:** If you believe your account(s) has been or will be subject to unauthorized Electronic Fund Transfers, CALL: 1-800-266-7277 and make the appropriate selection from the voice menu, OR WRITE: Compass Bank, Customer Service Department, P.O. Box 10566, Birmingham, Alabama 35296.

4.  **Compass Bank Business Days:** Monday through Friday, excluding holidays.
    **Account Access:** The types of Electronic Fund Transfers that you may make depend upon specific account type(s) and the services which you obtain, as well as the specific types of Electronic Fund Transfers you have authorized.

5.  **Charges:** Except as may be provided by a specific agreement with us, there is no additional charge for making Pre-authorized Electronic Fund Transfers. However, each Pre-authorized Electronic Fund Transfer will be subject to the regular account service charges, if any, in accordance with the terms of the related account(s) in effect from time to time.

6.  **Your Documentation of Transfers:**
    a. Receipts: Each time you make a transaction at our automated teller machine, you will have the option to obtain a receipt.
    b. Pre-authorized Transfers: If you have arranged to have direct deposits made to your account, you may call us to determine if the deposit has been made. If you have arranged for regular payments of varying amounts to be made from your account, the person you agree to pay should tell you ten (10) days before each payment the amount of the payment and when it will be made.
    c. Periodic Statements: You will receive a statement of your account each month you make an Electronic Fund Transfer. Otherwise, you will receive a statement at least quarterly. Your periodic statement will show the details of any Electronic Fund Transfer you made and the details of any Pre-authorized Transfers to or from your account that you instructed us to make.

7.  **Your Right to Stop Payment:** If you have authorized us to make regular Pre-authorized Electronic Fund Transfer payments out of your account, you may stop any payment by CALLING US at: 1-800-266-7277 and making the appropriate selection from the voice menu, or by WRITING US

at: Compass Bank, Customer Service Department, P.O. Box 10566, Birmingham, Alabama 35296. You must notify us in time for us to receive your request at least three (3) business days before the payment is scheduled to be made. You must provide us with sufficient information to identify the payment, as well as other information we may request. If you deliver your stop payment request by telephone, you must confirm your stop payment order to us in writing within twenty-one (21) days of your oral stop payment order. An oral stop payment request will not be binding on us after twenty-one (21) days if you fail to provide the required written confirmation. We also require that you provide us within twenty-one (21) days of our receipt of your oral or written stop payment order a copy of your written notice to the payee revoking the payee's authority to electronically obtain payments from your account. If we do not receive a copy of that notice from you within twenty-one (21) days of our receipt of your oral or written stop payment request, your stop payment request will no longer be binding on us. In order to fulfill your stop payment request on any Pre-authorized Electronic Fund Transfer, we may, in our discretion, but are not required to, stop all payments to the particular payee, or we may, in our discretion, notify you that your stop payment request cannot be fulfilled other than by closing your account. If you properly request us to stop payment and we fail to do so, we will reimburse you for losses or damages you suffer, if any, caused by our failure to stop payment as requested. Please see your agreement and disclosure statement for your Compass Check Card or Compass ATM card for different requirements that may apply to stop payment of any Pre-authorized Electronic Fund Transfer involving use of those cards or the account numbers on those cards.

8.  **Our Failure to Make Transfers:** If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will reimburse you for any losses or damages that you suffer as a result of our failure to act according to our agreement with you. However, there are some exceptions where we will not be liable, such as, but not limited to, the following: if, through no fault of ours, other than exercise of our right of set off, you do not have money in your account to cover the transfer; if the transfer would exceed the available credit of any overdraft line of credit you may have; if the money in your account is being held subject to legal process or other encumbrance restricting transfers to or from your account; if we have received notice of a dispute as to the rights of parties to the accounts or their creditors or representatives and we have placed a hold on the account until resolution of the dispute; or if circumstances beyond our control prevent the transfer despite our reasonable precautions.

9.  **Disclosure of Information to Third Parties:** We may disclose information to third parties about your account and the transfers you make as described in our Consumer Privacy Disclosure as amended or modified from time to time.

10. **In Case of Errors or Questions About Your Electronic Transfers:** Telephone or write us, as soon as you can, at the telephone number or address in Section 3 above, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than sixty (60) days after we sent you the FIRST statement on which the error or problem appeared. Your inquiry must include: Your name and account number; AND a description of the error or the transfer you are unsure about, and as clearly as you can, an explanation of why you believe there is an error or why you need more information; AND the dollar amount of the suspected error. If you tell us orally, we may require that you send us your inquiry in writing within ten (10) business days. We will investigate your inquiry and will correct any error promptly. We will tell you the results of our investigation within ten (10) business days [twenty (20) business days for claims on accounts open less than thirty (30) calendar days] after we hear from you; however, we may take up to forty-five (45) calendar days [ninety (90) calendar days for claims on accounts open less than thirty (30) calendar days, foreign-initiated transaction claims, and point-of sale transaction claims] to investigate your questions. If we need additional time to investigate, we will provisionally re-credit your account within ten (10) business days [twenty (20) business days for claims on accounts open less than thirty (30) calendar days] for the amount you think is in error so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your inquiry in writing, and do not receive your written inquiry within ten (10) business days, we may choose not to provisionally re-credit your account. If we find that there was no error, we will send you a written explanation within three (3) business days after we finish our investigation. You may ask for copies of the documents we used.

## FUNDS AVAILABILITY DISCLOSURE

Our policy is to make funds from your deposits available to you for the payment of checks presented through normal check collection channels on the first business day after the day we receive your deposit. Electronic direct deposits will be available on the day we receive your deposit. Once they are available, you can withdraw the funds in cash and we will use the funds to pay checks you have written. Certain exceptions to our funds availability policy are described below.

**Business Day.** For determining the availability of your deposits, every day is a business day except Saturdays, Sundays, and federal holidays.

**Cut-Off Time.** Generally, if you make a deposit with one of our tellers before 2:00 p.m., or at one of our automated teller machines before 1:00 p.m., or at one of our night depository facilities before 7:00 a.m. on a business day we are open, we will consider that day to be the day of deposit. Otherwise, we will consider that the deposit was made on the next business day we are open. However, in many locations, we offer later cut-off times. Please check for specific times that are posted in each banking center and displayed on ATM message screens. If no time is posted in the banking center, the cut-off time for the banking center is the time the banking center closes.

**Delayed Funds Availability for Outgoing Wire Transfers and the Purchase of Cashier's or Other Official Checks and Money Orders.** Funds from deposited checks processed through the Federal Reserve System will be available for outgoing wire transfers and the purchase of cashier's or other official checks and money orders no later than the second business day after the day of your deposit.

**Longer Delays May Apply.** In some cases, we will not make all of the funds that you deposit by check available to you on the first business day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the second business day after the day

of your deposit. However, the first $200 of your deposits will be made available on the first business day after the day of your deposit. If we are not going to make all of the funds from your deposit available to you on the first business day after the day of deposit, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If we decide to delay availability after you have left the bank premises, we will mail you a notice no later than the first business day after the day you make the deposit, or we decide to place the hold.

**Funds for the following deposits are available on the first business day after the day of deposit if you make the deposit in person to one of our tellers and ask them to place a stamp on your deposit slip indicating that special checks are included in the deposit:**

1. State or local government checks that are payable directly to you, deposited in person into an account held by you, in a bank located in the state that issued the checks.

2. Cashier's, certified and other checks drawn directly by a financial institution that are payable directly to you and deposited in person into an account held by you.

   In addition, funds you deposit by check (including those mentioned above) may be delayed for a longer period of time under the following circumstances:

   - We believe a check you deposited will not be paid.
   - You deposited one or more checks totaling more than $5,000 on any one day.
   - You redeposit a check that has been previously returned unpaid.
   - You have overdrawn your account repeatedly in the last six months.
   - There is an emergency, such as a failure of communications or computer equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh business day after the day of your deposit.

### Special Rules for New Accounts

If you are a new customer, the following special rules will apply during the first 30 days your account is open. Funds from electronic direct deposits to your account will be available on the day we receive the deposit. Funds from deposits of cash, wire transfers, and the first $5,000 of a day's total deposits of cashier's, certified, teller's, traveler's and federal, state and local government checks will be available on the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you and you ask one of our tellers to place a stamp on your deposit slip indicating that special checks are included in the deposit. The excess over $5,000 will be available no later than the ninth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,000 will not be available until the second business day after the day of your deposit.

Funds from all other check deposits will generally be available no later than the ninth business day after the day of your deposit. If you need funds from a deposit at a specific time, you should ask us when the funds will be available.

### TAXPAYER IDENTIFICATION NUMBERS
### (Backup Withholding)

The Internal Revenue Service (IRS) is responsible for ensuring that all persons pay the correct amount of federal income tax. In order to accomplish this task, they must match the income reported by businesses for individuals (salary, interest, dividends, etc.) to the income shown on individual tax returns. Taxpayer Identification Numbers (for individuals, their Social Security Numbers) are used as the basis for matching these records. A federal law requires all payers of interest (such as a bank) to report interest paid to individuals by Taxpayer Identification Number. Therefore, you must provide your correct Taxpayer Identification Number to us so that we may meet these reporting requirements. This law also stipulates that should a bank or other payer of interest not have your correct Taxpayer Identification Number on file, then 28% of interest, dividends and other payments made to you must be withheld and forwarded to the IRS to insure that taxes on this income are paid. This advance payment is known and referred to by the IRS as "backup withholding." Backup withholding is not an additional tax. Rather, the amount of taxes you normally would owe will be reduced by the amount of tax withheld. If an overpayment of taxes results from backup withholding, a refund may be obtained from the IRS.

Unless the IRS has instructed us to withhold from your interest and dividend payments, you can avoid this 28% backup withholding by providing us with your correct Taxpayer Identification Number. Additionally, you must certify that the Taxpayer Identification Number you provide us is correct and that you have not been advised by the IRS that you are subject to backup withholding. The IRS is empowered to impose penalties on you and us if your correct Taxpayer Identification Number is not provided. (Please see "Penalties" later in this section.)

### HOW BACKUP WITHHOLDING WORKS

Unless you are an exempt recipient (see Exempt Recipient section) you are subject to backup withholding if: You fail to furnish us your Taxpayer Identification Number, OR the IRS notifies us that you furnished an incorrect Taxpayer Identification Number, OR the IRS notifies us that you are subject to backup withholding (under Section 3406(a)(1)(C) of the Internal Revenue Code), OR for an interest or dividend account opened after December 31, 1983, you fail to certify to us that you are NOT subject to backup withholding, or fail to certify your Taxpayer Identification Number is correct.

**How to Avoid Backup Withholding:** When you open an account with us, we will provide you with the necessary forms to complete in order to provide and certify your Taxpayer Identification Number. TO AVOID BACKUP WITHHOLDING, all you have to do is provide us with your correct Taxpayer Identification Number and sign the certification statement to certify that the number you are providing is correct and that you are not

subject to backup withholding.

**Taxpayer Identification Number:** If you are an individual, your Taxpayer Identification Number is your Social Security Number. If you are not an individual, the number is your Employer Identification Number. In all instances, the number you give us should be the number of the owner of the account.

**Guidelines for Determining the Proper Identification Number to Give to Compass:** Social Security Numbers have nine digits separated by two hyphens: i.e., 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. Employer Identification Numbers have nine digits separated by only one hyphen: i.e., 00-0000000. The table below will help you determine the number to give to us.

| | FOR THIS TYPE OF ACCOUNT: | GIVE THE SOCIAL SECURITY NUMBER OF: |
|---|---|---|
| 1 | An individual account | The individual |
| 2 | Two or more individuals (joint / multiple party account) | The actual owner of the account. This person's name should be listed first on the account. |
| 3 | Husband and wife (joint / multiple party account) | The first person listed on the account. |
| 4 | Custodian account of a minor (Uniform Transfer to Minors Act) | The minor |
| 5 | Adult and minor (joint / multiple party account) | The adult or, if the minor is the only contributor, the minor |
| 6 | Account in the name of guardian or committee for a designated ward, minor or incompetent person | The ward, minor, or incompetent person |
| 7a | The usual revocable savings trust account (grantor is also trustee) | The grantor-trustee |
| 7b | So-called trust account is not a legal or valid trust under State law | The actual owner |
| 8 | A valid trust or estate | Legal Entity  (Do not furnish the identifying number of the personal representative or trustee unless the legal entity itself is not designated in the account title.) |

19

1 NOTE: Section 3406(a)(1)(C) of the Internal Revenue Code basically requires backup withholding if you have underreported to the IRS interest or dividend payments you received, or if you failed to file a Tax Return which would have included reportable interest or dividend payments. The IRS will notify you before they instruct us to withhold for either of these reasons.

**Obtaining a Number:** If you don't have a Taxpayer Identification Number or you don't know your number, obtain Form SS-5, Application for a Social Security Number Card, or Form SS-4, Application for Employer Identification Number, at the local office of the Social Security Administration or the Internal Revenue Service and apply for a number. When you get a number, submit a new form to us.

**Exempt Recipients:** Payees specifically exempted from backup withholding on ALL payments include the following:

- A corporation.
- A financial institution.
- An organization exempt from tax under Section 501(a), or an individual retirement plan.
- The United States or any agency or instrumentality thereof.
- A State, the District of Columbia, a possession of the United States, or any subdivision or instrumentality thereof.
- A foreign government, a political subdivision of a foreign government, or any agency or instrumentality thereof.
- An international organization or any agency or instrumentality thereof.
- A dealer in securities or commodities registered in the U.S. or a possession of the U.S.
- A real estate investment trust.
- A common trust fund operated by a bank under Section 584(a).
- An exempt charitable remainder trust, or a nonexempt trust described in Section 4947(a)(1).
- An entity registered at all times under the Investment Company Act of 1940.
- A foreign central bank of issue.
- Payments of dividends and patronage dividends not generally subject to backup withholding include the following:
  - » Payments to nonresident aliens subject to withholding under Section 1441.
  - » Payments to partnerships not engaged in a trade or business in the U.S. and which have at least one nonresident partner.
  - » Payments of patronage dividends where the amount received is not paid in money.
  - » Payments made by certain foreign organizations.
  - » Payments of interest not generally subject to backup withholding include the following:
  - » Payments of interest on obligations issued by individuals. Note: You may be subject to backup withholding if this interest is $600 or more and is paid in the course of the payer's trade or business and you have not provided your correct Taxpayer Identification Number to the payer.
  - » Payments of tax-exempt interest (including exempt-interest dividends under Section 852).
  - » Payments described in Section 6059(b)(05) to nonresident aliens.
  - » Payments on tax-free covenant bonds under Section 1451.
  - » Payments made by certain foreign organizations.
  - » If you are uncertain whether you qualify as an exempt recipient, call your accountant or the Internal Revenue Service.

To avoid possible withholding, exempt recipients should complete the form(s) provided by Compass and should check the box captioned Exempt Recipients. The form should also contain your Taxpayer Identification Number, and the certification statement must be signed. The form must then be returned to Compass.

## PENALTIES

1. **Penalty for Failure to Furnish Taxpayer Identification** Number. If you fail to furnish your taxpayer identification number to a payer, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

2. **Failure to Report Certain Dividend and Interest Payments.** If you fail to include any portion of an includible payment for interest, dividends, or patronage dividends in gross income, such failure will be treated as being due to negligence and will be subject to a penalty of 5% on any portion of an underpayment attributable to that failure unless there is clear and convincing evidence to the contrary.

3. **Civil Penalty for False Information With Respect to Withholding.** If you make a false statement with no reasonable basis that results in no imposition of backup withholding, you are subject to a penalty of $500.

4. **Criminal Penalty for Falsifying Information.** Falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

20

**IMPORTANT INFORMATION ABOUT YOUR CHECKING ACCOUNT (Check 21)**
Substitute Checks and Your Rights

### What is a substitute check?

To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check. Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account. However, you have rights under other law with respect to those transactions.

### What are my rights regarding substitute checks?

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, NSF fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest-bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive a refund of up to $2,500 or the amount of the substitute check, whichever is less, (plus interest if your account earns interest) within 10 business days after we received your claim and the remainder of your refund (plus interest if your account earns interest) not later than 45 calendar days after we received your claim.

We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your account.

### How do I make a claim for a refund?

If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact us at: Compass Bank, Attention: Electronic Banking P.O. Box 10566, Birmingham, AL 35296 or telephone number 1-800-COMPASS.

You must contact us within 40 calendar days of the date that we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

Your claim must include –
- A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);
- An estimate of the amount of your loss;
- An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and
- A copy of the substitute check or the following information to help us identify the substitute check: the check number, the name of the person to whom you wrote the check and the amount of the check

Revision Feb 2012 • Al Nova Branches Only
BBVA Compass is a trade name of Compass Bank,
a member of the BBVA Group. Compass Bank, Member FDIC.

99-36-2067